# EXHIBIT 3

**ARBITRATION TRIBUNALS OF THE**
**FINANCIAL INDUSTRY REGULATORY AUTHORITY**

*In the Matter of the Arbitration Between:*

**RANDALL A. TOMMERUP, INDIVIDUALLY AND
AS SOLE MEMBER OF R. TOMMERUP-
EXECUTIVE PARK, LLC AND R. TOMMERUP-
ARROWHEAD, LLC AND HELEN E. TOMMERUP,
INDIVIDUALLY AND AS SOLE MEMBER OF H.
TOMMERUP-EXECUTIVE PARK, LLC AND H.
TOMMERUP-ARROWHEAD, LLC,**

        **CLAIMANTS,**

  **vs.**                                 **Case No.**

**WAVELAND CAPITAL PARTNERS LLC AND
MELVIN T. DAY, II,**

        **RESPONDENTS.**

_____/

**STATEMENT OF CLAIM**

      CLAIMANTS RANDALL A. TOMMERUP, INDIVIDUALLY AND AS SOLE

MEMBER OF R. TOMMERUP-EXECUTIVE PARK, LLC AND R. TOMMERUP-

ARROWHEAD, LLC  (hereinafter referred to as "R. TOMMERUP") AND HELEN E.

TOMMERUP, INDIVIDUALLY AND AS SOLE MEMBER OF H. TOMMERUP-

EXECUTIVE PARK, LLC AND H. TOMMERUP-ARROWHEAD, LLC (hereinafter

collectively referred to as the "TOMMERUPS" or "CLAIMANTS") sue WAVELAND

CAPITAL PARTNERS LLC (hereinafter referred to as "H. TOMMERUP") (hereinafter

referred to as "WAVELAND") and MELVIN T. DAY, II (hereinafter referred to as "DAY")

(hereinafter collectively referred to as "RESPONDENTS") and allege the following:

## JURISDICTIONAL ALLEGATION

1.      The jurisdiction of this Tribunal is invoked under the Federal Arbitration Act and pursuant to the arbitration clauses contained in (a) the licensing agreement that RESPONDENT has with the Financial Industry Regulatory Authority ("FINRA"), by which they individually and collectively agreed to submit all disputes and/or complaints (i) with customers and/or (ii) arising out of or in connection with its business and/or (iii) arising out of the employment or termination of employment of its associated persons to arbitration, (b) FINRA *Code Of Arbitration Procedure*, and (c) the Form U-4 of DAY.  See, e.g., Spear, Leeds & Kellogg v. Central Life Assur. Co., 85 F.3d 21 (2d Cir. 1996); Oppenheimer & Co., Inc. v. Neidhardt, 56 F.3d 352 (2d Cir. 1995); John Hancock Life Ins. Co. v. Wilson, 254 F.3d 48, 59 (2d Cir. 2001); Vestax Sec. Corp. v. McWood, 280 F.3d 1078, 1080 (6th Cir. 2002).

## GENERAL ALLEGATIONS

2.      At all times relevant hereto, CLAIMANTS resided in Dillon, Montana. R. TOMMERUP is sixty-two (62) years old and works making and selling fence posts and rails. He earns an hourly wage plus a 10% commission on the materials.  H. TOMMERUP is sixty-one (61) years old and is currently employed as a bank teller.  The TOMMERUPS have been married for forty-one (41) years.

3.      RESPONDENTS knew or should have known that the monies CLAIMANTS invested with RESPONDENTS constituted a significant portion of their life savings. RESPONDENTS knew or should have known that CLAIMANTS wanted and needed conservative, low risk investments that provided dependable income.   CLAIMANTS

repeatedly emphasized to RESPONDENTS that they wanted and needed safe investments that would provide income. CLAIMANTS felt satisfied that RESPONDENTS understood that CLAIMANTS were cautious, conservative and inexperienced investors who were looking for safe investments that would provide dependable income.

4.     CLAIMANTS discussed a 1031 exchange with DAY. DAY knew or should have known that CLAIMANTS were not willing to invest in a high-risk investment in order to defer taxes. DAY recommended that CLAIMANTS invest a significant portion of their life savings in high-risk, high commission, illiquid and long-term investments. RESPONDENTS failed to conduct a reasonable due diligence on these investment programs, these investments were misrepresented to CLAIMANTS as conservative, low risk investments, the risks of these investments were not disclosed to CLAIMANTS, and these recommendations were unsuitable for CLAIMANTS given their financial situation, needs and investment objectives.

5.     FINRA recently announced that it has a number of ongoing investigations involving allegations of wrongdoing arising from the sale of Reg. D private placements, and that FINRA expects to bring cases against brokerage firms involved in selling private placement offerings next year. FINRA also observed that given the risks of these products, the lack of information concerning their operations, and their lack of liquidity, **"there's going to be a fairly limited universe of investors for whom these [private placement offerings] are suitable."** (See attached Exhibit "A," p. 2.) CLAIMANTS, individuals in their sixties who wanted and needed safe investments that provided income, did not fall within this limited universe of suitable investors.

## I.   RESPONDENT WAVELAND'S SYSTEM OF SUPERVISION OVER ITS OFFSITE BROKERS SUCH AS DAY WAS INADEQUATE

6.     DAY may have been an independent contractor with RESPONDENT WAVELAND.  However, FINRA and the States of Montana and Utah have made clear on numerous occasions that broker/dealers may not avoid their supervisory obligations by entering into independent contractor relationships with their agents.  In Notice to Members 86-65 (9/12/86), FINRA specifically noted that:

> Irrespective of an individual's location or compensation arrangements, **all associated persons are considered to be employees of the firm with which they are registered for purposes of compliance with FINRA rules governing the conduct of registered persons and the supervisory responsibilities of the member.**  The fact that an associated person conducts business at a separate location or is compensated as an independent contractor does not alter the obligations of the individual and the firm to comply fully with all applicable regulatory requirements.

(See Exhibit "B," pp. 1-2.)

### A.   RESPONDENT WAVELAND Negligently Failed to Research DAY'S Background and Negligently Hired DAY and Failed to Place DAY Under Special Supervision Given his Disciplinary History.

7.     FINRA Rule 3010(e), part of the FINRA supervisory rule previously numbered Article III, Section 27, provides that "[e]ach member shall have the responsibility and duty to ascertain by investigation the good character, business repute, qualifications and experience of any person prior to making such a certification in the application of such person for registration with this association."  In FINRA Notice to Members 88-67, dated September 1988, FINRA reminded RESPONDENT WAVELAND and all other brokerage firms that "member firms have an obligation to thoroughly research a potential employee's background

before hiring such person," and that "FINRA has brought disciplinary actions against member firms who have failed to properly research a potential employee's background prior to hiring such person."  (See attached Exhibit "C.")

8.    RESPONDENT WAVELAND knew that DAY had a significant disciplinary history.  Specifically, RESPONDENT WAVELAND knew that:

A.    Dain Bosworth Incorporated fired DAY in 1983, deeming him a "compliance risk" for customer Reg. T violations and for selling penny stocks.  (See attached Exhibit "D," p. 12.)

B.    In 1999, the Utah Division of Securities issued a Cease and Desist Order against DAY, finding that DAY had shared commissions with an unlicensed agent.  DAY was censured, fined, ordered to retake the Series 63 examination, and **suspended** for five (5) days. (Docket/Case No. SD-99-0004.)  (See Exhibit "D," pp. 14-16.)

C.    DAY started a viatical settlement business, Beneficial Interest Group, Inc.  His company filed for Chapter 7 bankruptcy in May 2000 after he was sued by an investor.  (See Exhibit "D," pp. 13-14.)

9.    Given DAY'S disciplinary history, RESPONDENT WAVELAND should have subjected DAY to special supervision.  RESPONDENT WAVELAND negligently hired DAY and allowed him to work off-site with no on-site supervision.

**B.    RESPONDENT WAVELAND Failed to Conduct Unannounced Inspections of DAY'S Office and Review his Customer Files, Correspondence Files, Advertising and Sales Literature Files and Business Records (Including Physical and Computer Files).**

10.    DAY worked in a WAVELAND office located at 1209 West 1800 North, Lehi, Utah.  (See attached Exhibit "D," p. 7.)  DAY was supervised by RESPONDENT WAVELAND'S compliance department in Irvine, California, over 663 miles away.  In 2005,

WAVELAND employed dozens or hundreds of representatives who, like DAY, worked from their homes or other off-site locations scattered around the country.

11.      FINRA Rule 3010(a)(5) requires firms to assign each registered representative to a supervisor who is responsible for day-to-day supervision of that person's activities. RESPONDENT WAVELAND'S supervisory system was deficient because RESPONDENT WAVELAND did not assign DAY to a direct supervisor.  DAY in effect supervised himself.

12.      In 1986, FINRA specifically warned RESPONDENT WAVELAND and other firms that "firms employing off-site representatives are responsible for establishing **and carrying out** procedures that will subject these individuals to effective supervision designed to monitor their securities-related activities **and to detect and prevent regulatory and compliance problems.**" The FINRA made a number of specific recommendations that would assist firms such as WAVELAND in preventing improper sales practices by their registered representatives, such as annual, unannounced inspections of the offices of their registered representatives and the review of incoming and outgoing correspondence and sales literature. FINRA specifically cautioned that "to fulfill these obligations, a firm should consider whether the number and location of its registered principals provides the capability to supervise its off-site representatives effectively." (See Exhibit "B.")

13.      The SEC has also made clear on numerous occasions that surprise inspections of off-site locations are required, that these unannounced examinations must be conducted at least twice yearly, and that customer files must be examined during these inspections. See In the Matter of Royal Alliance Assoc., Inc., Exchange Act Release No. 38174, 63 SEC Docket

1643 (January 15, 1997) (broker-dealer's practice of conducting a pre-announced compliance examination of its off-site registered representatives only once a year was <u>inadequate</u> to satisfy its supervisory obligations); <u>In the Matter of Consolidated Investment Services</u>, Exchange Act Release No. 36687, 61 SEC Docket 20 (January 5, 1996) (broker-dealer's supervision of a small office run by a single registered representative <u>inadequate</u> without surprise inspections, and annual compliance questionnaires <u>inadequate</u> substitute for on-site inspections); <u>In the Matter of NYLife Securities</u>, Exchange Act Release No. 40459, Admin. Proc. File No. 3-9712 (September 23, 1998) ("the Commission has determined that firms with a high number of one or two person offices have not discharged their supervisory obligations where there were no surprise inspections.") (broker-dealer's reliance on supervisory interviews of registered representatives and annual inspections of branch office by regional compliance personnel without examining any customer files was inadequate to prevent and detect registered representative's violations).

14.     The SEC has stated that these off-site location inspections should include at least:

> (1)     A review of a sampling of customer files, including account opening documents and trading records;

> (2)     A review of the signature guarantee log;

> (3)     A review of correspondence, advertisements, and sales literature made available at the remote office;

> (4)     A review of business records, including physical and computer files;

(5)    In-person questioning of the representative by the supervisor about business activities, including inquiry about any unusual activity; and

(6)    In-person interview by the supervisor of the representative's assistant or support staff, if any, about the remote office's business and any unusual activity.  (See Quest Capital Strategies, Inc., Release Number 34-44935 (October 15, 2001).

(See attached Exhibit "E," p. 3)

15.    RESPONDENT WAVELAND ignored these specific warnings by FINRA and directives by the SEC and failed to comply with their supervisory obligations over DAY. RESPONDENT WAVELAND failed to conduct annual, unannounced inspections of DAY'S office as advised by FINRA and required by the SEC.  Further, RESPONDENT WAVELAND failed to establish any procedures for the review of incoming and outgoing correspondence, Internet (e.g. e-mail) communications, and sales literature used by DAY, and simply relied upon him to forward these materials to the firm.  RESPONDENT WAVELAND never monitored any of DAY'S sales presentations, never reviewed on-site customer account documentation and other books and records, and never met with DAY to discuss the products he was selling and his sale methods.  To the contrary, RESPONDENT WAVELAND simply relied upon DAY to conduct himself appropriately, to forward to his supervisor all securities related correspondence, and to truthfully complete annual questionnaires concerning his conduct.

16.    Stated simply, supervisory obligations require a firm to obtain enough information to reasonably ensure that the day-to-day activities of off-site locations comply with

applicable rules and regulations.  <u>See</u> Regulatory and Compliance Workshop (Feb. 23, 2000). RESPONDENT WAVELAND took no steps to reasonably ensure that the day-to-day activities in DAY'S office complied with FINRA and firm rules and requirements and federal and state securities laws.

## II.   RESPONDENTS WAVELAND'S AND DAY'S SALE OF HIGH RISK, ILLIQUID AND UNSUITABLE INVESTMENTS TO CLAIMANTS

17.    During all periods material hereto, RESPONDENT WAVELAND was licensed and authorized to do business in the States of Montana and Utah and did business in Montana and Utah through DAY, a registered representative of WAVELAND.  RESPONDENT WAVELAND is a registered securities broker/dealer with the States of Montana and Utah and the Securities and Exchange Commission ("SEC") and a member of the Financial Industry Regulatory Authority ("FINRA").

18.    DAY, at all times relevant to the transactions alleged herein, was a registered representative, employee, and agent of RESPONDENT WAVELAND.  (<u>See</u> Exhibit "D.") At all times relevant hereto, DAY was the individual account executive responsible for the handling of the transactions with CLAIMANTS at WAVELAND and was acting within the scope of his position of employment and/or agency and/or apparent agency with WAVELAND.  **RESPONDENT DAY was <u>NOT</u> licensed in Montana when he recommended these transactions to CLAIMANTS, residents of Montana.  (<u>See</u>  Exhibit "D," p.2.)**

19.    RESPONDENTS agreed and undertook to perform the duties of a securities broker, financial consultant, controlling person, supervisor and licensed principal/officer and

brokerage firm relative to recommending and supervising the recommendations of the transactions with CLAIMANTS.

20.     The acts committed by RESPONDENTS, as alleged herein, were done by them personally through the use of the mails or other instrumentalities of interstate commerce.  The acts of RESPONDENT WAVELAND and each employee, agent, and representative of RESPONDENT WAVELAND are deemed to be the acts of and are chargeable to and binding upon RESPONDENT WAVELAND under principles of agency law, licensing, controlling person and the doctrine of *respondeat superior*.

21.     RESPONDENTS knew that CLAIMANTS trusted them to disclose all material facts concerning the investments recommended to them and to comply with all SEC, FINRA and state licensing requirements.  Throughout the course of their investment relationship, RESPONDENT WAVELAND, acting through DAY, sought to and did engender CLAIMANTS' trust and confidence in their ability and willingness to do anything in their power to properly advance all of CLAIMANTS' investment objectives and needs.  A fiduciary relationship existed between CLAIMANTS and RESPONDENTS.

22.     CLAIMANTS trusted DAY and believed that he would only recommend investments suitable for CLAIMANTS.  CLAIMANTS would not have trusted DAY'S representations concerning the investments at issue and would not have done business with DAY if they had been aware of DAY'S disciplinary history.  RESPONDENTS negligently failed to disclose DAY'S disciplinary history to CLAIMANTS.

23.     In total disregard for CLAIMANTS' investment objectives, financial situation and needs, RESPONDENT WAVELAND, acting through DAY, recommended that CLAIMANTS invest a significant portion of their life savings in the following high risk, high commission, illiquid, long-term real estate investments:

| CLAIMANTS | DATE | INVESTMENT | AMOUNT |
|---|---|---|---|
| TOMMERUPS | 1/28/05 | DBSI-Executive Park LLC, Tenant in Common | $150,000 |
| TOMMERUPS | 9/08/05 | DBSI Arrowhead, LLC 1695, 1705 & 1715 Indian Woods Circle, Tenant in Common | *$260,000 |
| | | TOTAL: | $410,000 |

**\*CLAIMANTS also assumed mortgage debt totaling $425,388.77 ($155,940.59 mortgage debt on DBSI-Executive Park and $269,448.18 on DBSI Arrowhead TIC).**

24.     **RESPONDENTS' recommendations that CLAIMANTS invest a significant portion of their life savings in these high-risk, high-commission, illiquid investments were clearly unsuitable.**  Not only were these individual recommendations unsuitable, but the resultant concentration of CLAIMANTS' account in these speculative, illiquid investments was likewise inappropriate.

25.     In that regard, it should also be pointed out that RESPONDENTS had complete and total control of CLAIMANTS' account from its inception through the life of the account. CLAIMANTS acquiesced to all of RESPONDENTS' recommendations, and DAY offered *no investment alternatives* to CLAIMANTS other than the transactions that were ultimately effected.   RESPONDENTS knew that CLAIMANTS trusted them and relied upon RESPONDENTS to act in CLAIMANTS' best interests, and promoted this trust and

confidence.   CLAIMANTS made clear and RESPONDENTS knew full well that CLAIMANTS totally relied upon them to make all the investment recommendations.

26.   RESPONDENT WAVELAND, acting through DAY, falsely represented to CLAIMANTS that these investments were low risk.  In addition, RESPONDENTS failed to review the material terms and risk factors of these investments with CLAIMANTS.  DAY continuously assured CLAIMANTS that the recommended investments were conservative and suitable for individuals whose primary investment objective was to earn income from safe investments.  CLAIMANTS made clear and DAY knew that CLAIMANTS did not want and could not afford any risk in view of their limited liquid net worth and net worth.  CLAIMANTS relied on income from these investments to help pay their living expenses.

27.   RESPONDENT WAVELAND, acting through DAY, failed to disclose to CLAIMANTS that these investments were long term, illiquid, high commission, and high risk investments that were unsuitable for CLAIMANTS in view of their financial situation, needs and investment objectives.

**A.    DBSI-Executive Park LLC, Tenant in Common and DBSI Arrowhead, LLC 1695, 1705 & 1715 Indian Woods Circle, Tenant in Common (collectively "DBSI")**

28.   RESPONDENT WAVELAND, acting through DAY, failed to disclose to CLAIMANTS that:

> a.    These DBSI investments were not registered with the Securities and Exchange Commission in violation of Section 5 of the Securities Act of 1933.

> b.    These DBSI investments were not registered with the States of Montana and Utah in violation of Montana and Utah laws.

c.     DAY was not licensed to sell securities in the State of Montana.

29.     RESPONDENTS also failed to make the following disclosures, among others, to CLAIMANTS:

i.     DBSI'S business practice was to identify properties and investors, purchase the properties, and then sell the properties at an inflated price to the investors. (See attached Exhibit "F," p. 2.) The DBSI properties were sold to CLAIMANTS at inflated prices.

ii.     DBSI or a DBSI affiliate guaranteed the monthly payment amount to each investor and represented that the payment amount would not be affected by tenant issues. However, DBSI failed to maintain sufficient cash reserves to make these guaranteed payments and CLAIMANTS' monthly return was dependent on the cash flow generated by the properties.

iii.     CLAIMANTS bore the risk of DBSI not paying their rent and CLAIMANTS bore the risk that DBSI might not be able to find subtenants for the properties.

iv.     The financial information given by DBSI to investors was not audited and did not comply with generally accepted accounting principles.

v.     DBSI'S internal records were in disarray. Many of the general ledger entries accounting for fund transfers from investors did not fully, fairly, and accurately reflect the transactions they purport to describe. Inter-company transfers were typically treated as loans and DBSI and its affiliates typically co-mingled and accumulated their available funds, which were disbursed for the most pressing obligations as they came due. Commingled funds were used without regard to their source and without regard to whether such obligations and expenses were tenants in common related or non-tenants in common related.

**B.**     **Section 1031 Tax-Deferred Exchange**

30.     RESPONDENTS improperly recommended that CLAIMANTS use a Section 1031 tax deferred exchange to invest all of the proceeds from the sale of real estate into these high-risk, high commission, illiquid and long-term investments. CLAIMANTS were not willing to and could not afford to incur risk in order to defer capital gains taxes. To the contrary, CLAIMANTS needed safe investments that would provide them income.

31.     RESPONDENTS ignored repeated admonitions by FINRA that tenants-in-common interests purchased through a 1031 tax deferred exchange are securities and that RESPONDENTS are required to conduct an appropriate due diligence, have a reasonable basis for its recommendation based on both a product analysis and an analysis of the investor's financial situation, needs and investment objectives, ensure that the promotional materials used are fair, accurate and balanced, implement appropriate internal controls, and provide appropriate training. Specifically, FINRA Notice 05-18 contained the following explanation of 1031 exchanges and admonitions that are relevant to the recommendations at issue in this case:

> **Executive Summary**
>
> **This Notice addresses Section 1031 tax-deferred exchanges of real property for certain tenants-in-common ("TIC") interests in real property offerings. [FN1] In a TIC exchange, interests in real property are exchanged for instruments that generally are securities for purposes of the federal securities laws and NASD rules. [FN2] This Notice reminds members that when offering TIC interests that are securities to customers, members and their associated persons must comply with all applicable NASD rules, including those addressing:**

- **suitability;**
- **due diligence;**
- **splitting commissions with unregistered individuals or firms;**
- **supervision; and**
- **recordkeeping.**

**In addition, members relying on private offering exemptions from the registration requirements of the Securities Act of 1933 must ensure that their manner of offering TIC interests complies with all applicable requirements, including the prohibition on general solicitation.**

**Tax Status**

Typically, the sale of an investment, including an investment in real estate, is a taxable event, with the seller being responsible for capital gains taxes on the appreciation of the investment. Under Section 1031 of the Internal Revenue Code, however, an investor in income-producing or rental real estate may exchange the investment for another investment in income-producing or rental real estate of equal or greater value and defer payment of capital gains. In order to qualify for a deferral under Section 1031, an investor must acquire an interest in real estate in the exchange, not an interest in a partnership.

For example, if an investor purchased rental real property in 1972 for $50,000, the property toDAY may be worth $2 million dollars. The sale of the property would cause the seller to incur taxes on the profit. If the owner of the rental property exchanged the rental property for different real property, he could defer paying these taxes. Because of the difficulty of finding equal and offsetting properties for each investor, sponsors have offered interests in larger real estate offerings to pools of investors, in the form of TIC interests. In the example provided, rather than exchanging a rental property valued at $2 million for a similarly valued property, the owner could pool his interest with other similarly situated property owners to acquire property or properties with a large enough value to provide tax deferral for all the investors. If, however, the pool of investors is treated as a partnership under the principles of federal tax law, the exchange will not qualify under Section 1031, and the taxes on the investors' profits will not be deferred under that section.

TIC exchanges have grown dramatically, from approximately $150 million in sales in 2001 to approximately $2 billion in 2004. The driving force behind the growth in TIC exchanges is their favorable tax treatment.

In March 2002, the IRS issued Revenue Procedure 2002-22, 1 C.B. 733 ("Rev. Proc. 2002-22"), which addresses the conditions under which the IRS will consider a request for a ruling that a TIC interest in rental real estate is not an interest in a partnership. Rev. Proc. 2002-22 describes the central characteristic of a tenancy in common (each owner is deemed to own individually a physically undivided part of the entire parcel of property) and sets forth 15 specific conditions that must be met before the IRS will consider issuing a ruling. If the arrangement among the investors is respected as a TIC interest in rental real estate, rather than an interest in a partnership, an exchange may qualify under Section 1031 if the other conditions of that section are satisfied.

### Securities Law Status

When TICs are offered and sold together with other arrangements, they generally would constitute investment contracts and thus securities under the federal securities laws.  An investment contract includes any contract, transaction or scheme in which persons invest their money in a common enterprise, with the expectation of profits to be derived predominantly from the efforts of others.  TIC interests are generally investment contracts because the tenants-in-common invest in an undivided fractional interest in the rental real property by pooling their assets and sharing in the risks and benefits of the enterprise, while obtaining profits derived predominantly from the efforts of others, such as through contracts concerning leasing, management and operation of the acquired property. In addition to managing the property, TIC sponsors typically structure the TIC and negotiate the sale price and the loan. The fact that investors in a particular TIC program might have authority to terminate a management contract, or even to maintain or repair the property, would not demonstrate that the TIC interest is not an investment contract.

Although Section 1031 does not apply to an exchange of investment property for "interests in a partnership," "stocks, bonds, notes," or "other securities," the federal securities law definitions of those terms do not control interpretation of the tax laws. Accordingly, the fact that TIC interests typically are investment contracts under securities laws does not inherently disqualify them as property that may be exchanged under Section 1031.

We have become aware that certain states may exempt particular types of TIC transactions from the definition of "security" under state law. We remind members, however, that a determination that a particular transaction does not involve a security for purposes of state law is not determinative for purposes of federal securities law.

Page 16 of 144

**Application of NASD Rules to TIC Exchanges**

*TIC interests are a type of non-conventional investment ("NCI"). In NTM 03-71, NASD explained that members engaged in the sale of NCIs must ensure that those products are offered and sold in a manner consistent with the member's general sales conduct obligations, as well as address any special circumstances presented by the sale of those products. Among the issues highlighted in NTM 03-71 are members' responsibilities to:*

- *conduct appropriate due diligence;*
- *perform a reasonable-basis suitability analysis;*
- *perform customer specific suitability analysis for recommended transactions;*
- *ensure that promotional materials used by the member are fair, accurate, and balanced;*
- *implement appropriate internal controls; and*
- *provide appropriate training to registered persons involved in the sale of these products.*

**Suitability and Due Diligence**

*Before recommending a TIC exchange, members must have a clear understanding of the investment goals and current financial status of the investor.* In many cases, a TIC interest will constitute a significant portion of an investor's total assets. Because of the favorable tax treatment, investors often elect to invest the entire proceeds from the sale of an investment property in a TIC exchange. *Concentration of an investor's assets in a single asset class, however, is not suitable for many investors. Members must, with respect to each customer for whom they make a recommendation, consider the risks from over-concentration against the benefits of tax deferral and the investment potential of the underlying real estate asset(s).*

TIC interests are illiquid securities. NASD is not aware of any secondary market for TIC interests. Moreover, the tenant-in-common form of ownership may require unanimous consent to sell a TIC interest. The subsequent sale of TIC interests may only be possible at a significant discount to the net asset value of the undivided interest in the real estate. As fees charged in connection with a TIC exchange increase, the money saved as a consequence of tax deferral will be offset. Accordingly, members should consider the effect of fees on each TIC exchange.

TIC exchange sponsors routinely obtain legal opinions regarding whether a particular TIC's offering structure will qualify as a like-kind exchange of real property under Section 1031. Given the importance of that tax treatment, a member should obtain a "clean" legal opinion that a TIC "should" or "will" qualify for exchange under Section 1031. If a sponsor failed to obtain a legal opinion, or only obtained a "more likely than not" opinion, that would be a material fact. In such a case, a member, as part of its due diligence responsibilities would be required to ascertain the specific tax status risks of the TIC exchange and inform the investor of the risks involved.

*In making a suitability determination in connection with a recommendation to a customer to purchase a TIC interest, a member must also consider whether the fees and expenses associated with TIC transactions outweigh the potential tax benefits to the customer. TICs structured with high up-front fees and expenses paid to the sponsor and/or salespersons of the selling broker-dealers raise particular concerns about the ability to make a suitable recommendation.* In addition, TIC transactions in many cases may not provide complete tax-free exchanges for investors ( e.g., in situations where the investor's debt ratio on the replacement property decreases, the difference may result in a taxable event for the investor). Members must take all of these factors into consideration when recommending a particular TIC transaction to a customer.

*NTM 03-71 reminds members that the type of due diligence that is appropriate will vary from product to product. NASD staff believes that it is not appropriate for members that recommend a TIC transaction simply to rely on representations made by the sponsor in an offering document. While the nature and extent of verification will vary with the facts and circumstances related to particular sponsors and offerings, members should make a reasonable investigation to ensure that the offering document does not contain false or misleading information. Such an investigation could include background checks of the sponsor's principals, review of the agreements ( e.g., property management, purchase and sale, lease and loan agreements) and property inspection. In addition, if the offering document contains projections, members should understand the basis for those projections, and the degree of likelihood that they will occur. For example, members should determine whether any projected yields can reasonably be supported by the property operations.*

### Licensing, Supervision and Recordkeeping

Associated persons selling TIC interests must have passed the appropriate qualification examinations. Because TICs are typically structured as direct participation programs ("DPPs"), associated persons who sell them generally must have passed either the Series 7 or the Series 22 (Limited

Representative -- Direct Participation Program securities). In addition, most states require the Series 63 State Agent's license. Also, as with any security, a TIC interest transaction must be reviewed and endorsed by a qualified principal in accordance with the member's supervisory procedures.  A qualified principal for supervising TIC interests would be either a General Securities Principal (Series 24) or a DPP principal (Series 39).

*In accordance with NASD Rule 3010, members should establish an appropriate supervisory system for the offer and sale of TIC interests. The system should include comprehensive written supervisory procedures reasonably designed to ensure compliance with all applicable rules, including suitability and sales practice requirements related to TIC transactions.* The supervisory system should address the sales practice issues discussed in this Notice, including ensuring that neither the member nor its registered representatives pay referral fees or otherwise share transaction-based compensation from TIC transactions with persons that would be deemed to be unregistered broker-dealers.

NASD and SEC record keeping and retention requirements also apply to TIC transactions, and firms should establish appropriate procedures to comply with the applicable requirements in SEC Rules 17a-3 and 17a-4, and NASD Rule 3110. Due to the complexity and varying documentation requirements of TIC exchanges, firms should examine the records they maintain and ensure that applicable record keeping requirements are satisfied.

**Private Offering Exemption**

Many TIC transactions are conducted without registration under the Securities Act of 1933 as private placements, most in reliance on Regulation D under that statute. One of the fundamental requirements of most Regulation D offerings is a prohibition on general solicitation.  As a result of this prohibition, neither the issuer nor any person acting on its behalf may offer or sell securities based on general solicitation or general advertising, including communications published in any newspaper or similar media or any seminar or meeting whose attendees have been invited by any general solicitation or advertising.

A critical factor in determining whether a communication is appropriately limited, and thus not a "general solicitation," is the existence of an adequate pre-existing relationship between a member and the TIC offeree. An adequate pre-existing relationship will enable the member to evaluate the potential TIC investor's sophistication and financial circumstances.

If a communication is made by general solicitation, then an issuer or its agents will have made a prohibited general solicitation if the communication includes an offer of the privately placed securities. If the communication references a security that is currently offered or contemplated to be offered at the time of the communication, the communication will generally be considered an offer of that security. In addition, if the person solicited via the communication is subsequently offered a security that was currently offered or contemplated to be offered at the time of the communication, the communication would generally be considered an offer of that security.

Members have requested guidance with regard to two specific methods of solicitation or advertising. In the first scenario, a registered representative who also holds a real estate license solicits potential investors by advertising a "real estate" seminar. At the seminar, investors are given a presentation on TIC exchanges and are made aware that the member offers TIC investments to its customers. Since the advertisement for the seminar would be a general solicitation, and since the references to the TIC investments currently being offered by members would be deemed an offer of those securities, the members engaged in such offerings would not be able to rely on the exemption from registration for private placements under Regulation D.

In the second scenario, members place advertisements in newspapers and magazines that indicate that the member sells TIC interests, but the advertisements do not identify any particular TIC investment for sale by the member. Since the advertisement itself is a general solicitation, the issue for members is whether the advertisement includes an offer of securities. In general, such an advertisement would not be deemed an offer of securities if:

- the advertisement is generic;
- the advertisement is not being made in contemplation of an offering; and
- the member has procedures to ensure that an investor solicited via the advertisement will not be offered TICs that the member is currently offering or contemplating offering at the time of the initial contact.

Advertisements that do not meet each of these conditions are likely to be deemed general solicitations and inconsistent with the conditions for private placements conducted in compliance with Regulation D. Moreover, in addition to meeting these conditions, the other requirements under Regulation D also must be met, including establishing an adequate, substantive and pre-existing

relationship with the investor and completing a suitability analysis prior to offering TICs to an investor.

(See attached Exhibit "G.")

32.     RESPONDENT WAVELAND, acting through DAY, misrepresented and omitted to disclose numerous material facts to CLAIMANTS concerning these investments, their operations, the risks involved in these investments, and the use of funds obtained from the sale of these investments to CLAIMANTS and others.  RESPONDENTS failed to review the risks of these investments with CLAIMANTS.

33.     In connection with the above offer of securities, RESPONDENTS failed to disclose the following material facts, among others, which were necessary to disclose in order to make the statements made, in light of the circumstances under which they were made, not misleading:

    a.      The financial condition of the issuers.

    b.      The potential risks of investing in these programs.

    c.      The use of investment proceeds.

    d.      The nature of the association between the issuers and companies that rendered services to the issuers.

    e.      The percentage of investments used for sales commissions and other offering expenses.

    f.      The identity, background, experience and disciplinary history of the individuals associated with the issuer, including the issuers' officers and principals.

34.     RESPONDENTS failed to comply with FINRA *Conduct Rules* 2310 and 2810.

FINRA Rule 2310(a) reads as follows:

> In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

FINRA Rule 2810 governs direct participation (i.e., limited partnership) programs.

Rule 2810(b)(2) (*Suitability*) reads in pertinent part as follows:

> **Rule 2810(b)(2)(B)**:  In recommending to a participant the purchase, sale, or exchange of an interest in a direct participation program, a member or person associated with a member shall:
>
>> i.    have reasonable grounds to believe, on the basis of information obtained from the participant concerning his investment objectives, other investments, financial situation and needs, and any other information known by the member or associated person, that:
>>
>>> (a)    the participant is or will be in a financial position appropriate to enable him to realize **to a significant extent** the benefits described in the prospectus, **including the tax benefits** where they are a significant aspect of the program;
>>>
>>> (b)    the participant has a fair market net worth sufficient to **sustain the risks inherent in the program**, **including loss of investment and lack of liquidity**; and
>>>
>>> (c)    the program is otherwise suitable for the participant; and
>>
>> ii.    maintain in the files the member documents disclosing the basis upon which the determination of suitability was reached as to each participant.

Rule 2810(b)(3) sets forth the following specific **due diligence responsibilities** of member firms that participate in the public offering of a direct participation (limited partnership) program:

**Rule 2810(b)(3)(A)**:  Prior to participating in a public offering of a direct participation program, a member or person associated with a member shall have reasonable grounds to believe, based on information made available to him by the sponsor through a prospectus or other materials, that all material facts are adequately and accurately disclosed and provide a basis for evaluating the program.

**Rule 2810(b)(3)(B)**:  In determining the adequacy of disclosed facts pursuant to subparagraph (A) hereof, a member or personal associated with a member shall obtain information on material facts relating at a minimum to the following, if relevant in view of the nature of the program:

    (1)    Items of compensation;

    (2)    Physical properties;

    (3)    Tax aspects;

    (4)    Financial stability and experience of the sponsor[1];

    (5)    The program's conflicts and risk factors; and

    (6)    Appraisals and other pertinent reports.

**Rule 2810(b)(3)(D)**:  Prior to executing a purchase transaction in a direct participation program, a member or person associated with a member shall inform the prospective participant of all pertinent facts relating to the liquidity and marketability of the program during the term of the investment.

(Emphasis added.)

35.    FINRA Rule 2810's predecessor, Appendix F of the NASD *Rules of Fair Practice*, was only adopted after years of review and comment.  The initial version was published for comment on May 9, 1972, and subsequent versions were published in 1973, 1977,

---

[1]    See also SEC v. Murphy, 626 F.2d 633, 643 (9th Cir. 1980) (In connection with an investment in a limited partnership, information relating to those who are responsible for the success or failure of the enterprise is clearly material).

1978, and 1981.  The final version of Appendix F was approved by the Securities and Exchange Commission on July 19, 1982, and circulated to all NASD member firms, including RESPONDENT WAVELAND, on October 19, 1982. (See  FINRA Notice to Members 82-50.)  RESPONDENT WAVELAND failed to implement this Notice to Members and discuss the special suitability requirements of FINRA 2810 with DAY before allowing him to recommend these high risk, illiquid investments to CLAIMANTS.  These investments were particularly disadvantageous to CLAIMANTS in light of their advanced age and their need for safety and retirement income.

36.     RESPONDENTS' conduct was clearly in violation of FINRA rules governing suitability, due diligence and risk disclosure (including but not limited to Rules 2310 and 2810). The concentration of CLAIMANTS' total net worth in these high-risk, long-term and illiquid investments was inconsistent with CLAIMANTS' investment objectives and needs, and CLAIMANTS were not informed of all pertinent facts relating to the degree of liquidity and lack of marketability of these programs.  **CLAIMANTS did not have a fair market net worth sufficient to sustain the risks inherent in these investments, including the loss of their investments and the lack of liquidity.**

37.     It is well-settled that a brokerage firm which recommends a security has a duty to ensure that its representations have a reasonable basis:

> In summary, the standards . . . are strict.  [A salesman] cannot recommend a security unless there is an adequate and reasonable basis for such recommendation.  He must disclose facts which he knows and those which are reasonably ascertainable.  By his recommendation, he implies that a reasonable investigation has been made and that his recommendation rests on the conclusions based on such investigation.  Where the salesman lacks essential

information about a security, he should disclose this as well as the risks which arise from his lack of information.

Hanley v. SEC, 415 F.2d 589, 595-97 (2nd Cir. 1969) (emphasis added).[2]  In short, a broker-dealer must not only "know the customer," but the broker-dealer must also know the "security." RESPONDENTS did not "know" these investments because they failed to conduct a reasonable investigation ("due diligence") into these high risk, high commission, illiquid and long-term investments before recommending these securities to CLAIMANTS.

38.    RESPONDENTS  failed to disclose to CLAIMANTS that RESPONDENTS had not conducted a proper due diligence into these investments.   RESPONDENT WAVELAND allowed DAY to hold himself out as a licensed representative of RESPONDENT WAVELAND and did not disclose to CLAIMANTS that the firm had not reviewed these investments and that the firm was not properly supervising DAY.

---

[2]    See also Mac Robbins & Co., 41 S.E.C. 116-119 (1962), Aff'd. Sub. Nom. Berko v. S.E.C., 316 F.2d (2d Cir. 1963) ("The making of recommendations to prospective purchasers without a reasonable basis, couched in terms of either opinion or fact, designed to induce purchases, is contrary to the basis obligation of fair dealing borne by those who engage in the sale of securities to the public."); Alexander Reid & Co., 40 S.E.C. 986-990 (1962) (A broker's recommendation must be "responsibly made on the basis of actual knowledge and careful consideration."); Securities Exchange Act Release No. 6721 (February 2, 1962) ("the making of recommendations for the purchase of a security implies that the dealer has a reasonable basis for such recommendations, which in turn, requires that, as a prerequisite, he shall have made a reasonable investigation:); Rice, Recommendations by a Broker-Dealer; the Requirement for a Reasonable Basis, 25 Mercer L.Rev. 537 (1974) (A broker that does not have a reasonable basis for recommending a particular security cannot satisfy the suitability rule, "since a broker-dealer would have difficulty contending that a recommendation was suitable for a given customer when you lack adequate information about the security involved.")

39.     RESPONDENTS violated their fiduciary duty to CLAIMANTS by handling CLAIMANTS' account in a manner that benefitted them the most, i.e., maximization of commissions by purchasing high-risk, high-commission, illiquid and unsuitable investments rather than acting in the best interest of CLAIMANTS, making material misrepresentations, failing to disclose material facts, failure to conduct a proper due diligence, and causing transactions that were inappropriate for CLAIMANTS given their financial position, needs, and investment objectives.

40.     FINRA Rule 3010 requires that each member establish and maintain a system to supervise the activities of each registered representative that is reasonably designed to achieve compliance with applicable securities laws and regulations and with the rules of FINRA.  It must include written procedures that are established, maintained, and enforced. RESPONDENT WAVELAND did not have an adequate system of supervision.  There was no system for on-site or off-site supervisory review of representations, recommendations, and actions by its registered representatives.  In actuality, RESPONDENT WAVELAND simply relied upon its off-site salesmen to supervise themselves.

41.     RESPONDENT WAVELAND'S supervisory procedures were deficient in that they did not have any system to track the investment history, including any prior high-risk, long term illiquid investments, of their clients, and monitor for excessive concentration. Accordingly, supervisory personnel, including the Compliance Department, could not exercise effective supervision and determine whether or not a specific recommendation would result

in an over-concentration of high-risk investments in view of the customer's liquid net worth, financial situation, investment objectives and needs.

42.    RESPONDENT WAVELAND'S failure to establish and implement adequate supervisory procedures over DAY is inexcusable, particularly in view of FINRA's dissemination to RESPONDENT WAVELAND of FINRA Notice to Members 86-65, dated September 12, 1986, which expressly warned FINRA member firms that FINRA had observed a pattern of rule violations and other regulatory problems stemming from the employment of registered persons who engage in securities-related activities on a full and part-time basis at locations away from the offices of the member.    FINRA pointed out that these off-site representatives, often classified for compensation purposes as independent contractors, are involved in other business enterprises such as insurance, real estate sales, accounting, or tax planning, and also frequently operate as separate business entities under names other than those of the members.    FINRA made the following observations concerning the regulatory responsibilities of member firms that are of particular relevance to this case:

> Irrespective of an individual's location or compensation arrangements, all associated persons are considered to be employees of the firm with which they are registered for purposes of compliance with FINRA rules governing the conduct of registered persons and the supervisory responsibilities of the member.   The fact that an associated person conducts business at a separate location or is compensated as an independent contractor does not alter the obligations of the individual and the firm to comply fully with all applicable regulatory requirements.

> Firms employing off-site representatives are responsible for establishing and carrying out procedures that will subject these individuals to effective supervision designed to monitor their securities-related activities and to detect and prevent regulatory compliance problems.   This can include:

1.   Educating off-site personnel regarding their obligations as registered persons to the firm and to the public, including prohibited sales practices.

2.   Maintaining regular and frequent contact with such individuals.

3.   *Implementing appropriate supervisory practices, such as records inspections and compliance audits at the representatives' places of employment, to ensure that their methods of business and day-to-day operations comply with applicable rules and requirements.   For greatest effectiveness in preventing and detecting violations, visits should be unannounced and include, for example, a review of on-site customer account documentation and other books and records, meetings with individual representatives to discuss the products they are selling and their sales methods, and an examination of correspondence and sales literature.*

Firms whose off-site personnel also engage in non-securities businesses should remind these individuals that correspondence pertaining to such businesses, unless submitted for review, may not include material related to securities transactions.

If a member has designated an individual responsible for reviewing the activities of other registered persons within the firm, the office of that individual must be inspected annually, regardless of whether such person is compensated as an employee or as an independent contractor.

The actions of an associated person in dealing with customers and customer account, regardless of whether he or she is compensated as an employee or an independent contractor, are actions on behalf of the firm.   The firm is responsible for supervising in a manner designed to detect and prevent violations of Section 2 [FINRA suitability rule].   Members should take affirmative steps to ensure that off-site personnel understand and abide by FINRA and firm policies regarding dealings with customers, customer account and customer funds.

(See Exhibit "B.") (Emphasis added.)

43.   FINRA Notice to Members 86-65 expressly urged each member to duplicate the

Notice and distribute it individually to all associated persons, and indicated that FINRA, in the

course of its member examinations, would make inquiry to ascertain that this Notice had been provided to all appropriate personnel.  (See Exhibit "B.")

44.    Upon information and belief, RESPONDENT WAVELAND never gave a copy of FINRA Notice to Members 86-65 to DAY and failed to properly educate DAY concerning his obligations as a registered person, including prohibited sales practices.

45.    FINRA Notice to Members 86-65 indicates it is not the first admonition by FINRA on this subject.  As early as 1982 FINRA circulated to all member firms an SEC Notice Concerning Independent Contractors dated June 18, 1982, which indicated that "to the extent that a firm forms a relationship with an independent contractor, that firm would be responsible for either (1) ensuring that the independent contractor was registered as a broker-dealer or (2) assuming the supervisory responsibilities attendant to a relationship with an associated person."   FINRA noted that "it would be advisable if [this SEC Notice] were distributed to all registered and compliance personnel in your firm, including branch office personnel."  FINRA further noted:

> **Broker-dealers may not shift their obligation to control or supervise the activities of their independent contractor salespersons who are associated persons, and contractual terms that attempt to limit broker-dealer liability for the acts of such persons under the federal securities laws are of no effect. . . . [I]n this connection, we also believe that it is important to emphasize that a simple denial of "control" of an independent contractor by a broker-dealer would not remove its responsibility for supervising that person.**

(See Exhibit "H" attached hereto.)

46.    RESPONDENTS committed numerous violations of FINRA *Rules of Fair Practice* in handling these transactions with CLAIMANTS, including:

A.    FINRA Rules 2110, 2310, 2120, and 2330, by engaging in conduct inconsistent with high standards of commercial honor and just and equitable principles of trade, by failing to conduct a reasonable and proper due diligence investigation, by recommending securities that RESPONDENTS did not "know," by recommending transactions that were unsuitable and excessive in view of CLAIMANTS' financial situation, needs and investment objectives, by engaging in deceptive or other fraudulent devices or contrivances, by making material misrepresentations and by failing to make material disclosures; and

B.    FINRA Rule 3010, by failing to establish and enforce a proper supervisory system over the activities of registered representatives that was reasonably designed to achieve compliance with applicable securities laws, rules, regulations, and statements of policy and procedure promulgated thereunder.

47.    RESPONDENTS' violations of FINRA rules constitute negligence. As the Fifth Circuit observed in Miley v. Oppenheimer & Co., Inc., 637 F.2d 318, 333 (5th Cir. 1981), the "NYSE and FINRA rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account," and the lower court properly included a reference to these rules in its jury charge. See Mihara v. Dean Witter & Company, Inc., 619 F.2d 814, 824 (9th Cir. 1980) ("Appellants contend that the admission of testimony regarding the New York Stock Exchange and FINRA rules served to dignify those rules and regulations to some sort of standard. The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held."). See also Dean Witter Reynolds, Inc. v. Hammock, 489 So.2d 761, 767 (1986) ("Case law is clear that evidence of violation of industry standards is admissible as non-conclusive evidence of

negligence."); St. Louis-San Francisco R.R. Co. v. White, 369 So.2d 1007 (Fla. 1st D.C.A.

1979); St. Louis-San Francisco R.R. Co. v. Burlison, 262 So.2d 280 (Fla. 1st D.C.A. 1972);

Clements v. Boca Aviation, Inc., 444 So.2d 597 (Fla. 4th D.C.A. 1984); Nance v. Winn Dixie

Stores, Inc., 436 So.2d 1075 (Fla. 3rd D.C.A. 1983); Reese v. Seaboard Coastline R.R. Co., 360

So.2d 27 (Fla. 4th D.C.A. 1978).

48.     RESPONDENTS also violated, among others, the Montana Rules of the

Securities Department:

**The Montana Rules of the Securities Department, Section 6.10.126.  Unethical
Practices by Broker-Dealers and Salesmen:**

> **Subp. (b).**     Inducing Trading in Customer's Account Which is
> Excessive in Size or Frequency in View of the Financial
> Resources and Character of the Account;
>
> **Subp. (c).**     Recommending to a customer the purchase, sale,
> or exchange of a security without grounds to believe that the
> transaction or recommendation is suitable for the customer based
> upon reasonable inquiry concerning the customer's investment
> objectives, financial situation and needs, and any other relevant
> information known by the broker-dealer;
>
> **Subp. (n).**     Effecting a transaction in, or inducing the purchase
> or sale of, a security by means of a manipulative, deceptive, or
> fraudulent device, practice, plan, program, design, or contrivance.

49.     RESPONDENTS also violated, among others, the rules of the Utah Securities

Commission:

**Rule R 164-1-3.  Fraudulent practices of broker-dealers, broker-dealer agents,
and issuer-agents.**

> •     Contradicting or negating the importance of information
> contained in a prospectus or other offering materials with intent
> to deceive or mislead.

- Using advertising or sales presentations in a deceptive or misleading manner.

- Effecting transactions in, or inducing the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance . . . .

**Rule R 164-6-1g.  Dishonest or unethical business practices.**

- Inducing trading in a customer's account which is excessive in size or frequency in view of the financial resources and character of the account.

- Recommending to a customer the purchase, sale or exchange or any security without reasonable grounds to believe that such transaction or recommendation is suitable for the customer based upon reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other relevant information known by the broker-dealer.

- Effecting any transaction in, or inducing the purchase or sale of, any security by means of any manipulative, deceptive or fraudulent device, practice, plan, program, design or contrivance.

- Using any advertising or sales presentation in such a fashion as to be deceptive or misleading.

- Failing to comply with any applicable provision of the Rules of Fair Practice of the National Association of Securities Dealers or any applicable fair practice or ethical standard promulgated by the SEC or by a self-regulatory organization to which the broker-dealer is subject and which is approved by the SEC.

50.    RESPONDENTS' violations of the Montana and Utah Administrative Codes constitute negligence *per se* because these rules were enacted for the protection of investors such as CLAIMANTS.  Palmer v. Shearson Lehman Hutton, Inc., 622 So.2d 1085 (Fla. 1st DCA 1993); Twiss v. Kury, 25 F.3d 1551 (11th Cir. 1994).

51.     Further, the contracts between RESPONDENTS and CLAIMANTS include not only securities industry rules and regulations, but also the internal rules and regulations established to govern the conduct of RESPONDENT WAVELAND'S own employees (DAY), such as the internal supervisory procedures and compliance manuals.  (See, e.g., Miller v. Johnston Barney, Fed. Sec. L. Rpts. CCH ¶ 92,498 (1986) at 93,031.)  For example, in Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981), the Sixth Circuit rejected Prudential-Bache Securities Inc.'s argument that the District Court should not have relied on Bache's internal rules, as codified in its Standard Practice Instructions Manual, as evidence of the proper standard of care:

> When a defendant has disregarded rules that it has established to govern the conduct of its own employees, evidence of those rules may be used against the defendant to establish the correct standard of care.  The content of such rules may also indicate knowledge of the risks involved and the precautions that may be necessary to prevent the risks.  Montgomery v. Balt. & Ohio R.R., 22 F.2d 359 (6th Cir. 1927).  See also Prosser, The Law of Torts § 33 (4th Ed. 1971).  The District Court correctly measured Bache's conduct by the standard of prudence it has established for its own employees.

Id. at 820.

52.     RESPONDENT WAVELAND violated numerous of their own policies in connection with these high risk, high commission, illiquid and long-term investment recommendations to CLAIMANTS.

53.     The acts committed by RESPONDENT WAVELAND and its employees, agents, and representatives, as alleged herein, were done by them personally through the use of the mails or other instrumentality of interstate commerce.  The acts of RESPONDENT

WAVELAND and their employees, agents, or representatives as alleged herein are deemed to be the acts of and are chargeable to and binding upon RESPONDENT and DAY.

54.     RESPONDENT WAVELAND is directly liable because they participated in, aided, and/or supervised the transactions heretofore mentioned.     RESPONDENT WAVELAND is also liable under the doctrines of *respondeat superior*, licensing, controlling person, and agency principles for the negligent actions and breaches of duty by DAY while in the scope of his employment with RESPONDENT WAVELAND.

55.     CLAIMANTS have been greatly damaged as a result of RESPONDENTS' misconduct.  Instead of receiving safety and income, CLAIMANTS were saddled with high risk, illiquid investments.  CLAIMANTS seek the recovery of damages in the amount of $410,000 as well as benefit of the bargain damages, lost opportunity costs, model portfolio damages, and prejudgment interest from RESPONDENTS.  See Nordyne v. Florida Mobile Home Supply, 625 So. 2d 1283 (Fla. 1st DCA 1993) (wherein the Florida Court of Appeals held that "evidence of profits that [the victim] would have realized in the ensuing . . . years was relevant because it tended to prove the position that the [victim] would have been in but for [the] wrongful acts."

56.     It is also well-settled that pre-judgment interest is an automatic element of damages which is mathematically computed as of the date of the wrongdoing (purchase). Argonaut Insurance Co. v. May Plumbing Co., 474 So. 2d 212 (Fla. 1985), wherein the court stated that:

> **Plaintiff is to be made whole from the date of the loss once a finder of fact has determined the amount of damages and defendant's liability therefor.  . . .**

Computation of prejudgment interest is merely a mathematical computation. There is no 'finding of fact' needed. Thus it is a purely ministerial duty of the trial judge or clerk of the court to add the appropriate amount of interest to the principal amount of the damages awarded in the verdict. . . . **Furthermore, just as the loss theory forecloses discretion in the award of prejudgment interest, there is no discretion in the rate of that interest. The legislature has established a statutory interest rate [12%] which controls prejudgment interest. §687.01, Fla. Stat. Id. at 214-215.**

See also Wickham Contracting v. Local Union No. 3, 955 F.2d 831, 836 (2d Cir. 1992).

57.    RESPONDENTS' failure to conduct a proper due diligence, misrepresentations, omissions and unsuitable recommendations to CLAIMANTS were egregious, as were RESPONDENTS supervisory omissions.  These acts by RESPONDENTS and DAY and their agents constitute independent torts for which CLAIMANTS seek recovery.  In addition, these acts were done with wanton, reckless disregard of the rights and property of CLAIMANTS and CLAIMANTS are also entitled to punitive damages in an amount to be determined by the arbitration panel.

58.    Punitive damages are further warranted due to RESPONDENTS' *fraudulent concealment* of their misconduct, which constitute independent torts for which CLAIMANTS seek recovery.  RESPONDENTS, acting through DAY, continuously assured CLAIMANTS that these investments were safe investments and that their principal was not in danger.  RESPONDENTS failed to disclose the inaccurate and incomplete nature of DAY'S representations, failed to conduct a proper due diligence, and failed to disclose that these securities were high-risk investments unsuitable for CLAIMANTS.

59.    RESPONDENTS' failure to disclose the inaccurate and incomplete nature of DAY'S representations, their lack of due diligence, the unsuitable nature of these investment

recommendations and the resulting concentration of CLAIMANTS' account in high-risk,

illiquid, long term and unsuitable investments, RESPONDENT WAVELAND'S failure to

supervise, and the fact that the securities issued by these investments were unregistered in

violation of state and federal law, not only warrant punitive damages but toll all statutes of

limitation periods in view of RESPONDENTS' fiduciary relationship with CLAIMANTS and

constitute independent torts for which CLAIMANTS seek recovery.  The Southern District

of Florida made the following statement on the issue of fraudulent concealment in a fiduciary

relationship:

> . . . [T]he law of fraud 'does not require that an aggrieved party have proceeded
> from the outset as though he were dealing with thieves.'  First Federal Savings
> & Loan Assoc. v. Dade Federal Savings & Loan Assoc., 403 So.2d 1097, 1100
> (5th DCA 1981).

> The existence of a fiduciary relationship between the Plaintiff and the
> Defendant, and silence on the part of the Defendant when there is a duty to
> disclose facts, can constitute a fraudulent withholding of facts.  Less than full
> disclosure on the part of a Defendant in a fiduciary relationship lawsuit, can be
> sufficient to establish fraudulent concealment.

**Wilder v. Meyer, 779 F. Supp. 164, 168-69 (S.D. Fla. 1991).  In short, where a fiduciary**

**relationship exists, acts of omission (failure to disclose material facts) can constitute**

**fraudulent concealment.**

60.     This can also be seen in Vucinich v. PaineWebber Jackson & Curtis, Inc. et al,

803 F.2d 454 (9th Cir. 1986), where the court held that the fiduciary relationship that exists

between a broker and his customer imposes upon the broker the duty to monitor the

customer's accounts and affirmatively advise the client as to any changed circumstances.  The

Court found that the broker's representations regarding monitoring of a customer's accounts

tolled the running of the statute of limitations [e.g., the prescription period] until such time as the broker fulfilled his obligation to advise the customer regarding matters relevant to possible misrepresentations. (Citing Twomey v. Mitchum, Jones, & Templeton, Inc., 262 Cal. App. 2d 690 727-729, 69 Cal. Rptr. 222 (1968). Further, the fraudulent concealment cannot be mitigated by the mere forwarding of a prospectus containing information that contradicts material representations made orally to investors. Luksch et al. v. Latham, 675 F. Supp. 1168 (N.D. Cal. 1987). See also In Re Robert A. Foster, Sec. Ex. Rel. No. 34408 (July 20, 1994) ("broker/dealers and their registered representatives 'owe a special duty of fair dealing to their clients.' The making of misrepresentations runs directly contrary to those fiduciary duties" and can render a broker/dealer liable in private actions "even where the investor has access to a prospectus providing full disclosure").

61.      A special relationship of trust and confidence exists between a securities salesman and his customer. Both Florida courts and the Sixth Circuit Court of Appeals in applying Florida law have expressly characterized that relationship as fiduciary in nature. (See, e.g., State v. Walsh, 66 Ohio App. 2d 85 (Franklin County 1979); Silverberg v. Thomson, McKinnon Securities, Inc., et al., No. 48545 (Cuyahoga County Court of Appeals Feb. 14, 1985) ("A broker-dealer is a fiduciary who owes his customer a high degree of care in transacting his business."); Byrley v. Nationwide Life Insurance Co., 94 Ohio App. 3d 1 (Erie County 1994) ("[A] broker and a client are in a fiduciary relationship."); Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981); Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989) ("A stock or commodities broker is the agent of the customer and

a fiduciary relationship exists between them."); Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979) ("A broker-dealer is a fiduciary who owes his customer a high degree of care in transacting his business."). The commentators uniformly agree with such characterization. See, e.g., 3 Loss, *Securities Regulation 1508* (2nd Ed. 1961) ("There is in effect and in law a fiduciary relationship"); 5C Jacobs, *Litigation and Practice Under Rule 10b-5 §210.03* (1994) ("Brokers owe a fiduciary duty to their customers"); 1 Restatement (Second) of Agency §13 (1957) ("A broker-dealer acting as an agent for his customer is a fiduciary with respect to matters within the scope of his agency"). And, the SEC has recognized a special relationship under both the fiduciary and shingle theories. See, e.g., Arleen Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949) (SEC revoked broker's registration for breach of fiduciary duty where the broker failed to disclose that he was not selling securities to his clients at the best prices available.); Charles Hughes & Co. v. SEC, 139 F.2d 434 (2d Cir. 1943), cert. denied 321 U.S. 786 (1944) (A securities salesman, by virtue of being in the securities business ["hanging out his shingle"], makes an implied representation to the customer that the customer will be dealt with fairly).

62. Numerous courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients. See Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979) (a securities broker dealer is a fiduciary who owes its customer a high degree of care in transacting business); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2nd Cir. 1978) (registered representative, as broker for investor, owed investor a fiduciary duty); Moholt v. Dean Witter Reynolds, Inc., 478 F.Supp. 451 (D.D.C. 1979) (stockbrokers are in a

position of quasi-fiduciaries and are held to high degree of trustworthiness and fair dealing); Pachter v. Merrill Lynch, Pierce, Fenner & Johnston, Inc., 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "the utmost good faith" toward him); Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker, under Florida law, stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Johnston, Inc., 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes, controls the account); Jaksich v. Thomson McKinnon Securities, Inc., 582 F.Supp. 485 (S.D.N.Y. 1984) (under New York law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); Utah State University of Agriculture and Applied Science v. Sutro & Co., 646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the authority of a trustee dealing with public funds); E.F. Hutton & Co. v. Weeks, 166 Ga.App. 443, 304 S.E.2d 420 (1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith).

63.    All limitations periods are tolled under the legal doctrines of accrual, continuous treatment, continuous representation, and continuing wrong.[3] See, e.g., Keller v. Reed, 603 So.2d 717, 719 (Fla. 2d DCA 1992) (accrual); Hall v. Steiner, 543 N.Y.S.2d 190 (N.Y. App.

---

[3]    Statutes of limitation of course only apply in civil actions, not arbitration proceedings.

Div. 1989) (continuous treatment); <u>Wilder v. Meyer</u>, 779 F.Supp. 164 (S.D. Fla. 1991) (continuous representation); and <u>Newport Largo, Inc. v. Monroe County</u>, 706 F.Supp. 1507 (S.D. Fla. 1988) (continuing wrong).  Further, all limitations periods are tolled under the doctrine of "blameless ignorance" or "*contra non valentum agere nulla currit prescription*."  This doctrine stops the running of the limitations period when the cause of action is not known or reasonably knowable by CLAIMANTS even if their ignorance was not induced by RESPONDENTS.  Stated simply, CLAIMANTS did not comprehend that they had been sold high risk, illiquid and unsuitable investments and that their legal rights had thus been violated.

64.     In <u>Miley v. Oppenheimer & Co., Inc.</u>, 637 F.2d 318, 332 (5th Cir. 1981), the Fifth Circuit cited the following passage from Goldberg's book entitled *Fraudulent-Dealer Practices* in support of awarding punitive damages that is very appropriate in this case:

> Most courts in the past have seen fit, when they find the broker-dealer's hand in the till, to simply request the removal of the offending appendage.  And when the till is empty, and the broker-dealer's fingerprints are all that remain where the money once lay, all the courts do is to require the crook to replace the booty.  If ever there was a situation where crime pays it is in such circumstances; heads the dishonest broker-dealer wins and tails everyone breaks even.  No wonder one commentator saw fit to term the average recovery in trading cases as creating for the broker-dealer a "low risk larceny."
>
> . . .  [T]he only sure way of deterring such conduct in the future is to take the profit away from the wrongdoers and slap on an additional amount as punitive damages: an award equal to treble damages would be fair, reasonable, and well within the public interest.

65.     CLAIMANTS have suffered mental anguish, emotional distress, humiliation and inconvenience from the loss of use of their property.  CLAIMANTS seek recovery for these non-economic injuries.

66.   <u>The Arbitrator's Manual</u> states the following in a quote from Aristotle:

> Equity is justice in that it goes beyond the written law.  And it is equitable to prefer arbitration to the law court, for the arbitrator keeps equity in view, whereas the judge looks only to the law, and the reason why arbitrators were appointed was that equity might prevail.

CLAIMANTS seek relief in equity, including restitution, rescission, specific performance, and any other equitable relief which this Panel deems appropriate.

**COUNT I**

<u>**VIOLATIONS OF FEDERAL SECURITIES LAWS**</u>

67.   CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 66 above, as if fully contained herein.

68.   The investments sold to CLAIMANTS and described in paragraphs 1 through 67 above were securities as defined in Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10).

69.   Under Section 20 of the Securities Exchange Act, 15 U.S.C. § 78t, RESPONDENT WAVELAND was a controlling person over the conduct described in paragraphs 1 through 68 above.

A.     <u>**Offer and Sale of Unregistered Securities**</u>

70.   RESPONDENTS, by engaging in the conduct described in paragraphs 1 though 69 above, directly, indirectly, or through persons that WAVELAND controlled, through use of the means or instruments of transportation or communication in interstate commerce or of the mails, offered to sell or sold securities, or, directly or indirectly, carried or caused such

Page 41 of 144

securities to be carried through the mails or in interstate commerce for the purpose of sale or delivery after sale.

71.     No registration statement was filed with the Securities and Exchange Commission or was in effect with respect to these investments during the offering of the securities sold to CLAIMANTS.

### B.     <u>Fraud in Offer or Sale of Securities</u>

72.     RESPONDENTS, by engaging in the conduct described in paragraphs 1 through 71 above, directly, indirectly, or through persons it controlled, offered to sell or sold securities, by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, and by means of a prospectus or oral communication which included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

73.     By reason of the foregoing, RESPONDENTS directly, indirectly, or through persons it controlled, violated and is subject to liability under Sections 12(2) and 15 of the Securities Act, 15 U.S.C. §§ 77*l*(2), 77*o*.

### C.     <u>Fraud in Connection With the Purchase or Sale of Securities</u>

74.     RESPONDENTS, by engaging in the conduct described in paragraphs 1 through 73 above, directly, indirectly, or through persons it controlled, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails, with *scienter*:

      a.      Employed devices, schemes, or artifices to defraud;

      b.      Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

      c.      Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

75.      By reason of the foregoing, RESPONDENTS directly, indirectly, or through persons it controlled, violated and is subject to liability under Sections 10(b) and 20 of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t, and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**WHEREFORE**, CLAIMANTS request this panel to enter an award for actual damages and rescission together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, punitive damages, and such other relief as is deemed proper and necessary.

## COUNT II

## VIOLATION OF THE SECURITIES ACT OF MONTANA

76.      CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 75 above, as if fully contained herein.

### A.    Failure to Register DBSI in Montana

77.      Section 30-10-202 of the Securities Act of Montana states that it is unlawful to offer or sell any security in Montana unless the security is registered under the Act.

78.     Section 30-10-307 of the Securities Act of Montana states that every sale made in violation of Section 30-10-202 may be rescinded at the election of the purchaser.  Pursuant to such rescission, the purchaser is entitled to recover the consideration paid for the security, plus interest, costs, and reasonable attorneys' fees.

79.     Given the lack of registration of DBSI in Montana, CLAIMANTS are entitled to rescission of their investment as well as interest, costs, and attorneys' fees.

**B.     Unsuitable Recommendations, Misrepresentations and Omissions of Material Fact**

80.     Sections 30-10-301 and 30-10-307 of the Securities Act of Montana also state that a purchaser is entitled to rescission, along with legal interest and attorneys' fees, from a person that offers or sells a security by means of fraud, misrepresentation, any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

81.     RESPONDENT WAVELAND, acting through DAY, made numerous false and misleading statements to CLAIMANTS concerning DBSI and failed to disclose numerous material facts to CLAIMANTS concerning DBSI, all as more fully stated above. CLAIMANTS accordingly are entitled to rescission of their DBSI transactions pursuant to Section 30-10-307 of the Securities Act of Montana.

82.     RESPONDENT WAVELAND is liable under the doctrine of ***respondeat superior*** for DAY'S violations of the Securities Act of Montana.  In addition, WAVELAND is liable under Section 30-10-307(2) of the Securities Act of Montana as a controlling person

over DAY'S activities.  Montana has adopted the Uniform Securities Act, which makes not only the perpetrator liable but also every broker/dealer or agent who directly or indirectly controls a person whose activities constitute violations of the Act.  If a claimant can show that the statute was violated, the victim is automatically entitled to the mandated recovery.

**WHEREFORE**, CLAIMANTS pray for compensatory and rescissionary damages under the Securities Act of Montana, interest, costs, attorneys' fees, and punitive damages.

## COUNT III

### VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT

83.    CLAIMANTS reallege, reaffirm, and reincorporate paragraphs 1 through 82 above, as if fully contained herein.

84.    RESPONDENT WAVELAND, acting through DAY, by engaging in the conduct previously described, engaged in unfair methods of competition or unfair or deceptive acts or practices in the conduct of trade or commerce in violation of § 30-14-103, MCA.

85.    By engaging in the conduct previously described, RESPONDENTS caused CLAIMANTS to suffer ascertainable losses as a result of methods, acts, or practices declared unlawful by § 30-14-103, MCA. Pursuant to § 30-14-133, CLAIMANTS are entitled to receive up to three times the actual damages, attorneys' fees, and any other appropriate relief.

**WHEREFORE**, CLAIMANTS request statutory damages, plus interest, attorney's fees, costs, punitive damages, and any other appropriate relief.

## COUNT IV

## VIOLATION OF UTAH SECURITIES ACT

86.     CLAIMANTS reallege, reaffirm and reincorporate paragraphs 1 through 85 above, as if fully contained herein.

### A.     Failure to Register DBSI in Utah

87.     Section 61-1-7 of the Utah Securities Act states that it is unlawful to offer or sell any security in Utah unless the security is registered under the Act.

88.     Section 61-1-22 and 61-1-7 of the Utah Securities Act state that every sale made in violation of Section 61-1-7 may be rescinded at the election of the purchaser.  Pursuant to such rescission, the purchaser is entitled to recover the consideration paid for the security, plus interest at the legal rate of 12% from the date of purchase as well as a reasonable attorney's fees and costs.

89.     Given the lack of registration of DBSI in Utah, CLAIMANTS are entitled to rescission of their investments as well as legal interest, costs and attorney's fees.

### B.     Unsuitable Recommendations, Misrepresentations and Omission of Material Fact

90.     Sections 61-1-1(2) and 61-1-22 also state that a purchaser is entitled to rescission, along with legal interest and attorney's fees, from a brokerage firm that offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading.

91.     RESPONDENT WAVELAND, acting through DAY, made numerous false and misleading statements to CLAIMANTS concerning DBSI and failed to disclose numerous material facts to CLAIMANTS concerning DBSI, all as more fully stated above. CLAIMANTS accordingly are entitled to rescission of their DBSI transactions pursuant to Section 61-1-22 of the Utah Securities Act.

92.     RESPONDENT WAVELAND is liable under the doctrine of ***respondeat superior*** for DAY'S violations of the Utah Securities Act.  In addition, RESPONDENT WAVELAND is liable under the Utah Securities Act, Section 61-1-22(4), as the controlling person over DAY'S activities.  Utah has adopted the Uniform Blue Sky Act which makes not only the perpetrator liable but also every broker/dealer or agent who directly or indirectly controls a person whose activities constitute violations of the Act.  That is to say, if a claimant can show that the statute was violated, the victim is automatically entitled to the mandated recovery.

**WHEREFORE**, CLAIMANTS pray for compensatory and rescissionary damages under the Utah Securities Act, interest at the legal rate, costs, reasonable attorney's fees under the Utah Securities Act, and punitive damages.

## COUNT V

## BREACH OF CONTRACT

93.     CLAIMANTS reallege, reaffirm and reincorporate paragraphs 1 through 92 above as if fully contained herein.

94.     The contractual relationships which were entered into between CLAIMANTS and RESPONDENTS incorporate by reference a brokerage house's duty to comply with all laws, rules, and regulations governing the transaction between RESPONDENTS and CLAIMANTS.   It must be emphasized that RESPONDENTS fraudulently induced CLAIMANTS to enter into this contractual relationship by, among other things, the false representations and non-disclosures of material facts by DAY that are itemized in this Statement of Claim.

95.     RESPONDENTS violated, among others, the following rules of FINRA *Rules of Fair Practice* in handling these transactions with CLAIMANTS, including:

> A.     FINRA Rules 2110, 2310, 2120, and 2330, by engaging in conduct inconsistent with high standards of commercial honor and just and equitable principles of trade, by failing to conduct a reasonable and proper due diligence investigation, by recommending securities that RESPONDENTS did not "know," by recommending transactions that were unsuitable and excessive in view of CLAIMANTS' financial situation, needs and investment objectives, by engaging in deceptive or other fraudulent devices or contrivances, by making material misrepresentations and by failing to make material disclosures; and

> B.     FINRA Rule 3010, by failing to establish and enforce a proper supervisory system over the activities of registered representatives that was reasonably designed to achieve compliance with applicable securities laws, rules, regulations, and statements of policy and procedure promulgated thereunder.

96.     These infractions breached the contractual relationship between CLAIMANTS and RESPONDENTS, which incorporated a brokerage firm's duty to comply with the industry

rules, customs and procedures governing the transaction with CLAIMANTS.  "[W]e note a number of cases in which customers of stockbrokers are deemed to have contemplated and authorized a course of dealing in accordance with rules and customs of the stock exchanges. Thus, the exchange rules are deemed incorporated into any agreement between customer and broker."  Brumm v. McDonald & Co. Sec., 603 N.E.2d 1141, 1147 (Ohio Ct. App. 1992) (citations omitted); Iowa Grain v. Farmers Grain and Feed, 293 N.W.2d 22 (Iowa 1980); White v. Merrill Lynch, Pierce, Fenner & Johnston, 218 A.2d 655 (N.J. Super. Ct. 1966).  See also Midwest Television v. Scott, Lancaster, Mills & Atha, 252 Cal. Rptr. 573, 579 (Cal. Ct. App. 1988) ("The industry practice becomes a part of the contract, and the evidence of such custom is admissible. . . .").

97.    RESPONDENTS also violated, among others, the rules of the Utah Securities Commission:

**Rule R 164-1-3.  Fraudulent practices of broker-dealers, broker-dealer agents, and issuer-agents.**

- Contradicting or negating the importance of information contained in a prospectus or other offering materials with intent to deceive or mislead.

- Using advertising or sales presentations in a deceptive or misleading manner.

- Effecting transactions in, or inducing the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance . . . .

**Rule R 164-6-1g.  Dishonest or unethical business practices.**

- Inducing trading in a customer's account which is excessive in size or frequency in view of the financial resources and character of the account.

- Recommending to a customer the purchase, sale or exchange or any security without reasonable grounds to believe that such transaction or recommendation is suitable for the customer based upon reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other relevant information known by the broker-dealer.

- Effecting any transaction in, or inducing the purchase or sale of, any security by means of any manipulative, deceptive or fraudulent device, practice, plan, program, design or contrivance.

- Using any advertising or sales presentation in such a fashion as to be deceptive or misleading.

- Failing to comply with any applicable provision of the Rules of Fair Practice of the National Association of Securities Dealers or any applicable fair practice or ethical standard promulgated by the SEC or by a self-regulatory organization to which the broker-dealer is subject and which is approved by the SEC.

98.     RESPONDENTS also violated, among others, the Montana Rules of the

Securities Department:

**The Montana Rules of the Securities Department, Section 6.10.126.   <u>Unethical Practices by Broker-Dealers and Salesmen</u>:**

**Subp. (b)**.     Inducing Trading in Customer's Account Which is Excessive in Size or Frequency in View of the Financial Resources and Character of the Account;

**Subp. (c).**     Recommending to a customer the purchase, sale, or exchange of a security without grounds to believe that the transaction or recommendation is suitable for the customer based upon reasonable inquiry concerning the customer's investment objectives, financial situation and needs, and any other relevant information known by the broker-dealer;

> **Subp. (n).** Effecting a transaction in, or inducing the purchase or sale of, a security by means of a manipulative, deceptive, or fraudulent device, practice, plan, program, design, or contrivance.

99. Likewise, the State Broker/Dealer Administrative Codes are incorporated into the contractual agreement between CLAIMANTS and RESPONDENTS. "[L]aw, existing at the time the contract is formed, becomes a part of the contract. Valid agency rules and regulations, promulgated within the agency's authority, have the force and effect of law." See e.g., Kinnard v. Homann, 750 S.W.2d 30, 31-32 (Tex. Ct. App. 1988) (citations omitted). "It is fundamental that the laws of Florida are a part of every Florida contract." Department of Ins. v. Teachers Ins. Co., 404 So. 2d 735, 741 (Fla. 1981).

100. The contracts between RESPONDENTS and CLAIMANTS are further defined by the internal rules and regulations established to govern the conduct of RESPONDENT WAVELAND'S own employees, such as internal supervisory procedures and compliance manuals. (See, e.g., Miller v. Johnson Barney, Fed. Sec. L. Rpts. CCH ¶92,498 (1986) at 93,031.) ("The relations between [brokerage firm and customer] were not defined solely in terms of the joint account agreement, but also . . . by the internal rules and regulations established to 'govern the conduct of [the firm's] own employees"). For example, in Thropp v. Bache Halsey Stuart Shields, Inc., 650 F. 2d 817 (6th Cir. 1981), the Sixth Circuit rejected Prudential-Bache Securities Inc.'s argument that the District Court should not have relied on Bache's internal rules, as codified in its *Standard Practice Instructions Manual*, as evidence of the proper standard of care:

> When a defendant has disregarded rules that it has established to govern the conduct of its own employees, evidence of those rules may be used against the

> defendant to establish the correct standard of care.  The content of such rules may also indicate knowledge of the risks involved and the precautions that may be necessary to prevent the risks.  Montgomery v. Balt & Ohio R.R., 22 F.2d 359 (6th Cir. 1927).  See also Prosser, The Law of Torts §33 (4th ed. 1971).  The District Court correctly measured Bache's conduct by the standard of prudence it has established for its own employees.

Id. at 820.

101.    RESPONDENTS violated many of their own internal rules and procedures in handling these transactions with CLAIMANTS.

102.    RESPONDENTS also violated the duty of commercial reasonableness, fair dealing, and good faith, required of all parties to a contract.  "Hornbook Law implies a covenant of good faith and fair dealing into the performance and enforcement of every contract. . . . [G]ood faith is part of every contract . . . ."  First Texas Sav. Ass'n v. Comprop Inv. Properties, 752 F. Supp. 1568, 1573 (M.D. Fla. 1990); Burger King Corp. v. Austin, 805 F. Supp. 1007 (S.D. Fla. 1992).  This covenant of fair dealing is particularly demanding for stockbrokers and brokerage firms, who are expert fiduciaries of their customers, who obtain their commissions only after advising and inducing customer investments, and who are thereby subject to an inherent conflict of interest.

> [P]etitioner acted simultaneously in the dual capacity of investment advisor and of broker and dealer.  In such capacity, conflicting interests must necessarily arise.  When they arise, the law has consistently stepped in to provide safeguards in the form of prescribed and stringent standards of conduct on the part of the fiduciary.

Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949).

103.    The covenant of good faith and fair dealing required RESPONDENTS to do what the contract presupposed would be done to accomplish its purpose and to protect the

contracting parties' reasonable expectations.  It presupposed that RESPONDENTS would comply with applicable industry and governmental rules, provide all necessary information to CLAIMANTS, and act reasonably and in good faith to recommend suitable investments for CLAIMANTS in light of CLAIMANTS' financial circumstances and needs.  RESPONDENTS violated this covenant by putting their own interests first, not complying with industry rules, recommending wholly unsuitable investments to CLAIMANTS, and misrepresenting, concealing and not supplying material information.  CLAIMANTS suffered damages from these breaches of covenant and are entitled to recompense.

104.    RESPONDENTS' infractions breached their written contracts with FINRA to follow securities laws and FINRA rules.  As a condition of RESPONDENTS' FINRA membership applications pursuant to Article III, Section 1 of FINRA By-Laws, RESPONDENTS contracted with FINRA to comply with all FINRA rules, federal securities laws, and federal securities rules and regulations in the handling of customer accounts.

105.    Defrauded customers such as CLAIMANTS are intended third-party beneficiaries of RESPONDENTS' agreements with FINRA to comply with securities laws and regulations and FINRA rules.  CLAIMANTS are entitled to redress for RESPONDENTS' breaches of these contracts.  Oppenheimer & Co. v. Neidhardt, [Current Binder] Fed. Sec. L. Rep. (CCH) ¶98,224 (S.D.N.Y. May 4, 1994) (customers are third-party beneficiaries of brokerage firm's obligation to follow FINRA rules); Scobee Funeral Home v. E.F. Hutton & Co., 711 F. Supp. 605, 607 (S.D. Fla. 1989) (customers are third-party beneficiaries of FINRA requirements); Creative Sec. v. Bear Stearns & Co., 671 F. Supp. 961, 966 (S.D.N.Y. 1987)

("Many courts recognize that securities exchange members are contractually bound by the regulations of their organizations."); <u>Axelrod & Co. v. Kordich, Victor & Neufeld</u>, 451 F.2d 828, 841 (2d Cir. 1971) ("Each member firm, by virtue of its admission, agrees to be governed by the Exchange's constitution and rules.  When a transaction of purchase and sale of any security is effected, the contract is subject to all the provisions of the Exchange's constitution and rules. . . .  These provisions are binding on exchange members.")

106.    The RESPONDENTS' failure to comply with the contracts between the parties and with the laws, rules, and regulations governing the contracts between the parties, was intentional or reckless and was done in willful and wanton disregard of CLAIMANTS' rights. All of RESPONDENTS' actions and omissions were done solely for the purpose of generating commissions, and as such is conduct for which the RESPONDENTS should be punished.

**WHEREFORE**, CLAIMANTS request this panel to enter an award for actual and rescissionary damages together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed proper and necessary.

**COUNT VI**

**<u>COMMON LAW FRAUD</u>**

107.    CLAIMANTS reallege, reaffirm and reincorporate paragraphs 1 through 106 above, as if fully contained herein.

Page 54 of 144

108.   All of the misrepresentations and omissions of RESPONDENTS were done with the intent to mislead CLAIMANTS and with the specific intent to have CLAIMANTS rely on said misrepresentations and omissions.  At a minimum, the misrepresentations were done recklessly, without knowledge of their truth or falsity.  CLAIMANTS did rely thereon and made investments to their detriment causing substantial losses.

109.   Further, RESPONDENTS' misrepresentations and omissions constitute constructive fraud, which entails the use of a confidential or fiduciary relationship to take advantage of another.

110.   The fraud, the misrepresentations, and the omissions claims are quasi-contractual in nature and arose from and are implied from the contractual relationship between CLAIMANTS and RESPONDENTS.  These claims also arose independently from the contractual relationship between CLAIMANTS and RESPONDENTS.

**WHEREFORE**, CLAIMANTS request this panel to enter an award for actual damages and rescission together with benefit of the bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed proper and necessary.

**COUNT VII**

**<u>BREACH OF FIDUCIARY DUTY</u>**

111.   CLAIMANTS reallege, reaffirm and reincorporate paragraphs 1 through 110 above, as if fully contained herein.

112.    At all times relevant hereto there existed between the RESPONDENTS and

CLAIMANTS a fiduciary relationship by reason that:

      A.    The RESPONDENTS at all times possessed superior knowledge, judgment, skill, and experience in the securities market in contrast to CLAIMANTS' lack of meaningful knowledge and understanding in that CLAIMANTS could not fully appreciate the substantial risk to which their monies were exposed; and

      B.    The RESPONDENTS at all times had access to the books, records, and other sources of information concerning the financial and operating condition, rules, and policies of the RESPONDENTS, FINRA, and the State Statutes and Administrative Codes.    This information was not readily accessible to CLAIMANTS; and

      C.    DAY at all times while handling CLAIMANTS' monies was an experienced account executive acting within the scope of his employment and authority and apparent authority with RESPONDENTS.

113.    This fiduciary duty arose from and is implied from the contractual relationship

between CLAIMANTS and RESPONDENTS.  This fiduciary duty also arose independently

from the contractual relationship between CLAIMANTS and RESPONDENTS.

114.    Because of the RESPONDENTS' superior knowledge, skill, judgment, and

experience in the securities market, the RESPONDENTS owed to CLAIMANTS a duty to

recommend suitable investments, to disclose all material facts, and to refrain from misleading

CLAIMANTS.  Further, the RESPONDENTS owed this fiduciary duty to protect and further

CLAIMANTS' interests over and above its desire to generate commissions through

transactions with CLAIMANTS and to promote their own interests.  RESPONDENTS

specifically had a duty by virtue of this fiduciary relationship with CLAIMANTS to conduct a proper due diligence, to supervise DAY'S recommendations and representations, and to disclose to CLAIMANTS that these securities were unregistered, high-risk and illiquid investments, that DAY'S representations to CLAIMANTS concerning these investments were incomplete and inaccurate, and that RESPONDENT WAVELAND was not properly supervising DAY.

115.    A special relationship of trust and confidence exists between a securities salesman and his customer.  Both Florida courts and the Sixth Circuit Court of Appeals in applying Florida law have expressly characterized that relationship as fiduciary in nature. (See, e.g., State v. Walsh, 66 Ohio App. 2d 85 (Franklin County 1979); Silverberg v. Thomson, McKinnon Securities, Inc., et al., No. 48545 (Cuyahoga County Court of Appeals Feb. 14, 1985) ("A broker-dealer is a fiduciary who owes his customer a high degree of care in transacting his business."); Byrley v. Nationwide Life Insurance Co., 94 Ohio App. 3d 1 (Erie County 1994) ("[A] broker and a client are in a fiduciary relationship."); Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981); Street v. J.C. Bradford & Co., 886 F.2d 1472 (6th Cir. 1989) ("A stock or commodities broker is the agent of the customer and a fiduciary relationship exists between them."); Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979) ("A broker-dealer is a fiduciary who owes his customer a high degree of care in transacting his business.").   The commentators uniformly agree with such characterization.  See, e.g., 3 Loss, *Securities Regulation 1508* (2nd Ed. 1961) ("There is in effect and in law a fiduciary relationship"); 5C Jacobs, *Litigation and Practice Under Rule 10b-5*

§210.03 (1994) ("Brokers owe a fiduciary duty to their customers"); 1 Restatement (Second) of Agency §13 (1957) ("A broker-dealer acting as an agent for his customer is a fiduciary with respect to matters within the scope of his agency").  And, the SEC has recognized a special relationship under both the fiduciary and shingle theories.  See, e.g., Arleen Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949) (SEC revoked broker's registration for breach of fiduciary duty where the broker failed to disclose that he was not selling securities to his clients at the best prices available.); Charles Hughes & Co. v. SEC, 139 F.2d 434 (2d Cir. 1943), cert. denied 321 U.S. 786 (1944) (A securities salesman, by virtue of being in the securities business ["hanging out his shingle"], makes an implied representation to the customer that the customer will be dealt with fairly).

116.    Numerous courts around the country have recognized the fiduciary duty that stockbrokers owe to their clients.  See Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017 (6th Cir. 1979) (a securities broker dealer is a fiduciary who owes his customer a high degree of care in transacting business); Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2nd Cir. 1978) (registered representative, as broker for investor, owed investor a fiduciary duty); Moholt v. Dean Witter Reynolds, Inc., 478 F.Supp. 451 (D.D.C. 1979) (stockbrokers are in a position of quasi-fiduciaries and are held to high degree of trustworthiness and fair dealing); Pachter v. Merrill Lynch, Pierce, Fenner & Johnston, Inc., 444 F.Supp. 417 (E.D.N.Y. 1978) (brokerage firm and the account executive assigned to service plaintiff's account were bound, as plaintiff's agents, to exercise "the utmost good faith" toward him); Thropp v. Bache Halsey Stuart Shields, Inc., 650 F.2d 817 (6th Cir. 1981) (as fiduciary, stockbroker, under Florida law,

stands in special relationship to client and owes him duty to use reasonable care and to act in good faith); Leboce, S.A. v. Merrill Lynch, Pierce, Fenner & Johnston, Inc., 709 F.2d 605 (9th Cir. 1983) (California law imposes fiduciary obligations on broker where broker, for all practical purposes, controls the account); Jaksich v. Thomson McKinnon Securities, Inc., 582 F.Supp. 485 (S.D.N.Y. 1984) (under New York law, securities brokers maintain fiduciary duties to their customers, and relationship between the two parties is one of principal and agent); Utah State University of Agriculture and Applied Science v. Sutro & Co., 646 P.2d 715 (Utah 1982) (stock brokers have an especially high degree of care to ascertain the authority of a trustee dealing with public funds); E.F. Hutton & Co. v. Weeks, 166 Ga.App. 443, 304 S.E.2d 420 (1983) (broker's duty to account to its customer is fiduciary in nature, resulting in obligation to exercise the utmost good faith).

117.   Because of the fiduciary relationship between CLAIMANTS and the RESPONDENTS, CLAIMANTS reasonably relied to their detriment on the RESPONDENTS' superior knowledge, skill, judgment, and experience in handling their monies.

118.   RESPONDENTS knowingly and deliberately breached their fiduciary duty to CLAIMANTS by making material misrepresentations, failing to conduct a proper due diligence investigation, failing to make material disclosures, and investing in unsuitable securities in total disregard for CLAIMANTS' best interests, solely for the purpose of enriching and protecting the RESPONDENTS, and concealing the unsuitable nature of the transactions by not making the requisite disclosures to CLAIMANTS. The RESPONDENTS'

disregard and violation of the rules of the SEC and FINRA governing their conduct and the conduct of their agents and employees constitutes a breach of fiduciary duty to CLAIMANTS.

119.    RESPONDENTS also breached their fiduciary duty by failing to ensure compliance with all applicable state statutes and rules, including those relating to misrepresentations and omissions in the sale of securities, suitability, and registration.

120.    RESPONDENTS are jointly and severally liable because they participated in, supervised, or approved the previously noted transactions.  In addition, RESPONDENTS are jointly and severally liable under the principles of licensing, agency, controlling person and *respondeat superior* for the damage caused to CLAIMANTS by the breach of their fiduciary duty.

121.    The acts committed by RESPONDENTS, as alleged herein, were done by them personally through the use of the mails or other instrumentality of interstate commerce.  The acts of RESPONDENTS, and each employee, agent, or representative of RESPONDENTS, including DAY, are deemed to be the acts of and are chargeable to and binding upon RESPONDENTS.

122.    It is well-settled law that "an employer is vicariously liable for compensatory damages resulting from the negligent acts of employees committed within the scope of their employment even if the employer is without fault."  See, e.g., Mercury Motors Express, Inc. v. Johnston, 393 So. 2d 545, 549 (Fla. 1981).

123.    RESPONDENTS' breach of their fiduciary duty to CLAIMANTS constitutes conduct for which the RESPONDENTS deserve to be punished to deter RESPONDENTS from engaging in the same or similar conduct in the future.

**WHEREFORE**, CLAIMANTS request this panel to enter an award for actual damages together with benefit of the bargain damages, rescissionary damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, attorney's fees, non-economic damages, punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed proper and necessary.

## COUNT VIII

## <u>NEGLIGENCE AND GROSS NEGLIGENCE</u>

124.    CLAIMANTS reallege, reaffirm and reincorporate paragraphs 1 through 123 above, as if fully contained herein.

125.    RESPONDENTS, by virtue of their position as CLAIMANTS' broker-dealer, their professional skill and ability, the level of confidence and care imposed upon other broker dealers in similar positions, and their fiduciary obligations owed CLAIMANTS due care.  The industry standard of care is set forth by FINRA, the SEC rules, the State Acts and Administrative Codes, and the firms' own internal guidelines.

126.    RESPONDENTS' violations of FINRA Rules constitute negligence.  As the Fifth Circuit observed in <u>Miley v. Oppenheimer & Co., Inc.</u>, 637 F.2d 318, 333 (5th Cir. 1981), the "NYSE and FINRA rules are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account," and the lower

court properly included a reference to these rules in its jury charge.  <u>See</u> <u>Mihara v. Dean</u> <u>Witter & Company, Inc.</u>, 619 F.2d 814, 824 (9th Cir. 1980) ("Appellants contend that the admission of testimony regarding the New York Stock Exchange and FINRA rules served to dignify those rules and regulations to some sort of standard.  The admission of testimony relating to those rules was proper precisely because the rules reflect the standard to which all brokers are held.")  <u>See</u> <u>also</u> <u>Dean Witter Reynolds, Inc. v. Hammock</u>, 489 So.2d 761, 767 (1986) ("Case law is clear that evidence of violation of industry standards is admissible as non-conclusive evidence of negligence"); <u>St. Louis-San Francisco R.R. Co. v. White</u>, 369 So.2d 1007 (Fla. 1st D.C.A. 1979); <u>St. Louis-San Francisco R.R. Co. v. Burlison</u>, 262 So.2d 280 (Fla. 1st D.C.A. 1972); <u>Clements v. Boca Aviation, Inc.</u>, 444 So.2d 597 (Fla. 4th D.C.A. 1984); <u>Nance v. Winn Dixie Stores, Inc.</u>, 436 So.2d 1075 (Fla. 3rd D.C.A. 1983); <u>Reese v. Seaboard</u> <u>Coastline R.R. Co.</u>, 360 So.2d 27 (Fla. 4th D.C.A. 1978).

127.    RESPONDENTS' violations of the Utah and Montana Administrative Codes constitute negligence *per se* because these rules were enacted for the protection of investors such as CLAIMANTS.  <u>See</u>, <u>e.g.</u>, <u>Palmer v. Shearson Lehman Hutton, Inc.</u>, 622 So.2d 1085 (Fla. 1st DCA 1993); <u>Twiss v. Kury</u>, 25 F.3d 1551 (11th Cir. 1994).

128.    RESPONDENT WAVELAND had supervisory duties over DAY and failed to diligently and properly supervise their officers, employees, and agents.

129.    DAY was at all times material hereto acting within the scope of his employment with RESPONDENT WAVELAND and RESPONDENT WAVELAND is liable under principles of *respondeat superior*, licensing, controlling person and agency.

130.     RESPONDENTS' conduct, as set forth in previous Counts, is a breach of their duty to CLAIMANTS.

131.     RESPONDENTS breached their duty to CLAIMANTS by failing to provide sufficient control and supervision over their officers, employees, agents, and registered representatives and in not ensuring compliance with the applicable federal and state securities laws, rules, regulations, policies, self-regulatory organization policies, and procedures.

132.     The RESPONDENTS' actions as set forth above constitute both negligence and gross negligence.

133.     As a result of the RESPONDENTS' conduct as set forth above, CLAIMANTS have suffered damages.

134.     The RESPONDENTS' conduct as set forth above proximately caused CLAIMANTS' damages.

WHEREFORE, CLAIMANTS have been greatly damaged as a result of RESPONDENTS' misconduct. Instead of receiving safety and income, CLAIMANTS were saddled with unregistered and unsuitable investments. CLAIMANTS seek the recovery of damages in the amount of at least $410,000, as well as bargain damages, lost opportunity costs, model portfolio damages, prejudgment interest, costs, reasonable attorney's fees, and punitive damages in an amount to be determined by the arbitrators, and such other relief as is deemed necessary and proper.

Respectfully Submitted,

GOODMAN & NEKVASIL, P.A.

Kalju Nekvasil, Esq.
Florida Bar No. 0802468
Stephen Krosschell, Esq.
Florida Bar No. 0351199
14020 Roosevelt Blvd., Suite 808
P.O. Box 17709
Clearwater, Florida 33762
Telephone:    727-524-8486
Facsimile:    727-524-8786
Attorneys for CLAIMANTS

Dated:  October 13, 2010

Page 64 of 144

## <u>INDEX OF EXHIBITS</u>

Exhibit "A"        "FINRA:  We'll Lower the Boom on Shady Private Placements."
                   *Investment News* (December 10, 2009)


Exhibit "B"        <u>FINRA Notice to Members 86-65</u> (dated September 12, 1986)
                   "Compliance with FINRA Rules of Fair Practice in the Employment and
                   Supervision of Off-Site Personnel"


Exhibit "C"        <u>NASD Notice to Members 88-67</u> (dated September 1998)
                   "Subject: Obligation to Provide Accurate Information on Forms U-4 and
                   U-5 and to Research Potential Employee's Background."


Exhibit "D"        DAY'S Registration History


Exhibit "E"        SEC Division of Market Regulation
                   Staff Legal Bulletin No. 17:  <u>Remote Office Supervision</u>


Exhibit "F"        Idaho Securities Bureau Action Against DBSI


Exhibit "G"        <u>FINRA Notice to Members 05-18</u> (dated March 2, 2005)
                   "PRIVATE PLACEMENTS OF TENANTS-IN-COMMON INTERESTS
                   NASD Issues Guidance on Section 1031 Tax-Deferred Exchanges of
                   Real Property for Certain Tenants-in-Common Interests in Real
                   Property Offerings"


Exhibit "H"        FINRA Memorandum concerning "Important SEC Notice Concerning
                   Independent Contractors"

Friday, December 11, 2009

Register | Subscribe | 🔊 RSS | Current issue

# InvestmentNews

**The Leading News Source for Financial Advisers**

[SEARCH]

⊙ Archives ⊙ Stock Lookup ⊙ ETF/Fund Lookup

Adviser Compensation and Staffing Study

HOME    NEWS & OPINION    PRINT EDITION    ONLINE EDITION    NEWSLETTERS    EVENTS    TOOLS & RESOURCES    TRAINING CENTER    COMMUNITY

Related topics:    Compliance

## Finra: We'll lower the boom on shady private placements

By Sara Hansard
December 10, 2009, 4:02 PM EST

Post a Comment |    Recommend (3)

🖨 ✉ 🔊 🖨 ⊡
PRINT EMAIL RSS REPRINT SHARE

Finra expects to bring cases against brokerage firms involved in selling private placement offerings next year, a Finra enforcement official said today.



"We have a number of investigations under way involving allegations of wrongdoing arising from the sales of these 'Reg D' private placements," said James Shorris, executive vice president and executive director of enforcement at The Financial Industry Regulatory Authority Inc. Finra expects to bring enforcement cases on private placements next year, he said. "Reg D" refers to the securities regulations that govern the sale of private-placement investments, which are generally exempt from having to be registered with regulators. The investments usually are made in small companies.

The self-regulatory organization has been receiving increasing numbers of complaints from investors in recent months concerning sales of private placements, Mr. Shorris said. Finra is looking at misrepresentations made by brokers in connection with the sale of the products, as well as whether sales made to customers were suitable.

Finra has been increasing the resources it devotes to investigations of private placements throughout the year, and it expects to begin bringing cases "soon," he said.

The industry regulator also is questioning whether brokerage firms and registered representatives who sold the private placements did due diligence on the products they sold, as well as whether some brokerage firms had a conflict of interest with the issuers, Mr. Shorris said.

Among the allegations Finra is looking into is whether private-placement sales were made with only a single source of due-diligence information, and whether the due-diligence provider was independent of the company issuing private-placement securities. "If the due-diligence report was paid for by the issuer, there's clearly a potential conflict," Mr. Shorris said. "It's something we're looking into."



IM    C    A

Inside InvestmentNews.com

**Featured Archives**

**ETF Insights: Online Conference**
Missed the live event? No problem! Log on and view Bill Gross and other industry experts discuss the latest developments in ETFs, and strategies for utilizing ETFs in clients' portfolios.

**Featured Links**

**Attract Top Talent**
Post your job requirements in the InvestmentNews Career Connection and find the best talent for your advisory firm.

**View archived webcasts**
Need CE credits before the end of the year? Check out InvestmentNews' archived webcasts and earn CE credit while listening to timely, relevant discussions on hot topics



**Latest News**

Plan to place B-D advisers under Finra



EXHIBIT
A
tabbies

Finra is also examining whether brokerage firms that sold the products are affiliated with companies that issued the securities, as opposed to sales made by brokerage firms that are independent of the issuers. "If it turned out the issuer was engaged in wrongdoing or fraud and the firm had a captive entity wholesaling the product, we have more questions about the access [the brokerage firm] may have had to information about potential wrongdoing about the issuer," Mr. Shorris said.

In addition, Finra is looking at whether firms adequately supervised sales of the products.

"These products are not without risk. They are not particularly transparent when it comes to information about their operations. They're not especially liquid. There's going to be a fairly limited universe of investors for whom these are suitable," Mr. Shorris said.

Finra's action comes as the Securities and Exchange Commission has been bringing fraud cases against issuers of private placements.

The plaintiff's bar is also training its sights on Reg D private placements. In an apparent first, a group of investors recently sued their registered representative and his individual practice in a potential class action stemming from oil-and-gas private placements that the SEC claims were fraudulent.

Related Articles

SEC charges another private-placement provider

Rep and his practice sued, in apparent first

States gain in turf war over private placements

Adviser named in private-placement suit says he did nothing wrong

Recommend this article?
Recommend (3)

User Comments

PRINT EMAIL RSS REPRINT SHARE

POWERED BY Pluck

scrapped

House passes sweeping financial reform

Next hot job? Compliance officer at financial firm

Morningstar to buy data analysis firm for $51.5M

McCann rolls out enhanced pay plan at UBS

Most Popular
Pimco nabs Treasury's $700B man

$900M Merrill Lynch team strikes out on its own

Morgan Stanley shakes up management as Gorman preps for CEO spot

Moves likely to help Tiger's wife hit the green

Value Line fires its legendary investment brain





Bring IN to Your Inbox with e-Newsletters

REGULATORY ALERT
InvestmentNews Daily
SUBSCRIBE



September 12, 1986

TO:     All NASD Members, Associated Persons and Other Interested Persons

RE:     Compliance with the NASD Rules of Fair Practice in the Employment and
        Supervision of Off-Site Personnel

---

### EXECUTIVE SUMMARY

NASD rules and policies consider associated persons of a member to be employees of the member, regardless of their locations or compensation arrangements. The notice addresses regulatory issues that relate to off-site employment of registered persons, including supervisory procedures, private securities transactions, fair dealings with customers and communications with the public.

Because of the significance of the issues discussed in this notice, the NASD strongly urges that it be distributed to all associated persons and recommends that it be included in the compliance manual of all firms employing off-site personnel.

### INTRODUCTION

A significant number of NASD members employ registered persons who engage in securities-related activities, on a full- or part-time basis, at locations away from the offices of the members. These off-site representatives, often classified for compensation purposes as independent contractors, may also be involved in other business enterprises such as insurance, real estate sales, accounting or tax planning. They may also operate as separate business entities under names other than those of the members. The NASD, in the course of its disciplinary proceedings, has observed a pattern of rule violations and other regulatory problems stemming from factors inherent in these arrangements and the manner in which they are effectuated.

Irrespective of an individual's location or compensation arrangements, all associated persons are considered to be employees of the firm with which they are registered for purposes of compliance with NASD rules governing the conduct of registered persons and the supervisory responsibilities of the member. The fact

EXHIBIT
B

that an associated person conducts business at a separate location or is compensated as an independent contractor does not alter the obligations of the individual and the firm to comply fully with all applicable regulatory requirements.

To provide guidance to the membership in meeting these obligations, this notice discusses certain regulatory issues that frequently arise in the context of off-site employment. Because of the importance of these issues, the NASD urges each member to duplicate this notice and distribute it individually to all associated persons. In addition, it is suggested that this notice be included in the compliance manual of firms employing off-site representatives. **The NASD, in the course of its member examinations, will make inquiries to ascertain that this notice has been provided to all appropriate personnel.**

### Article III, Section 27, NASD Rules of Fair Practice: Supervision

Section 27(a) sets forth the basic duty of a member firm to:

> ". . .establish, maintain and enforce written procedures which will enable it to supervise properly the activities of each registered representative and associated person to assure compliance with applicable securities laws, rules, regulations and statements of policy promulgated thereunder and with the rules of this Association."

Although the rule does not prescribe specific supervisory procedures to be followed by all firms, it clearly mandates that the adopted procedures enable a firm to supervise **properly** the activities of **each** associated person to **assure** compliance. Thus, firms employing off-site representatives are responsible for establishing **and carrying out** procedures that will subject these individuals to effective supervision designed to monitor their securities-related activities and to detect and prevent regulatory and compliance problems.

This can include:

1.    Educating off-site personnel regarding their obligations as registered persons to the firm and to the public, including prohibited sales practices.

2.    Maintaining regular and frequent contact with such individuals.

3.    Implementing appropriate supervisory practices, such as records inspections and compliance audits at the representatives' places of employment, to ensure that their methods of business and day-to-day operations comply with applicable rules and requirements.

For greatest effectiveness in preventing and detecting violations, visits should be unannounced and include, for example, a review of on-site customer account documentation and other books and records, meetings with individual representatives to discuss the products they are selling and their sales methods, and an examination of correspondence and sales literature.

To fulfill these obligations, a firm should consider whether the number and location of its registered principals provides the capability to supervise its off-site representatives effectively.

Section 27(c) includes the requirement that a member:

". . .review and endorse in writing, on an internal record, all transactions and all correspondence of its registered representatives pertaining to the solicitation or execution of any securities transaction."

This requirement applies equally in the case of off-site representatives. Firms whose off-site personnel also engage in non-securities businesses should remind these individuals that correspondence pertaining to such businesses, unless submitted for review, may not include material related to securities transactions.

Section 27(d) imposes upon a member the obligation to:

". . .review the activities of each office, which shall include the periodic examination of customer accounts to detect and prevent irregularities and abuses and at least an annual inspection of each office of supervisory jurisdiction."

An office of supervisory jurisdiction (OSJ) is defined in Section 27(f) as:

". . .any office designated as directly responsible for the review of the activities of registered representatives or associated persons in such office and/or in other offices of the member."

If a member has designated an individual as responsible for reviewing the activities of other registered persons within the firm, the office of that individual must be inspected annually, regardless of whether such person is compensated as an employee or as an independent contractor.

### Article III, Section 40, NASD Rules of Fair Practice:
### Private Securities Transactions

Past experience of the NASD in examining members indicates that the conduct of off-site representatives most frequently resulting in violations of NASD rules involves unauthorized private securities transactions, or "selling away." The NASD expects that the promulgation of Section 40 and the clarification of the obligations of members and associated persons in such transactions will reduce the instances of selling away among all associated persons, including off-site representatives.

Several aspects of Section 40, and certain related issues, merit emphasis in the context of off-site personnel. **Section 40 cannot accomplish its objectives unless member firms communicate the substance of the rule to their associated persons and take affirmative steps to ensure that these requirements are understood and observed.** This is especially true in the case of off-site representatives whose day-to-day access to compliance personnel and individuals experienced in the securities industry may be limited and whose participation in non-private securities transactions may be infrequent and restricted in scope.

- 4 -

Because of their location and other circumstances of their employment, off-site personnel have a greater opportunity than on-site personnel to engage in undetected selling away. Consequently, firms that employ such persons are responsible for monitoring their activities in a manner reasonably intended to detect violations. Further, the obligations imposed upon the firm and the associated person under the rule are neither altered nor lessened in any way by the fact that the individual is compensated as an independent contractor.

The rule requires a member that approves an associated person's involvement in private securities transactions for compensation to record the transactions on its books and records and supervise the individual's participation "as if the transactions were executed on behalf of the member." Although the rule does not specify the manner of recordation, the firm may wish to maintain records that provide information regarding:

- The individual and the security involved;

- The amount and source of compensation;

- The names of the investors and the amounts and dates of the investments;

- The issuer, syndicator or any other broker-dealer involved; and

- The manner in which the firm undertook to supervise the associated person's participation.

These records should be in a form that would permit the NASD to ascertain, upon examination, all relevant information regarding the participation of associated persons in private securities transactions.

Several issues arise in connection with supervising the involvement of off-site representatives in private securities transactions. The NASD has observed that some firms permit such persons to form and sell interests in limited partnerships for which they serve as general partners. While this is not an impermissible activity, members and registered persons are reminded that such transactions are **securities** transactions, and therefore subject to Section 40 and all other rules and regulations governing such transactions. Thus, the member is responsible for ensuring that the formation of these partnerships and the solicitation and sale of interests therein are conducted in compliance with all applicable requirements, including those pertaining to documentation, due diligence, disclosure, suitability determinations, and the handling of customer funds.

There have been instances in which associated persons have engaged in private securities transactions without notifying the firm, due to the belief or the advice of third parties that the product involved was not a security. Under federal securities laws, the definition of a security includes the commonly understood products, such as stocks and bonds, as well as other investment products, such as an "investment contract" in which one or more individuals invest in a common venture with the expectation of receiving a monetary return on their investment from or through the efforts of a third party.

Because questions frequently arise as to whether a particular investment instrument is a security, a registered person should not sell any product offered by

an entity outside the firm without consulting the member to determine the product's status as a security.

## Article III, Section 2, NASD Rules of Fair Practice:
## Recommendations to, and Fair Dealings with, Customers

Article III, Section 2 of the NASD Rules of Fair Practice requires that:

> "[i]n recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by the customer as to his other security holdings and as to his financial situation and needs."

The policy of the NASD Board of Governors pertaining to Section 2 sets forth specific guidelines in the areas of recommending speculative, low-priced securities, excessive trading activity, trading in mutual fund shares, fraudulent activity, and recommending purchases beyond the customer's capability.

The actions of an associated person in dealing with customers and customer accounts, regardless of whether he or she is compensated as an employee or an independent contractor, are actions on behalf of the firm. The firm is responsible for supervising in a manner designed to detect and prevent violations of Section 2. Members should take affirmative steps to ensure that off-site personnel understand and abide by NASD and firm policies regarding dealings with customers, customer accounts and customer funds.

## Article III, Section 10, Rules of Fair Practice:
## Influencing or Rewarding Employees of Others

Article III, Section 10 of the NASD Rules of Fair Practice prohibits members and associated persons from giving:

> ". . .anything of value, including gratuities, in excess of fifty dollars per individual per year to any person. . .where such payment or gratuity is in relation to the business of the employer of the recipient of the payment or gratuity"

unless such payments or gratuities are pursuant to a written agreement between the payor and the recipient to which the recipient's employer has consented.

It is, therefore, a violation of Section 10 for a member to compensate an associated person of another member in connection with securities transactions without the employer firm's consent. A member's obligations under Section 10 are not affected by the fact that the recipient is compensated by his or her NASD employer member as an independent contractor.

## Article III, Section 35, Rules of Fair Practice:
## Communications with the Public

Article III, Section 35(b) of the NASD Rules of Fair Practice requires that every item of advertising and sales literature, as defined in Section 35(a):

"...be approved by signature or initial, prior to use, by a registered principal (or his designee) of the member."

Paragraph (2) of Section 35(b) requires further that a separate file of such items be maintained for a period of three years.

This rule applies to all materials originated or distributed by off-site representatives that meet the definition of "advertisement" or "sales literature," including those prepared or used by persons compensated as independent contractors. In particular, firms must approve any materials referencing that securities are sold by the off-site representative through the member, even though such materials may be intended to promote the non-securities businesses of the off-site personnel.

Article III, Section 35(d)(2)(A) further requires that all advertisements and sales literature contain the name of the member, as well as certain other information under specified circumstances. The fact that an associated person may operate under a business name other than that of the member does not alter this requirement. The NASD has received inquiries regarding the need to include the name of the member in promotional materials that do not include references to the associated person's securities-related activities. Particular materials should be considered individually, preferably by the firm's compliance department, to determine whether they fall within the scope of Section 35.

### Unregistered Broker-Dealers

The Securities and Exchange Commission has taken the position that an individual who operates as an independent contractor must be registered as a broker-dealer unless he or she is under the control of a registered broker-dealer. [1]/ The question of "control" must be evaluated in light of the facts and circumstances of each situation and is not susceptible to a test of general application. There are, however, circumstances inherent in off-site employment and independent contractor compensation arrangements that may give rise to potential liability for operating as unregistered broker-dealers. Thus, registered persons and member firms may want to consider registering of off-site locations as broker-dealers.

Any questions regarding this notice should be directed to either Dennis C. Hensley, NASD Vice President and Deputy General Counsel, at (202) 728-8245, or Jacqueline D. Whelan, Attorney, NASD Office of the General Counsel, at (202) 728-8270.

Sincerely,

Frank J. Wilson
Executive Vice President
and General Counsel

---

[1]/ Refer to the statement by the SEC Division of Market Regulation, dated June 18, 1982, forwarded to all NASD members on August 25, 1982.



Print

## 88-67 Obligation to Provide Accurate Information on Forms U-4 and U-5 and to Research Potential Employee's Background

| SUGGESTED ROUTING* |
| --- |
| Senior Management<br>Legal & Compliance<br>Operations<br>Registration |

*These are suggested departments only. Others may be appropriate for your firm.

### EXECUTIVE SUMMARY

The NASD reminds members that the NASD By-Laws and Rules of Fair Practice require that complete and accurate information be provided on Forms U-4 and U-5 and that members are responsible for investigating a potential employee's background prior to hiring such person.

### BACKGROUND

The NASD Board of Governors, in implementing the recommendations of the Regulatory Review Task Force, has determined that it is appropriate to re-emphasize the NASD's policy with respect to complete and accurate disclosure on Forms U-4 and U-5 and with respect to a member's obligation to adequately research the background of its potential employees.

### Complete and Accurate Forms U-4 and U-5

Associated persons of NASD members have an obligation to provide complete and accurate information on any Uniform Application for Securities Industry Registration or Transfer ("Form U-4") that is to be filed with the NASD. Article IV, Section 2(a)(3) of the By-Laws, which relates to registered representatives and associated persons, together with the instructions to Form U-4, clearly require that complete and accurate information be provided on this Form. In addition, Item 1 on page 4 of the Form U-4 requires each applicant for registration with the NASD to swear or affirm that the applicant has read and understood the items and instructions on the form and that the applicant's answers (including attachments) are true and complete to the best of the applicant's knowledge.

Member firms are also required to file complete and accurate information on any Uniform Termination Notice for Securities Industry Registration ("Form U-5") that is required to be filed with the NASD. Article IV, Section 3 of the By-Laws requires that a member firm file Form U-5 promptly, but not later than 30 calendar days after terminating a registered person. Items 13-15 on Form U-5 ask for information concerning apparent misconduct by a person while associated with the firm submitting the Form U-5. A "yes" answer to Items 13-15 must be accompanied by a detailed explanation of the apparent misconduct. Failure to provide accurate answers to Items 13-15 may deprive the NASD of its ability to detect violations and subsequently sanction persons for violations of the NASD's rules and other applicable federal statutes and regulations. Failure to provide this information may also subject members of the investing public to repeated misconduct and may deprive member firms of the ability to make informed hiring decisions.

The NASD would also point out that members and their associated persons may be subject to administrative, civil, and even criminal penalties for failing to provide complete and accurate information on Forms U-4 and U-5.

### Researching a Potential Employee's Background

Member firms have an obligation to thoroughly research a potential employee's background before hiring such person. Article III, Section 27(e) of the Rules of Fair Practice provides that "[e]ach member shall have the responsibility and duty to ascertain by investigation the good character, business repute, qualifications and experience of any person prior to making such a certification in the application of such person for registration with this association." The last section of Form U-4 on page 4 also requires that the member firm certify that the member has communicated with all of the applicant's previous

EXHIBIT
C
exhibit

employers for the past three years and has taken appropriate steps to verify the items and attachments contained in the Form U-4. The NASD has brought disciplinary actions against member firms who have failed to properly research a potential employee's background prior to hiring such person. Members are reminded that they may use the Firm Access Query Systems (FAQS) or may file an information request through NASD Disclosure Program in order to comply with the investigation requirement.

Questions concerning this notice may be directed to Craig L. Landauer, Senior Attorney, Office of General Counsel, at (202) 728-8291.

©2008 FINRA. All rights reserved.

CRD® or IARD(SM) System    Current As Of:   11/29/2009
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:   Florida
Request Submitted:   11/30/2009 4:00:19 PM                                    **Page 3 of 19**

**Individual    869170 - DAY II, MELVIN THOMAS**

**Administrative Information**
**Composite Information**

| | |
|---|---|
| **Full Legal Name** | DAY II, MELVIN THOMAS |
| **Year of Birth** | 1951 |
| **State of Residence** | UT |

**Active Employments**

| | |
|---|---|
| **Current Employer** | INTERMOUNTAIN FINANCIAL SERVICES, INC.(15386) |
| **Firm Main Address** | 2636 S. OLD SETTLERS RD<br>HEBER CITY<br>UT, UNITED STATES<br>84032 |
| **Firm Mailing Address** | P.O. BOX 669<br>HEBER CITY<br>UT, UNITED STATES<br>84032 |
| **Business Telephone#** | 801-531-1155 |
| **Independent Contractor** | Yes |

**Office of Employment Address**

| CRD Branch# | NYSE Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Address Start Date | Address End Date | Type of Office |
|---|---|---|---|---|---|---|---|
| 380278 | | | Yes | No | 09/08/2008 | | Located At |
| **Address** | 599 S. 500 E.<br>AMERICAN FORK, UT  84003  UNITED STATES | | | | | | |
| BD Main | | | Yes | No | 06/15/2007 | 09/08/2008 | Supervised From |
| **Address** | 2636 S. OLD SETTLERS RD<br>HEBER CITY, UT  84032  UNITED STATES | | | | | | |

| | |
|---|---|
| **Reportable Disclosures?** | Yes |
| **Statutory Disqualification?** | SDRQRSRVW |
| **Registered With Multiple Firms?** | No |
| **Material Difference in Disclosure?** | No |

**Personal Information**

| | |
|---|---|
| **Individual CRD#** | 869170 |
| **Other Names Known By** | DAY, TOM<br>DAY, TOM<br>DAY II, MELVIN THOMAS |
| **Year of Birth** | 1951 |

PAGE 76 OF 144



EXHIBIT
D
tabbies

CRD® or IARD(SM) System      Current As Of:   11/29/2009
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:   Florida
Request Submitted:   11/30/2009 4:00:19 PM                        Page 4 of 19

| Individual | 869170 - DAY II, MELVIN THOMAS |
|---|---|

## Administrative Information
### Registrations with Current Employer(s)

From    06/15/2007    To    Present        INTERMOUNTAIN FINANCIAL SERVICES, INC.(15386)

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|---|---|---|---|---|
| FINRA | GP | 10/30/2007 | APPROVED | 06/18/2007 |
| FINRA | GS | 10/30/2007 | APPROVED | 06/18/2007 |
| UT | AG | 06/18/2007 | APPROVED | 06/18/2007 |

### Registrations with Previous Employer(s)

From    12/10/2007    To    09/25/2008    DBSI SECURITIES CORPORATION(11687)
Reason for Termination        Voluntary
Termination Comment

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|---|---|---|---|---|
| CA | AG | 06/26/2008 | TERMED | 02/13/2008 |
| FINRA | GP | 09/25/2008 | TERMED | 02/11/2008 |
| FINRA | GS | 09/25/2008 | TERMED | 02/11/2008 |
| ID | AG | 09/25/2008 | TERMED | 06/27/2008 |
| MT | AG | 09/25/2008 | TERMED | 02/12/2008 |
| NV | AG | 09/25/2008 | TERMED | 07/02/2008 |
| UT | AG | 09/25/2008 | TERMED | 03/07/2008 |
| WY | AG | 09/25/2008 | TERMED | 06/27/2008 |

From    03/01/2004    To    12/31/2006    WAVELAND CAPITAL PARTNERS LLC(40054)
Reason for Termination        Voluntary
Termination Comment

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|---|---|---|---|---|
| CA | AG | 12/31/2006 | TERMED | 03/19/2004 |
| FINRA | GP | 12/31/2006 | TERMED | 03/19/2004 |
| FINRA | GS | 12/31/2006 | TERMED | 03/19/2004 |
| KS | AG | 12/31/2006 | TERMED | 03/19/2004 |
| NV | AG | 12/31/2006 | TERMED | 03/19/2004 |
| UT | AG | 12/31/2006 | TERMED | 04/12/2004 |

From    11/16/1998    To    03/08/2004    SENTRA SECURITIES CORPORATION(10249)
Reason for Termination        Voluntary
Termination Comment

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|---|---|---|---|---|
| CA | AG | 03/15/2004 | TERMED | 11/16/1998 |
| FINRA | GP | 03/15/2004 | TERMED | 11/16/1998 |
| FINRA | GS | 03/15/2004 | TERMED | 11/16/1998 |
| FL | AG | 03/15/2004 | T_NOREG | |
| ID | AG | 12/31/2002 | TERMED | 11/16/1998 |
| KS | AG | 03/15/2004 | TERMED | 09/07/1999 |
| NV | AG | 03/15/2004 | TERMED | 11/16/1998 |
| OR | AG | 12/31/2003 | TERMED | 11/16/1998 |
| UT | AG | 03/15/2004 | TERMED | 11/16/1998 |
| WA | AG | 03/15/2004 | TERMED | 11/16/1998 |

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

CRD® or IARD(SM) System       Current As Of:   11/29/2009
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:   Florida
Request Submitted:     11/30/2009 4:00:19 PM                                    Page 5 of 19

| Individual | 869170 - DAY II, MELVIN THOMAS |
|---|---|

**Administrative Information**

**Registrations with Previous Employer(s)**

From    02/16/1995  To   11/16/1998  UNITED PACIFIC SECURITIES, INC.(21986)

Reason for Termination        Administrative Termination

Termination Comment       Administrative Termination

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|---|---|---|---|---|
| CA | AG | 11/16/1998 | TERMED | 02/05/1996 |
| FINRA | GP | 11/16/1998 | TERMED | 02/27/1995 |
| FINRA | GS | 11/16/1998 | TERMED | 02/27/1995 |
| ID | AG | 11/16/1998 | TERMED | 04/18/1997 |
| NV | AG | 11/16/1998 | TERMED | 11/09/1995 |
| OR | AG | 11/16/1998 | TERMED | 02/07/1996 |
| UT | AG | 11/16/1998 | TERMED | 03/09/1995 |
| WA | AG | 11/16/1998 | TERMED | 08/28/1996 |

From    10/29/1992  To   02/28/1995  PACIFIC CLIFFS CAPITAL, INC.(30327)

Reason for Termination        Unknown Conversion

Termination Comment       AS PER FIRMS REQUEST

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|---|---|---|---|---|
| FINRA | GS | 02/14/1994 | TERMED | 12/02/1992 |
| UT | AG | 02/28/1995 | TERMED | 12/08/1992 |

From    10/18/1993  To   02/03/1995  CONSOLIDATED INVESTMENT SERVICES, INC.(7929)

Reason for Termination        Voluntary

Termination Comment       Voluntary

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|---|---|---|---|---|
| FINRA | GP | 02/09/1995 | TERMED | 01/28/1994 |
| FINRA | GS | 02/09/1995 | TERMED | 10/26/1993 |
| UT | AG | 02/09/1995 | TERMED | 11/09/1993 |

From    10/01/1993  To   02/01/1995  CONSOLIDATED INVESTMENT SERVICES, INC.(7929)

Reason for Termination        Voluntary

Termination Comment

<<No Registrations with Previous Employer(s) found for this Individual.>>

From    01/02/1991  To   04/01/1992  CUNA BROKERAGE SERVICES, INC.(13941)

Reason for Termination        Voluntary

Termination Comment

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|---|---|---|---|---|
| FINRA | GS | 04/06/1992 | TERMED | 02/11/1991 |
| UT | AG | 04/06/1992 | TERMED | 02/19/1991 |

From    04/01/1990  To   12/31/1990  CENTURY INVESTORS OF AMERICA, INC.(5322)

Reason for Termination        Voluntary

Termination Comment       Voluntary

| Regulator | Registration Category | Status Date | Registration Status | Approval Date |
|---|---|---|---|---|
| FINRA | GS | 12/31/1990 | TERMED | 04/26/1990 |
| UT | AG | 12/31/1990 | TERMED | 04/27/1990 |

---

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

CRD® or IARD(SM) System     Current As Of:   11/29/2009
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:   Florida
Request Submitted:   11/30/2009 4:00:19 PM

Individual     869170 - DAY II, MELVIN THOMAS

Administrative Information

Professional Designations

<<No Professional Designations found for this Individual.>>

Employment History

| From | 12/2007 | To | Present | Name | DBSI SECURITIES CORPORATION |
|------|---------|----|---------|------|------------------------------|
| | | | | Location | MERIDIAN, ID, USA |
| | | | | Position | REGIONAL VICE PRESIDENT |
| | | | | Investment Related | Yes |
| From | 06/2007 | To | Present | Name | INTERMOUNTAIN FINANCIAL SERVICES, INC |
| | | | | Location | HEBER, UT, USA |
| | | | | Position | REGISTERED REPRESENTIVE |
| | | | | Investment Related | Yes |
| From | 09/2003 | To | 12/2007 | Name | SPECTRUS REAL ESTATE GROUP |
| | | | | Location | BOISE, ID, USA |
| | | | | Position | SALES EXECUTIVE |
| | | | | Investment Related | Yes |
| From | 03/2004 | To | 04/2007 | Name | WAVELAND CAPITAL PARTNERS LLC |
| | | | | Location | CARLSBAD, CA, USA |
| | | | | Position | REGISTERED REPRESENTATIVE |
| | | | | Investment Related | Yes |
| From | 11/1998 | To | 02/2004 | Name | SENTRA SECURITIES CORPORATION |
| | | | | Location | CARLSBAD, CA |
| | | | | Position | OTHER - REPRESENTATIVE |
| | | | | Investment Related | Yes |
| From | 02/1995 | To | 11/1998 | Name | UNITED PACIFIC SECURITIES, INC. |
| | | | | Location | AMERICAN FORK, UT |
| | | | | Position | NOT PROVIDED |
| | | | | Investment Related | Yes |
| From | 10/1992 | To | 02/1995 | Name | PACIFIC CLIFFS CAPITAL, INC. |
| | | | | Location | WATONSVILLE, CA |
| | | | | Position | NOT PROVIDED |
| | | | | Investment Related | Yes |
| From | 10/1993 | To | 02/1995 | Name | CONSOLIDATED INVESTMENT SERVICES, INC. |
| | | | | Location | LEHI, UT |
| | | | | Position | NOT PROVIDED |

PAGE 79 OF 144

**CRD® or IARD(SM) System        Current As Of:   11/29/2009**
**Snapshot - Individual**
**CRD® or IARD(SM) System Report provided to:   Florida**
**Request Submitted:      11/30/2009 4:00:19 PM**                            Page 7 of 19

| Individual | 869170 - DAY II, MELVIN THOMAS |
|---|---|

**Administrative Information**
**Employment History**

| | | | | Investment Related | Yes |
|---|---|---|---|---|---|
| From | 10/1993 | To | 02/1995 | **Name** | CONSOLIDATED INVESTMENT SERVICES, INC. |
| | | | | **Location** | LITTLETON, CO |
| | | | | **Position** | NOT PROVIDED |
| | | | | Investment Related | Yes |
| From | 04/1992 | To | 08/1993 | **Name** | INDEPENDANT FINANCIAL SERVICES (SELF) |
| | | | | **Location** | OREM, UT |
| | | | | **Position** | FINANCIAL_CONSUL - Financial Consultant |
| | | | | Investment Related | No |
| From | 01/1991 | To | 04/1992 | **Name** | CUNA BROKERAGE SERVICES, INC. |
| | | | | **Location** | SALT LAKE CITY, UT |
| | | | | **Position** | NOT PROVIDED |
| | | | | Investment Related | Yes |
| From | 04/1990 | To | 04/1992 | **Name** | PLAN AMERICA |
| | | | | **Location** | OREM, UT |
| | | | | **Position** | OTHER - REGISTERED REP FINANCIAL CONSU |
| | | | | Investment Related | No |
| From | 01/1990 | To | 04/1992 | **Name** | GALLMAN PAFS AGENCY |
| | | | | **Location** | RENO, NV |
| | | | | **Position** | OTHER - PLAN AMERICA REPRESENTATIVE |
| | | | | Investment Related | No |
| From | 04/1990 | To | 12/1990 | **Name** | CENTURY INVESTORS OF AMERICA, INC. |
| | | | | **Location** | SALT LAKE CITY, UT |
| | | | | **Position** | NOT PROVIDED |
| | | | | Investment Related | Yes |
| From | 01/1990 | To | 04/1990 | **Name** | SELF EMPLOYED SELLING LIFE INSURANCE |
| | | | | **Location** | AMERICAN FORK, UT |
| | | | | **Position** | AGENT - Agent |
| | | | | Investment Related | No |
| From | 07/1989 | To | 01/1990 | **Name** | SLIP SAFE |
| | | | | **Location** | SANDY, UT |
| | | | | **Position** | OTHER - NAT'L. SALES MGR. |
| | | | | Investment Related | No |

PAGE 80 OF 144

CRD® or IARD(SM) System          Current As Of:   11/29/2009
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:   Florida
Request Submitted:   11/30/2009 4:00:19 PM                                    Page 8 of 19

**Individual      869170 - DAY II, MELVIN THOMAS**

**Administrative Information**
**Office of Employment History**

From   06/2007      To   Present

Name   INTERMOUNTAIN FINANCIAL SERVICES, INC.(15386)

Independent Contractor   Yes

**Office of Employment Address**

| CRD Branch# | NYSE Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Address Start Date | Address End Date | Type of Office |
|---|---|---|---|---|---|---|---|
| 380278 | | | Yes | No | 09/08/2008 | | Located At |
| **Address** | 599 S. 500 E. AMERICAN FORK, UT  84003  UNITED STATES | | | | | | |
| BD Main | | | Yes | No | 06/15/2007 | 09/08/2008 | Supervised From |
| **Address** | 2636 S. OLD SETTLERS RD HEBER CITY, UT  84032  UNITED STATES | | | | | | |

From   12/2007      To   09/2008

Name   DBSI SECURITIES CORPORATION(11687)

Independent Contractor   No

**Office of Employment Address**

| CRD Branch# | NYSE Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Address Start Date | Address End Date | Type of Office |
|---|---|---|---|---|---|---|---|
| BD Main | | | Yes | No | 12/10/2007 | 09/25/2008 | Supervised From |
| **Address** | 12426 W. EXPLORER DRIVE, SUITE 200 BOISE, ID  83713  UNITED STATES | | | | | | |
| | | | No | Yes | 12/10/2007 | 09/25/2008 | Located At |
| **Address** | 1020 W. 3200 N. LEHI, UT  84043  UNITED STATES | | | | | | |
| 202570 | | | Yes | No | 12/10/2007 | 09/25/2008 | Supervised From |
| **Address** | 1550 S TECH LN MERIDIAN, ID  83642  UNITED STATES | | | | | | |

From   01/2008      To   02/2008

Name   DBSI SECURITIES CORPORATION(11687)

Independent Contractor

**Office of Employment Address**

| CRD Branch# | NYSE Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Address Start Date | Address End Date | Type of Office |
|---|---|---|---|---|---|---|---|
| | | | No | No | 01/30/2008 | 02/08/2008 | Located At |
| **Address** | 1020 W. 3200 N. | | | | | | |

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

CRD® or IARD(SM) System    **Current As Of:**  **11/29/2009**
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:  **Florida**
**Request Submitted:**   11/30/2009 4:00:19 PM

| Individual | 869170 - DAY II, MELVIN THOMAS |
|---|---|

**Administrative Information**
**Office of Employment History**
   **Office of Employment Address**
      LEHI, UT  84043  USA

From    03/2004    To  12/2006

Name    WAVELAND CAPITAL PARTNERS LLC(40054)

Independent Contractor   Yes

   **Office of Employment Address**

| CRD Branch# | NYSE Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Address Start Date | Address End Date | Type of Office |
|---|---|---|---|---|---|---|---|
| | | | No | Yes | 08/07/2006 | 12/31/2006 | Located At |
| **Address** | 1020 W. 3200 N.<br>LEHI, UT  84043  UNITED STATES | | | | | | |
| BD Main | | | Yes | No | 03/01/2004 | 12/31/2006 | Supervised From |
| **Address** | 19800 MACARTHUR BLVD, SUITE 650<br>IRVINE, CA  92612  UNITED STATES | | | | | | |
| | | | No | No | 03/01/2004 | 08/07/2006 | Located At |
| **Address** | 1209 W 1800 N.<br>LEHI, UT  84043  USA | | | | | | |

From    11/1998    To  03/2004

Name    SENTRA SECURITIES CORPORATION(10249)

Independent Contractor   No

   **Office of Employment Address**

| CRD Branch# | NYSE Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Address Start Date | Address End Date | Type of Office |
|---|---|---|---|---|---|---|---|
| | | 7500 | No | No | 11/16/1998 | 03/08/2004 | Located At |
| **Address** | 5950 LA PLACE COURT #160<br>CARLSBAD, CA  92008 | | | | | | |

From    02/1995    To  11/1998

Name    UNITED PACIFIC SECURITIES, INC.(21986)

Independent Contractor   No

   **Office of Employment Address**

| CRD Branch# | NYSE Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Address Start Date | Address End Date | Type of Office |
|---|---|---|---|---|---|---|---|
| | | | No | No | 02/16/1995 | 11/16/1998 | Located At |
| **Address** | 69 E. MAIN STE: 1<br>AMERICAN FORK, UT  84003 | | | | | | |

From    10/1992   To  02/1995

PAGE _82_ OF _144_

Individual     869170 - DAY II, MELVIN THOMAS

**Administrative Information**
**Office of Employment History**
**Name**     PACIFIC CLIFFS CAPITAL, INC.(30327)

**Independent Contractor**     No

**Office of Employment Address**

| CRD Branch# | NYSE Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Address Start Date | Address End Date | Type of Office |
|---|---|---|---|---|---|---|---|
| | | | No | No | 10/29/1992 | 02/28/1995 | Located At |

**Address**     135 AVIATION WAY #17
WATONSVILLE, CA  95076

From     10/1993     To   02/1995

**Name**     CONSOLIDATED INVESTMENT SERVICES, INC.(7929)

**Independent Contractor**     No

**Office of Employment Address**

| CRD Branch# | NYSE Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Address Start Date | Address End Date | Type of Office |
|---|---|---|---|---|---|---|---|
| | | | No | No | 10/18/1993 | 02/03/1995 | Located At |

**Address**     130 W. MAIN STE. 100
LEHI, UT  84043

From     10/1993     To   02/1995

**Name**     CONSOLIDATED INVESTMENT SERVICES, INC.(7929)

**Independent Contractor**     No

**Office of Employment Address**

| CRD Branch# | NYSE Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Address Start Date | Address End Date | Type of Office |
|---|---|---|---|---|---|---|---|
| | | | No | No | 10/01/1993 | 02/01/1995 | Located At |

**Address**     5777 SOUTH RAPP STREET
LITTLETON, CO  80120

From     01/1991     To   04/1992

**Name**     CUNA BROKERAGE SERVICES, INC.(13941)

**Independent Contractor**     No

**Office of Employment Address**

| CRD Branch# | NYSE Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Address Start Date | Address End Date | Type of Office |
|---|---|---|---|---|---|---|---|
| | | 7562 | No | No | 01/02/1991 | 04/01/1992 | Located At |

**Address**     1805 S. REDWOOD RD, P.O. BOX 27288 (84127)
SALT LAKE CITY, UT  84104

From     04/1990     To   12/1990

PAGE 83 OF 144

CRD® or IARD(SM) System        Current As Of:   11/29/2009
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:   Florida
Request Submitted:   11/30/2009 4:00:19 PM                                     Page 11 of 19

**Individual    869170 - DAY II, MELVIN THOMAS**

**Administrative Information**
**Office of Employment History**

**Name**    CENTURY INVESTORS OF AMERICA, INC.(5322)

**Independent Contractor    No**

**Office of Employment Address**

| CRD Branch# | NYSE Branch Code# | Firm Billing Code | Registered Location? | Private Residence? | Address Start Date | Address End Date | Type of Office |
|---|---|---|---|---|---|---|---|
| | | 7562 | No | No | 04/01/1990 | 12/31/1990 | Located At |

**Address**    1805 S REDWOOD ROAD, P O BOX 27288
SALT LAKE CITY, UT  84104

**Other Business**
SPECTRUS REAL ESTATE GROUP
12426 W. EXPLORER DR., SUITE 220
BOISE, ID  83713
INVESTMENT RELATED, REAL ESTATE SALES
HIRE DATE 12/2007 10 HOURS PER WEEK

**Examination Information**

| Exam | Status | Status Date | Exam Date | Grade | Score | Window Dates |
|---|---|---|---|---|---|---|
| S7 | OFFICIAL_RESULT | 07/21/1979 | 07/21/1979 | PASSED | 197 | - |
| S24 | OFFICIAL_RESULT | 01/27/1994 | 01/27/1994 | PASSED | 72 | - |
| S63 | OFFICIAL_RESULT | 07/17/1999 | 07/17/1999 | PASSED | 76 | - |
| S63 | EXPIRED | 02/28/1993 | | | 0 | - |
| S63 | EXPIRED | 03/14/1988 | | | 0 | - |
| S63 | OFFICIAL_RESULT | 07/21/1983 | 07/21/1983 | PASSED | 76 | - |

**CE Regulatory Element Status**
**Current CE Status    SATISFIED**
**CE Base Date        03/21/2005**

**Current CE**
<<No Current CE found for this Individual.>>

**Next CE**

| Requirement Window | Requirement Type | Session |
|---|---|---|
| 03/21/2010-07/18/2010 | Anniversary | 101 |

**CE Directed Sequence History**

| Source | Type of Penalty | Date of Action | Effective Date | Appeal Status | Decision Date |
|---|---|---|---|---|---|
| UT | SEQUENCE | 02/04/2005 | 03/21/2005 | - | |

**Inactive CE History Dates**

| From | 07/19/2005 | To | 07/19/2005 |
|---|---|---|---|

**Previous CE Requirement Status**

| Requirement Type | Status | Previous Window | Session | Status Date | Result |
|---|---|---|---|---|---|
| Anniversary | REQUIRED | 07/27/1999-11/23/1999 | 201 | 07/27/1999 | 07/27/1999 - |

CRD® or IARD(SM) System      Current As Of:   11/29/2009
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:   Florida
Request Submitted:    11/30/2009 4:00:19 PM                        **Page 12 of 19**

| Individual | 869170 - DAY II, MELVIN THOMAS |
|---|---|

## Administrative Information
### Previous CE Requirement Status

| Requirement Type | Status | Previous Window | Session | Status Date | Result |
|---|---|---|---|---|---|
| Anniversary | SATISFIED | 07/27/1999-11/23/1999 | 201 | 11/03/1999 | 11/03/1999 - CMPLT |
| Anniversary | REQUIRED | 07/27/2002-11/23/2002 | 201 | 07/29/2002 | 07/29/2002 - |
| Anniversary | SATISFIED | 07/27/2002-11/23/2002 | 201 | 09/16/2002 | 09/16/2002 - CMPLT |
| Directed Sequence | CEINACTIVE | 03/21/2005-07/18/2005 | 201 | 07/19/2005 | 07/19/2005 - |
| Directed Sequence | SATISFIED | 03/21/2005-07/18/2005 | 201 | 07/19/2005 | 07/19/2005 - CMPLT |
| Directed Sequence | REQUIRED | 03/21/2005-07/18/2005 | 201 | 03/21/2005 | 03/21/2005 - |
| Anniversary | REQUIRED | 03/21/2007-07/18/2007 | 201 | 03/21/2007 | 03/21/2007 - |
| Anniversary | SATISFIED | 03/21/2007-07/18/2007 | 201 | 07/17/2007 | 07/17/2007 - CMPLT |

## Filing History

| Filing Date | Form Type | Filing type | Source |
|---|---|---|---|
| 09/25/2008 | U5 | Full termination | DBSI SECURITIES CORPORATION (11687) |
| 09/08/2008 | U4 | Amendment filing | INTERMOUNTAIN FINANCIAL SERVICES, INC. (15386) |
| 09/08/2008 | BR | Initial filing | INTERMOUNTAIN FINANCIAL SERVICES, INC. (15386) |
| 06/26/2008 | U5 | Partial termination | DBSI SECURITIES CORPORATION (11687) |
| 06/26/2008 | U4 | Amendment filing | DBSI SECURITIES CORPORATION (11687) |
| 02/08/2008 | U4 | Dual | DBSI SECURITIES CORPORATION (11687) |
| 01/30/2008 | NRF | Initial filing | DBSI SECURITIES CORPORATION (11687) |
| 06/15/2007 | U4 | Initial filing | INTERMOUNTAIN FINANCIAL SERVICES, INC. (15386) |
| 12/20/2006 | U5 | Full termination | WAVELAND CAPITAL PARTNERS LLC (40054) |
| 08/07/2006 | U4 | Amendment filing | WAVELAND CAPITAL PARTNERS LLC (40054) |
| 03/03/2006 | U4 | Amendment filing | WAVELAND CAPITAL PARTNERS LLC (40054) |
| 03/07/2005 | U4 | Amendment filing | WAVELAND CAPITAL PARTNERS LLC (40054) |
| 02/04/2005 | U6 | Individual registered with CRD | UT |
| 04/12/2004 | U4 | Amendment filing | WAVELAND CAPITAL PARTNERS LLC (40054) |
| 04/12/2004 | U4 | Amendment filing | WAVELAND CAPITAL PARTNERS LLC (40054) |
| 03/17/2004 | U4 | Amendment filing | WAVELAND CAPITAL PARTNERS LLC (40054) |
| 03/15/2004 | U5 | Full termination | SENTRA SECURITIES CORPORATION (10249) |
| 03/04/2004 | U4 | Amendment filing | SENTRA SECURITIES CORPORATION (10249) |
| 03/02/2004 | U4 | Relicense | WAVELAND CAPITAL PARTNERS LLC (40054) |
| 11/28/2003 | U5 | Partial termination | SENTRA SECURITIES CORPORATION (10249) |
| 01/28/2003 | U4 | Amendment filing | SENTRA SECURITIES CORPORATION (10249) |
| 12/20/2002 | U5 | Partial termination | SENTRA SECURITIES CORPORATION (10249) |
| 03/11/2002 | U4 | Amendment filing | SENTRA SECURITIES CORPORATION (10249) |
| 08/19/1999 | U4 | Amendment filing | SENTRA SECURITIES CORPORATION (10249) |
| 07/07/1999 | U5 | Conversion Filing | CONSOLIDATED INVESTMENT SERVICES, INC. (7929) |

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.

CRD® or IARD(SM) System        Current As Of:   11/29/2009
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:   Florida
Request Submitted:    11/30/2009 4:00:19 PM

| Individual | 869170 - DAY II, MELVIN THOMAS |
|------------|--------------------------------|

**Administrative Information**
**Filing History**

| Filing Date | Form Type | Filing type | Source |
|-------------|-----------|-------------|--------|
| 07/06/1999 | U4 | Conversion Filing | CONSOLIDATED INVESTMENT SERVICES, INC. (7929) |
| 07/05/1999 | U4 | Conversion Filing | SENTRA SECURITIES CORPORATION (10249) |
| 07/05/1999 | U5 | Conversion Filing | UNITED PACIFIC SECURITIES, INC. (21986) |
| 07/05/1999 | U4 | Conversion Filing | UNITED PACIFIC SECURITIES, INC. (21986) |
| 07/05/1999 | U5 | Conversion Filing | PACIFIC CLIFFS CAPITAL, INC. (30327) |
| 07/05/1999 | U4 | Conversion Filing | PACIFIC CLIFFS CAPITAL, INC. (30327) |
| 07/05/1999 | U5 | Conversion Filing | CONSOLIDATED INVESTMENT SERVICES, INC. (7929) |
| 07/05/1999 | U4 | Conversion Filing | CONSOLIDATED INVESTMENT SERVICES, INC. (7929) |
| 07/05/1999 | U4 | Conversion Filing | CONSOLIDATED INVESTMENT SERVICES, INC. (7929) |
| 07/05/1999 | U5 | Conversion Filing | CUNA BROKERAGE SERVICES, INC. (13941) |
| 07/05/1999 | U4 | Conversion Filing | CUNA BROKERAGE SERVICES, INC. (13941) |
| 07/05/1999 | U5 | Conversion Filing | CENTURY INVESTORS OF AMERICA, INC. (5322) |
| 07/05/1999 | U4 | Conversion Filing | CENTURY INVESTORS OF AMERICA, INC. (5322) |

PAGE 86 OF 144

CRD® or IARD(SM) System       **Current As Of:   11/29/2009**
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:   Florida
Request Submitted:    11/30/2009 4:00:19 PM                         Page 14 of 19

| Individual | 869170 - DAY II, MELVIN THOMAS |
|---|---|

**Reportable Events**

**Number of Reportable Events**

| | |
|---|---|
| **Bankruptcy** | 2 |
| **Bond** | 0 |
| **Civil Judicial** | 0 |
| **Criminal** | 0 |
| **Customer Complaint** | 0 |
| **Internal Review** | 0 |
| **Investigation** | 0 |
| **Judgement/Lien** | 0 |
| **Regulatory Action** | 1 |
| **Termination** | 1 |

| **Occurrence#** | 117873 | **Disclosure Type** | Termination |
|---|---|---|---|
| **FINRA Public Disclosable** | Yes | **Reportable** | Yes |
| **Material Difference in Disclosure** | No | | |

| **Filing ID** | 13230790 | | **Form (Form Version)** | U4 (06/2003) |
|---|---|---|---|---|
| **Filing Date** | 03/02/2004 | | | |
| **Source** | 40054 - WAVELAND CAPITAL PARTNERS LLC | | | |
| **Disclosure Questions Answered** | 14J(1) | | | |

| **Termination DRP** | | **DRP Version** | 10/2005 |
|---|---|---|---|

| 1. Firm name: | DAIN BOSWORTH INCORPORATED |
|---|---|
| 2. Termination type: | Discharged |
| 3. Date filed/Explanation: | 08/12/1983 |
| 4. Allegation(s): | NOT PROVIDED<br>MANAGEMENT CLAIMED THAT I WAS A COMPLIANCE<br>RISK FOR CUSTOMER REG T VIOLATIONS, AND DEALING WITH STOCKS<br>UNDER $5/SHARE. |
| 5. Principal product type: | Equity - OTC |
| Other product type: | |
| 6. Comment: | TERMINATION. I JOINED A FIRM THAT PERMITTED<br>PENNY STOCK TRADES.<br>I ALSO TOLD MY ASSOCIATE REPS (BEFORE MY<br>TERMINATION) THAT I THOUGHT DAIN BOSWORTH WOULD BE CLOSING<br>THEIR SALT LAKE CITY OFFICE BECAUSE IT WAS IN DIRE NEED OF<br>REPAIRS, ETC. MANAGEMENT DIDN'T LIKE THAT. ALTHOUGH THEY DID<br>CLOSE A FEW MONTHS LATER; PROMISING RIGHT UP TO THE END THAT<br>THEY HAD NO INTENTION OF CLOSING. I THINK THERE WAS SOME<br>SOUR<br>GRAPES. |

| **Occurrence#** | 1062760 | **Disclosure Type** | Bankruptcy |
|---|---|---|---|
| **FINRA Public Disclosable** | Yes | **Reportable** | Yes |

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.       PAGE 87 OF 144

CRD® or IARD(SM) System        Current As Of:   11/29/2009
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:   Florida
Request Submitted:   11/30/2009 4:00:19 PM                                          Page 15 of 19

**Individual      869170 - DAY II, MELVIN THOMAS**

**Reportable Events**

**Material Difference in Disclosure      No**

| | | | |
|---|---|---|---|
| **Filing ID** | 22595881 | **Form (Form Version)** | U4 (10/2005) |
| **Filing Date** | 02/08/2008 | | |
| **Source** | 11687 - DBSI SECURITIES CORPORATION | | |
| **Disclosure Questions Answered** | 14K(1),14K(2) | | |

**Bankruptcy/SIPC DRP**                              **DRP Version      10/2005**

1. Action type:                        Bankruptcy

2. Action date/Explanation:            05/23/2000

3. Organization:                       BENEFICIAL INTEREST GROUP INC., PRESIDENT

4. Court:                              US BANKRUPTCY COURT, DISTRICT OF UTAH, SALT LAKE CITY
                                       CASE # 00C-25701, CHAPTER 7

5. Currently pending:                  No

6. Disposition type:                   Discharged

7. Disposition date/Explanation:       08/30/2000

8. Summary of events:                  IN JUNE 1994 I STARTED A VIATICAL SETTLEMENT BUSINESS,
                                       ORGANIZED AS BENEFICIAL INTEREST GROUP, INC. (I VOLUNTARILY
                                       CLOSED OPERATIONS SEPT 1944 WHEN THE SEC RULED VIATICALS
                                       TO BE SECURITIES.) WHEN I FILED A CLAIM ON ONE VIATOR THE
                                       INSURANCE COMPANY HAD, WITHOUT PROPER NOTIFICATION,
                                       CANCELLED THE POLICY. RATHER THAN ALLOWING THE ESCROW
                                       AGENT ATTORNEY TO SUE ON OUR BEHALF, ONE INVESTOR WAS
                                       ADVISED TO SUE ME.

9. Trustee/Payment:

   Currently open:

   Direct payment initiated
   date/Explanation:

10. Comment:                           ONE INVESTOR SUED ME AND B.I.G. INSTEAD OF LETTING OUR
                                       ESCROW COMPANY FIGHT IT FOR US. I DIDN'T HAVE THE MONEY TO
                                       FIGHT 2 CASES AT ONCE AND LOST MY CASE.

| | | | |
|---|---|---|---|
| **Occurrence#** | 1187729 | **Disclosure Type** | Bankruptcy |
| **FINRA Public Disclosable** | Yes | **Reportable** | Yes |
| **Material Difference in Disclosure** | No | | |

| | | | |
|---|---|---|---|
| **Filing ID** | 13410031 | **Form (Form Version)** | U4 (06/2003) |
| **Filing Date** | 04/12/2004 | | |
| **Source** | 40054 - WAVELAND CAPITAL PARTNERS LLC | | |
| **Disclosure Questions Answered** | 14K(1) | | |

**Bankruptcy/SIPC DRP**                              **DRP Version      10/2005**

PAGE 88 OF 144

CRD® or IARD(SM) System      Current As Of:   11/29/2009
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:   Florida
Request Submitted:   11/30/2009 4:00:19 PM                                    Page 16 of 19

Individual     869170 - DAY II, MELVIN THOMAS

**Reportable Events**

**Bankruptcy/SIPC DRP**                          **DRP Version**    10/2005

1. Action type:                    Bankruptcy

2. Action date/Explanation:        05/23/2000

3. Organization:                   BENEFICIAL INTEREST GROUP, INC. - PRESIDENT

4. Court:                          US BANKRUPTCY COURT DISTRICT OF UTAH (SALT LAKE)
                                   DOCKET CASE# 00C-25702
                                   CHAPTER 7

5. Currently pending:              No

6. Disposition type:               Discharged

7. Disposition date/Explanation:   08/30/2000

8. Summary of events:              B.I.G. INC., A VIATICAL SETTLEMENT COMPANY (APPROVED BY B/D).
                                   ONE INVESTOR FORCED ME AND THE COMPANY TO COURT INSTEAD
                                   OF ALLOWING OUR ESCROW COMPANY TO TAKE ERRING INSURANCE
                                   COMPANY AND EMPLOYER (OF INSURED) TO COURT.  I WAS FORCED
                                   TO HIRE AN ATTORNEY TO FIGHT EMPLOYER AND INSURANCE
                                   COMPANY.  I DID NOT HAVE THE MONEY TO HIRE AN ATTORNEY FOR
                                   MY OWN DEFENSE AS WELL, AND LOST.  THE SINGLE INVESTOR WAS
                                   THE ONLY CREDITOR NAMED.

9. Trustee/Payment:

   Currently open:

   Direct payment initiated
   date/Explanation:

10. Comment:

| Occurrence# | 1238782 | Disclosure Type | Regulatory Action |
| **FINRA Public Disclosable** | Yes | **Reportable** | Yes |
| **Material Difference in Disclosure** | No | | |

| **Filing ID** | 22595881 | | **Form (Form Version)** | U4 (10/2005) |
| **Filing Date** | 02/08/2008 | | | |
| **Source** | | 11687 - DBSI SECURITIES CORPORATION | | |
| **Disclosure Questions Answered** | | 14D(1)(e),14D(1)(d),14D(1)(b) | | |

**Regulatory Action DRP**                        **DRP Version**    10/2005

1. Regulatory action initiated by:    UTAH DIVISION OF SECURITIES

2. Principal sanction:                Suspension

   Other sanction(s):                 RETAKE S63 EXAM; CEASE AND DESIST ORDER; FINE

3. Date Initiated/Explanation:        02/17/1999

4. Docket/Case#:                      SD-99-0004

5. Employing firm:                    UNITED PACIFIC SECURITIES          PAGE 89 OF 144

CRD® or IARD(SM) System          **Current As Of:    11/29/2009**
**Snapshot - Individual**
**CRD® or IARD(SM) System Report provided to:   Florida**
**Request Submitted:    11/30/2009 4:00:19 PM**                                        Page 17 of 19

| Individual     869170 - DAY II, MELVIN THOMAS |
| --- |

**Reportable Events**

**Regulatory Action DRP**                                        **DRP Version     10/2005**

   6.  Principal product type:              Other

      Other product type(s):

   7.  Allegation(s):                        I SHARED COMMISION WITH ANOTHER SECURITIES BROKER, AGENT
                                    WITHOUT PRIOR COMPANY APPROVAL. (B/D APPROVAL)

   8.  Current status:                       Final

   9.  Appealed to:

   10. Resolution:                           Stipulation and Consent

   11. Resolution date/Explanation:          02/22/1999

   12. A. Resolution detail:                 Monetary/Fine Sanction (Amount: $5,000.00), Suspension Sanction, Cease
                                  and Desist/Injunction Sanction

      B. Other sanction(s)                   RETAKE AND PASS S63 EXAM
         ordered:

      C. Sanction detail:                    FIVE DAY SUSPENSION

   13. Comment:                              NOT PROVIDED

**Filing ID**          14910109                      **Form (Form Version)**     U6 (06/2003)
**Filing Date**        02/04/2005
**Source**             Utah
**Disclosure Questions Answered**

**Regulatory Action DRP**                                        **DRP Version     10/2005**

   1.  Regulatory action initiated by:    UTAH DIVISION OF SECURITIES

   2.  Principal sanction:                 Suspension

      Other sanction(s):                  RETAKE S63 EXAM; CEASE AND DESIST; FINE

   3.  Date Initiated/Explanation:         02/17/1999

   4.  Docket/Case#:                       SD-99-0004

   5.  Employing firm:                     UNITED PACIFIC SECURITIES

   6.  Principal product type:             Other

      Other product type(s):

   7.  Allegation(s):                      SPLITTING COMMISSIONS WITH AN AGENT NOT LICENSED WITH THE
                                SAME BROKER-DEALER

   8.  Current status:                     Final

   9.  Appealed to:                                                                      PAGE 90 OF 144

   10. Resolution:                         Stipulation and Consent

**CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.**

CRD® or IARD(SM) System          Current As Of:   11/29/2009
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:   Florida
Request Submitted:    11/30/2009 4:00:19 PM                                    Page 18 of 19

**Individual    869170 - DAY II, MELVIN THOMAS**
**Reportable Events**

**Regulatory Action DRP**                          DRP Version    10/2005

11. Final order:

12. Resolution date/Explanation:        02/22/1999

13. A. Resolution detail:        Monetary/Fine Sanction (Amount: $5,000.00), Suspension Sanction, Cease
    and Desist/Injunction Sanction

    B. Other sanction(s)         RETAKE AND PASS S63 EXAM
    ordered:

    C. Sanction detail:          FIVE DAY SUSPENSION

14. Comment:                     FOR MORE INFORMATION, PLEASE VISIT THE DIVISION'S WEB SITE
    AT:
    HTTP://WWW.SECURITIES.STATE.UT.US/ACTIONSEVENTS.ASP?
    DOCKET+NUMBER=SD%2D99%2D0004

**Regulator Archive and Z Records**

| | | | |
|---|---|---|---|
| Occurrence# | 117872 | Disclosure Type | Bankruptcy |
| FINRA Public Disclosable | No | Reportable | No |
| Material Difference in Disclosure | No | | |

| | | | |
|---|---|---|---|
| Filing ID | 23283 | Form (Form Version) | U4 (08/1999) |
| Filing Date | 07/06/1999 | | |
| Source | 7929 - CONSOLIDATED INVESTMENT SERVICES, INC. | | |

**Disclosure Questions Answered**

**Bankruptcy/SIPC DRP**                           DRP Version    10/2005

1. Action type:                  Bankruptcy

2. Action date/Explanation:      09/01/1985

3. Organization:

4. Court:                        SELF
                                 Not Provided
                                 CH 13 BANKRUPTCY

5. Currently pending:            No

6. Disposition type:             Dismissed

7. Disposition date/Explanation: 10/01/1990

8. Summary of events:            DISMISSED '90

9. Trustee/Payment:

   Currently open:

   Direct payment initiated
   date/Explanation:

10. Comment:                     Not Provided
                                 I GOT BEHIND ON TAXES & HOSPITAL BILLS & FILED A

PAGE 91 OF 144

CRD® or IARD(SM) System    Current As Of:    11/29/2009
Snapshot - Individual
CRD® or IARD(SM) System Report provided to:  Florida
Request Submitted:    11/30/2009 4:00:19 PM                                    Page 19 of 19

| Individual | 869170 - DAY II, MELVIN THOMAS |
|---|---|

**Regulator Archive and Z Records**

**Bankruptcy/SIPC DRP**                              **DRP Version**    10/2005

CH 13 TO HAVE MORE TIME TO PAY OFF CREDITORS.

| Occurrence# | 273483 | **Disclosure Type** | Regulatory Action |
|---|---|---|---|
| **FINRA Public Disclosable** | No | **Reportable** | No |
| **Material Difference in Disclosure** | No | | |

| **Filing ID** | 116804 | **Form (Form Version)** | U5 (08/1999) |
|---|---|---|---|
| **Filing Date** | 07/07/1999 | | |
| **Source** | 7929 - CONSOLIDATED INVESTMENT SERVICES, INC. | | |
| **Disclosure Questions Answered** | | | |

**Regulatory Action DRP**                              **DRP Version**    10/2005

1.  Regulatory action initiated by:    STATE OF MN

2.  Principal sanction:

    Other sanction(s):

3.  Date Initiated/Explanation:        10/10/1994

4.  Docket/Case#:                      SE9406348

5.  Employing firm:

6.  Principal product type:

    Other product type(s):

7.  Allegation(s):                     INVESTIGATION OF SALES OF FRACTIONALIZED
                                       INTERESTS IN INSURANCE POLICIES IN THE STATE OF MN WHICH
                                       APPEAR
                                       TO BE SECURITES UNDER MN REGULATIONS.

8.  Current status:                    Pending

9.  Appealed to:

10. Resolution:

11. Resolution date/Explanation:

12. A. Resolution detail:

    B. Other sanction(s)
       ordered:

    C. Sanction detail:                Not Provided

13. Comment:                           Not Provided

CRD® or IARD(SM) System Report -- See notice regarding CRD Data on cover page.



## U.S. Securities and Exchange Commission

**Division of Market Regulation**

**Staff Legal Bulletin No. 17:
Remote Office Supervision**

**Action:** Publication of Division of Market Regulation Staff Legal Bulletin.

**Date:** March 19, 2004.

**Summary:** This staff legal bulletin (bulletin) sets forth the views of the Division of Market Regulation (Division), reminding broker-dealers that small, remote offices require vigilant supervision. The bulletin describes certain supervisory tools that, based on Commission staff examinations and recent Commission enforcement cases, are characteristic of good supervisory procedures, including the use of unannounced onsite inspections.

**Supplementary Information:** The statements in this bulletin represent the views of the Division's staff. This bulletin is not a rule, regulation, or statement of the Securities and Exchange Commission (Commission). Further, the Commission has neither approved nor disapproved its content.

**Contact Information:** James Brigagliano, Assistant Director, Elizabeth Sandoe, Special Counsel, or Liza Orr, Attorney, of the Division of Market Regulation, at 202-942-0772.

**Introduction**

Sections 15(b)(4)(E)[1] and 15(b)(6)(A) [2] of the Securities Exchange Act of 1934 (Exchange Act) authorize the Commission to impose sanctions on a firm or any person that fails to reasonably supervise a person subject to their supervision that commits a violation of the federal securities laws.[3] Section 15(b)(4)(E) also provides an affirmative defense against a charge of failure to supervise where reasonable procedures and systems for applying the procedures have been established and effectively implemented without reason to believe such procedures and systems are not being complied with.[4] The Commission's policy regarding failure to supervise is well established.[5] The Commission "has long emphasized that the responsibility of broker-dealers to supervise their employees is a critical component of the federal regulatory scheme."[6] A broker-dealer must develop a system for implementing its procedures that could reasonably be expected to prevent and detect securities law violations.[7] In addition, a broker-dealer must have an appropriate system of follow-up and review if red flags are detected.[8] However, establishing policies and procedures alone is not sufficient to discharge supervisory responsibility. It is also necessary to implement measures to monitor compliance with those policies and procedures.[9]

**EXHIBIT
E**

PAGE 93 OF 144

Some broker-dealer firms have geographically dispersed offices staffed by

only a few people, and many are not subject to onsite supervision. Their distance from compliance and supervisory personnel can make it easier for registered representatives (representatives) and other employees in these offices to carry out and conceal violations of the securities laws.[10] The supervision of small, remote offices, therefore, can be especially challenging. The Commission staff has examined branch offices and the Commission has brought numerous enforcement cases involving inadequate supervision of these small, remote offices. These cases address situations in remote offices where supervisory mechanisms failed to detect and prevent misconduct. These cases illustrate gaps in firms' supervisory systems and provide insight into the steps that can help firms achieve effective remote office supervision.

The purpose of this bulletin is to remind broker-dealers that vigilant supervision is a necessary component of a firm's policies and procedures and highlight those practices to improve supervision that have been suggested by recent Commission enforcement cases. This bulletin discusses certain remote office supervisory procedures, but it is not intended to be an exhaustive list. This bulletin does not interpret SRO rules and is not intended to replace existing supervisory obligations under SRO rules or the federal securities laws. While we mention certain SRO rules, we do so only to remind readers that many SRO rules also address supervision. We recognize that each firm is different and that firms need flexibility to adopt procedures to suit their individual structure and business needs. Our suggestions are not meant to be exclusive. Nor do they constitute a safe harbor. Rather, this bulletin may assist firms in crafting effective supervisory procedures to prevent and detect remote office misconduct.

We urge firms to review their policies and procedures for remote office supervision to determine if they are reasonably designed to prevent and detect wrongdoing. We suggest an approach to remote office supervision that includes clearly articulated firm policies and procedures and steps to promote customer awareness. We note that these supervisory suggestions also may be relevant to non-remote offices.[11]

**Policies and Procedures**

Clearly articulated and vigorously enforced policies and procedures, with sufficient resources to implement them, are an essential part of a supervisory system for remote offices. Comprehensive policies and procedures address all aspects of a remote office's operations. The following policies and procedures may form part of an effective supervisory system.

1. **Inspections.** Inspections are a vital component of a supervisory system.[12] The Commission has determined that broker-dealers that conduct business through remote offices have not adequately discharged their supervisory obligations where there are no inspections of those offices.[13] Effective inspections can detect misconduct in its infancy, deter future wrongdoing, and prevent or mitigate investor harm.[14] An effective supervisory system employs a combination of onsite and offsite monitoring, including the use of unannounced inspections and mechanisms for verifying that deficiencies are corrected.

   a. **Routine or "For Cause" Inspections.** Onsite inspections usually take one of two forms: routine or "for cause." Routine

inspections are conducted in the ordinary course of business, while "for cause" inspections are conducted upon learning about a specific event or potential violation. We suggest that all inspections include at least: (1) a review of a sampling of customer files, including account opening documents and trading records; (2) a review of the signature guarantee log; (3) a review of correspondence, advertisements, and sales literature made available at the remote office; (4) a review of business records, including physical and computer files; (5) in-person questioning of the representative by the supervisor about business activities, including inquiry about any unusual activity; and (6) in-person interview by the supervisor of the representative's assistant or support staff, if any, about the remote office's business and any unusual activity.[15] If during the course of the examinations deficiencies are identified, examiners should consider the need to conduct a more in-depth review.

b. **Unannounced Inspections.** Routine or "for cause" inspections may be either announced or unannounced. Unannounced inspections are conducted on a random, surprise basis.[16] We encourage firms to use unannounced, onsite inspections of remote offices to enhance supervision.[17] They can deter and detect misconduct because they diminish the opportunity for concealment, removal, or destruction of the evidence of misconduct.[18] The Commission staff's experience in the examination program as well as the Commission's enforcement cases, reinforce our belief that unannounced onsite inspections are among the most effective tools to expose and deter misconduct that might otherwise go undetected.[19]

For example, in *Quest Capital Strategies, Inc.*, the Commission sanctioned a firm for failing to supervise. In that case, the representative engaged in repeated misconduct that violated firm policies.[20] The firm learned of the misconduct yet failed to institute heightened supervision of the representative and relied on the representative's assurances that he would discontinue the activity. Although the firm was aware of the misconduct, it performed only a much belated, pre-announced inspection of the representative's one-person office. The Commission noted, "a surprise inspection is a compliance tool that is necessarily available to every securities firm in carrying out its supervisory responsibilities."[21]

In addition, a supervisor is more likely to uncover evidence of misconduct in customer files, such as fictitious account statements, during an unannounced inspection than in an announced inspection that gives the representative an opportunity to remove such documents from customer files.[22] An unannounced inspection might also reveal marketing materials that describe unapproved products, local billboards with unapproved advertisements, or customer account statements showing purchases of unapproved securities.[23] In many failure to supervise cases, the Commission has observed

that unannounced, onsite inspections may well have detected misconduct by enabling the supervisor to review records evidencing misconduct.[24]

Unannounced inspections could be employed at random, as well as when triggered by "red flags" warning of potential misconduct. As the Commission emphasized in *Edwin Kantor*, "[r]ed flags and suggestions of irregularities demand inquiry as well as adequate follow-up and review. When indications of impropriety reach the attention of those in authority, they must act decisively to detect and prevent violations of the federal securities laws."[25] Red flags that could suggest the existence or occurrence of illegal activity and might prompt an unannounced inspection include:[26] (1) customer complaints;[27] (2) a large number of elderly customers; (3) a concentration in highly illiquid or risky investments; (4) an increase or change in the types of investments or trading concentration that a representative in a remote office is recommending or trading;[28] (5) an unexpected improvement in a representative's production, lifestyle, or wealth; (6) questionable or frequent transfers of cash or securities between customer accounts, or to or from the representative;[29] (7) the disciplinary history of the representative;[30] (8) substantial customer investments in one or a few securities or class of mutual fund shares that is inconsistent with firm policies related to such investments; (9) churning;[31] (10) trading that is inconsistent with customer objectives;[32] or (11) significant switching activity of mutual funds or variable products held for short time periods. It is equally important that representatives do not obtain advance notice about a particular focus of an inspection. Advance notice of the focus affords representatives an opportunity to "doctor" particular records. For this reason, we suggest that firms avoid "cookie-cutter" inspections in each remote office.

d. **Offsite Monitoring of Trading, Handling of Funds, and Use of Personal Computers.** Centralized technology to monitor the trading and handling of funds in remote office accounts, as well as the use of personal computers, helps detect misappropriation of customer funds, selling away, and unauthorized trading, among other things.[33] In *SG Cowen* and *Lehman Brothers*, for example, Frank Gruttadauria had a personal computer that was networked to computers used by other employees of the firm but not to the firm-wide system and used this computer to generate false statements and reports, among other things.[34] The Commission found that SG Cowen and Lehman Brothers did not have supervisory procedures reasonably designed to prevent and detect Gruttadauria's generation of falsified account statements on personal computers.[35] Thus, if firms permit communications with customers from employees' home computers or personal computers not connected to the firm's network, SRO rules require firms to employ systems to monitor those communications.[36] In addition, we believe that effective monitoring to detect these transgressions would include

PAGE 96 OF 144

contacting a random sampling of customers to make general inquiries or to inquire about specific account activity.

2. **Designate supervisory responsibility.** Explicit delineation of the supervisory hierarchy, including the designation of a direct supervisor for each representative and the assignment of specific supervisory responsibilities to the supervisor, is a necessary part of a firm's supervisory structure.[37] Consideration should be given to the independence of supervision when supervisory responsibility is designated. For example, one factor firms should consider is whether the supervisor stands to benefit from the representative's sales activities.[38] No individual can supervise themselves.[39] As with all supervisory procedures, the Commission has stated that firms should provide a system of review and follow-up to ensure that supervision (by a branch manager or a producing manager) is diligently exercised.[40] We also encourage firms to review the number of representatives for whom a supervisor is responsible as well as the number, nature, and extent of remote offices that an office of supervisory jurisdiction oversees. The degree of supervisory effectiveness is likely to decrease if a supervisor does not have adequate resources to oversee all of the representatives for whom he or she is responsible.

3. **Carefully review NASD Forms U-4 and U-5 when hiring representatives.**[41] Firms should be especially cautious about employing personnel with disciplinary histories. Where a representative with a disciplinary history is employed in a remote office, the Commission has repeatedly emphasized the need for heightened supervision of the representative.[42] For example, the Commission in *Kirkpatrick* noted that had the branch manager responsible for supervising the representatives in a remote office imposed heightened supervision on a representative with a disciplinary history, it is likely that the branch manager could have detected earlier or prevented the representative's fraudulent scheme.[43] Where a representative has left a firm for cause or changed firms several times, the hiring firm should try to ascertain the reason for the changes and contact prior firms as necessary. The Commission noted in *Signal Securities, Inc.* that as a result of the firm's failure to adopt and implement such procedures, its supervisory personnel were unaware of some of the relevant information that indicated that a representative needed heightened supervision.[44]

4. **Closely monitor outside business activities and selling away.**[45] A firm should have adequate procedures for reviewing, analyzing, or following up on the information representatives provide concerning outside activities.[46] In addition, a firm should be alert to and investigate "red flags" indicating possible undisclosed outside business activities and assess all outside business activities by a representative, whether or not related to the securities business. The Commission has recognized that there is a risk that representatives will use outside business activities to carry out or conceal securities law violations.[47] A representative appearing to live more lavishly than his business income would allow might be a "red flag" indicating

pursuit of improper or outside business activities. Additionally, we suggest that firms be wary of a representative who owns a company with a name similar to the name of the firm. A customer may make a check payable to the firm that could be altered by a representative and deposited into a bank account in the name of the company he owns.

10. **Implement procedures to detect financial misconduct.** We suggest that firms consider implementing procedures to prevent and detect the following improper activities: (1) the receipt of checks made payable to a representative or any outside business of a representative;[48] (2) the opening of a bank account in the firm's name or any name similar to the firm's name by a representative; (3) the receipt of cash and securities by a representative; (4) frequent or questionable transfers of funds or securities between customer accounts; (5) use of a post office box or an address associated with the representative for customer accounts; and (6) the transfer of customer funds or securities to employee accounts without supervisory approval.[49] Inspections and thorough investigations of customer complaints can help detect financial misconduct. For example, the Commission noted in *Signal Securities, Inc.* that had a supervisor pursued a customer's complaint more diligently, he might have discovered that a representative was sending the customer fabricated statements for fictitious accounts and misappropriating customer funds.[50]

11. **Education for representatives.** It is incumbent on firms to provide representatives with training so that the representatives understand the responsibilities under the firm's procedures, as well as under the securities laws and rules applicable to their business.[51] As with all compliance and sales practice matters, firms are more likely to prevent misconduct if they provide training for representatives and periodically reinforce that training.[52]

12. **Monitor and verify customer address changes.** Commission rules require firms to send notification of a change of address to a customer's old address for each account with a natural person as a customer or owner.[53] This verification enhances customer protection, and we encourage firms to send such verifications for all customer address changes. Moreover, a customer address change to a post office box or an address affiliated with a representative warrants additional steps to verify that the change is genuine.[54] In *SG Cowen*, the Commission found that the firm had inadequate procedures for an independent supervisor to follow up on critical missing account documentation involving Gruttadauria's customers. A branch compliance examiner discovered that a large number of Gruttadauria's accounts were using post office boxes or "care of" addresses as the mailing address for account statements without the necessary letter of authorization from the customer on file authorizing use of such addresses. The firm's inadequate procedures allowed Gruttadauria to appear to resolve the matter himself, which he did by creating falsified and forged letters of authorization on his personal computer and forwarding them on to the compliance department. No one at the firm investigated either the circumstances

under which addresses for the customer accounts were changed without a letter of authorization, or the manner in which Gruttadauria obtained and supplied the missing documentation.[55]

15. **Record use of the signature guarantee stamp.**[56] A firm should have procedures to deter misuse of the signature guarantee stamp to prevent forgeries. These procedures might include maintaining a log of all uses of the stamp and using a stamp with a counter that records each use of the stamp. In *Royal Alliance*, the Commission found that the firm failed to implement procedures adequate to govern the registered principals' use of the signature guarantee stamp.[57] While the firm's policy required registered principals to maintain logs indicating which documents had been signature-guaranteed, there was no review or follow-up on "red flags" indicating inconsistencies.

16. **Maintain copies of and review incoming and outgoing correspondence.** The Exchange Act and rules thereunder require firms to maintain copies of incoming and outgoing correspondence,[58] while SRO rules require firms to review and retain such correspondence,[59] including all documents, reports, profit and loss statements, e-mails, or other materials sent to customers by a representative or received from customers. Firms can enhance the effectiveness of their inspections by reviewing e-mails between representatives.[60] One method of monitoring use of facsimile machines in remote offices is to program these machines to automatically send duplicate incoming and outgoing facsimiles to an office of supervisory jurisdiction.[61]

**Customer Awareness**

Customer awareness is also an essential component of an effective supervisory system. There is a greater likelihood that misconduct will be promptly identified and rectified when customers (1) are aware of firm procedures, (2) know how to access educational information from regulators, and (3) know how to contact their representative's supervisor and the firm's compliance department. We encourage firms to incorporate the following customer awareness procedures into their supervisory systems.

1. **Confirm new account information with customers.** Reviewing all new account information and confirming the information, including investment objectives, with customers within 30 days of opening the account may prevent falsification of customer information.[62] When confirming the account information, firms may wish to prominently instruct customers to promptly notify the firm about any change to their account opening information. We suggest that firms establish procedures so that customers forward information regarding corrections and changes to their account information to the firm's compliance department or other central location, in addition to their representative. To the extent the firm provides online access, firms could encourage customers to review their account statements online to verify account statement accuracy. **PAGE 99 OF 144**

2. **Direct customer correspondence to a central firm location.**

Firms must provide customers with the address and telephone number to which complaints may be directed.[63] We encourage firms to provide customers with the name, address, e-mail, and telephone number of their representative's supervisor and the firm's compliance department in order to facilitate alerting firms of problems with representatives.

6. **Notify customers of firm procedures.** Customers will be less susceptible to misconduct if they are informed about representatives' legal obligations, as well as firm procedures, including policies prohibiting representatives from (i) accepting customer checks payable to the representative or any business name other than the name of the firm; (ii) accepting cash; (iii) borrowing money from customers; and (iv) guaranteeing profits, or the price or the performance of a security.

7. **Establish procedures for direct communication between the firm and customers.** In appropriate circumstances, direct communication from firms to customers, independent of the representative and his supervisor, is an important supervisory mechanism to prevent and detect wrongdoing. For example, it is a prudent practice for a firm's compliance department to communicate directly with customers about unusual activity in accounts or on a spot-check basis.

8. **Inform customers about information available from regulators.** We believe it is useful for firms to inform customers about information available on the Commission's website published by the Commission's Office of Investor Education and Assistance, as well as the websites of the National Association of Securities Dealers and the New York Stock Exchange.[64]

### Conclusion

While this bulletin does not provide an exhaustive list of steps to effectively discharge supervisory responsibilities, we believe it contains helpful information that broker-dealers can use to prevent misconduct in remote offices, or detect it at an early stage.

### Endnotes

[1] Section 15(b)(4)(E) provides that the "Commission, by order, shall censure, place limitations on the activities, functions, or operations of, suspend for a period not exceeding twelve months, or revoke the registration of any broker or dealer if it finds... that such broker or dealer... has willfully aided, abetted, counseled, commanded, induced, or procured the violation by any person of any provision of the Securities Act of 1933, the Investment Advisers Act of 1940, the Investment Company Act of 1940, the Commodity Exchange Act, [the Securities Exchange Act of 1934], the rules or regulations under any of such statutes, or the rules of the Municipal Securities Rulemaking Board, or has failed reasonably to supervise, with a view to preventing violations of the provisions of such statutes, rules, and regulations, another person who commits such a violation, if such other person is subject to his supervision." 15 U.S.C. § 78o(b)(4)(E).

PAGE 100 OF 144

[2] 15 U.S.C. § 78o(b)(6)(A) (authorizing the Commission to impose sanctions on any associated person of a broker-dealer that violates the federal securities laws).

[3] The rules of self-regulatory organizations (SROs) also require member firms to reasonably supervise the activities of their employees and their employees' compliance with securities laws and regulations. *See, e.g.,* NASD Rule 3010; NASD Notice to Members 99-45, *NASD Provides Guidance on Supervisory Responsibilities* (June 1999); NASD Notice to Members 98-38, *NASD Reminds Members of Supervisory and Inspection Obligations* (May 1998); NASD Notice to Members 86-65, *Compliance with the NASD Rules of Fair Practice* (Sept. 1986). *See also,* NYSE Rule 342.

[4] 15 U.S.C. § 78o(b)(4)(E).

[5] *See* John H. Gutfreund, et al., 51 S.E.C. 93, 108 (Dec. 3, 1992).

[6] *Id. See also,* SG Cowen Securities Corp., Release No. 34-48335 (Aug. 14, 2003), *citing* Smith Barney, Harris Upham & Co., Inc., et al., Release No. 34-21813 (March 5, 1985) (stating that "[t]he Commission has emphasized that the `responsibility of broker-dealers to supervise their employees by means of effective, established procedures is a critical component in the federal investor protection scheme regulating the securities markets.'").

[7] *See* Kirkpatrick, Pettis, Smith, Polian Inc. ("Kirkpatrick"), et al., Release No. 34-48748 (Nov. 5, 2003).

[8] *See* W.J. Nolan & Co., et al., Release No. 34-44833 (Sept. 24, 2001). *See also,* Edwin Kantor, 51 S.E.C. 440, 447 (May 20, 1993).

[9] *See* Signal Securities, Inc., et al., Release No. 34-43350 (Sept. 26, 2000), *quoting* Thomson & McKinnon, Release No. 34-8310 (May 8, 1968) ("Although it was registrant's stated policy...it failed to establish an adequate system of internal control to insure compliance with such policy.").

[10] The Commission has had a longstanding concern with the supervision of dispersed offices. *See* Reynolds & Co., 39 S.E.C. 902, 916 (May 25, 1960) (discussing the necessity of particular supervisory attention to broker-dealers with multiple, geographically scattered offices prior to the adoption of the Commission's failure to supervise authority under section 15(b)(4)(E)). *See also,* Shearson, Hamill & Co., 42 S.E.C. 811, 843 (Nov. 12, 1965) (stating "[t]he need for central control increases, not decreases, as branch offices become more numerous, dispersed and distant."); Smith Barney, Harris Upham & Co., Inc., et al., Release No. 34-21813 (March 5, 1985) (holding that "a small branch office poses the potential for significant problems if subject to inadequate supervision").

[11] *See, e.g.,* SG Cowen Securities Corp., Release No. 34-48335 (Aug. 14, 2003). *See also,* Lehman Brothers, Inc., Release No. 34-48336 (Aug. 14, 2003). These cases highlighted the issue of the independence of inspections, in particular the supervision of a producing branch manager who allegedly defrauded customers. The representative, Frank Gruttadauria, was a producing branch manager in a branch office. The responsibility for supervising Gruttadauria's daily retail brokerage activity

was entrusted to one of his subordinates. In effect, Gruttadauria was his supervisor's boss. The New York Stock Exchange and the National Association of Securities Dealers, Inc. have filed with the Commission proposed supervisory rules that among other things address the independence of supervision. See Release No. 34-48298 (Aug. 7, 2003) (SR-NASD-2002-162) (amendments to proposed rule change). See also, Release No. 34-48299 (Aug. 7, 2003) (SR-NYSE-2002-36) (amendments to proposed rule change); Release No. 34-46859 (Nov. 20, 2002) (SR-NASD-2002-162); Release No. 34-46858 (Nov. 20, 2002) (SR-NYSE-2002-36); Prudential Securities, Inc., Release No. 34-33082 (Oct. 21, 1993) (illustrating sales practices abuses and supervisory deficiencies in branch offices).

[12] See Signal Securities, Inc., et al., Release No. 34-43350 (Sept. 26, 2000), citing Consolidated Investment Services, Inc., Release No. 34-36687 (Jan. 5, 1996). See also, Royal Alliance Associates, Inc., Release No. 34-38174 (Jan. 15, 1997); NASD Rule 3010(c).

[13] See Consolidated Investment Services, Inc., Release No. 34-36687 (Jan. 5, 1996) (broker-dealer's supervision of small office run by a single representative inadequate without inspections).

[14] See, e.g., Signal Securities, Inc., et al., Release No. 34-43350 (Sept. 26, 2000) (stating that if broker-dealer firm's procedures had included on-site inspections, the firm might have detected representative's unlawful activities).

[15] See Quest Capital Strategies, Inc., Release No. 34-44935 (Oct. 15, 2001).

[16] We believe that unannounced inspections do not include inspections where the firm gives the representative advance notice of an onsite inspection, such as giving a representative one or two days notice of the inspection or informing the representative that there will be an inspection in the next month but omitting the specific date. Additionally, we do not believe an inspection can be considered surprise if it occurs at the same time each year or is otherwise predictable by the representative. See, e.g., Kaufman, Bernstein et al., Release No. IA-2194 (Nov. 20, 2003) (finding that "[g]iven the predictable timing of the examinations, Kaufman and Bernstein were effectively put on notice that the examination would begin in the first few days of January each year. The examinations did not take place, therefore, `without prior notice,' but rather followed a predictable pattern that gave Kaufman and Bernstein at least constructive notice as to when the annual examination would occur.").

[17] See Quest Capital Strategies, Inc., Release No. 34-44935 (Oct. 15, 2001). See also, Senatore, Supervision Challenges Facing Broker-dealers Employing the Independent Contractor Small Branch Office Model: A Call to Action, 52 Bus. Law. 1359 (1997) (strongly emphasizing the need for unannounced inspections when representatives are in remote locations with no onsite supervisors); Walsh, Right the First Time: Regulation, Quality, and Preventive Compliance in the Securities Industry, 1997 Colum. Bus. L. Rev. 165, 200 (highlighting the fact that one can "reasonably question the effectiveness" of pre-announced inspections).

[18] We understand from market participants that occasionally a firm might

have difficulty effecting unannounced inspections because the representative is out of the office. If this is an issue, we suggest the firm take steps to increase the likelihood that a representative will be present at his remote office. For example, a firm might require submission of representatives' calendars on a monthly or quarterly basis.

[19] *See* SEC Press Release No. 2000-143 (Sept. 27, 2000) (former Director of Enforcement Richard H. Walker commented, "As remote brokerage offices have proliferated in recent years, there have been too many failures in supervision. Investors are well served by effective supervision of these offices, including regular unannounced inspections. Customers of these offices must be assured the full range of investor protections.").

[20] Quest Capital Strategies, Inc., Release No. 34-44935 (Oct. 15, 2001).

[21] *Id. See also,* NYLIFE Securities Inc., Release No. 34-40459 (Sept. 23, 1998) (noting that "the Commission has determined that firms with a high number of one or two person offices have not discharged their supervisory obligations where there were no surprise inspections.") *See also,* Royal Alliance Associates, Inc., Release No. 34-38174 (Jan. 15, 1997) (broker-dealer's practice of conducting a pre-announced compliance examination of its off-site representatives only once a year was inadequate to satisfy its supervisory obligations); Consolidated Investment Services, Inc., Release No. 34-36687 (Jan. 5, 1996) (noting that surprise inspections of a small office run by a single representative would have been a prudent course of action).

[22] *See* Quest Capital Strategies, Inc., Release No. 34-44935 (Oct. 15, 2001).

[23] *See Id.*

[24] *See, e.g.,* NYLIFE Securities Inc., Release No. 34-40459 (Sept. 23, 1998).

[25] Edwin Kantor, 51 S.E.C. 440, 447 (May 20, 1993). *See also,* Gutfreund, 51 S.E.C. at 108, *citing* Prudential-Bache Securities, Inc., Release No. 34-22755 (Jan. 2, 1986) (stating that a supervisor must conduct "adequate follow-up and review" whenever he or she detects unusual trading activity or other irregularities).

[26] Some of these activities may themselves be violations of the securities laws and rules, or of SRO rules, while others may be evidence of such violations.

[27] *See, e.g.,* Signal Securities, Inc., et al., Release No. 34-43350 (Sept. 26, 2000) (finding that supervisor failed adequately to investigate a representative's activities after receiving a call in which a customer expressed concerns about how the representative handled his account).

[28] *See, e.g.,* Kirkpatrick, et al., Release No. 34-48748 (Nov. 5, 2003) (firm made inquiries regarding a representative's trading concentration in a particular stock and began imposing restrictions on trading in that stock due to concerns that the representative's activities might be affecting the market price of the stock). **PAGE 103 OF 144**

[29] *See, e.g.,* SG Cowen Securities Corp., Release No. 34-48335 (Aug. 14, 2003) (finding that "[a] crucial component of Gruttadauria's fraudulent conduct was misappropriating funds and securities out of customer accounts and then transferring them into an intermediary brokerage account or directly to other customers or their designees.").

[30] *See, e.g.,* Kirkpatrick, et al., Release No. 34-48748 (Nov. 5, 2003) (firm hired a representative with a disciplinary history, as well as a history of financial insolvency, and failed to increase the level of supervision of the representative's activities).

[31] *See, e.g.,* D.E. Frey and Company, Inc., Release No. 34-43354 (Sept. 26, 2000) (firm failed reasonably to supervise representatives that were, among other things, churning customer accounts).

[32] *See, e.g.,* Mark Gilbert Platt, et al., Release No. 34-48968 (Dec. 22, 2003) (branch office manager failed reasonably to supervise representative that was, among other things, recommending "unsuitable speculative small-cap technology stocks for the accounts of three elderly Josephthal customers each of whom had stated more conservative investment objectives.").

[33] Review of remote office activity by the firm's Compliance or Surveillance Department is especially important in preventing and detecting misconduct.

[34] SG Cowen Securities Corp., Release No. 34-48335 (Aug. 14, 2003); Lehman Brothers, Inc., Release No. 34-48336 (Aug. 14, 2003).

[35] *Id.*

[36] *See, e.g.,* NASD Rule 3010(d); NASD Notice to Members 98-11, *SEC Approves Rules Regarding Supervision, Review and Record Retention of Correspondence* (Jan. 1998). *See generally* SG Cowen Securities Corp., Release No. 34-48335 (Aug. 14, 2003); Lehman Brothers, Inc., Release No. 34-48336 (Aug. 14, 2003).

[37] *See, e.g.,* SG Cowen Securities Corp., Release No. 34-48335 (Aug. 14, 2003) (stating that "[b]y choosing persons subordinate to Gruttadauria to oversee his daily retail brokerage activity, SGC structured its supervisory and compliance functions in a manner that created an inherent risk that Gruttadauria would not be adequately supervised...This structure may have been a contributing factor in the [firm's] supervisory failures..."). *See also,* Signal Securities, Inc., et al., Release No. 34-43350 (Sept. 26, 2000) (finding that broker-dealer firm's supervisory procedures were inadequate because they failed clearly to assign supervisory responsibilities among the various supervisors); *Id., quoting* Mabon, Nugent & Co., Release No. 34-19424 (Jan. 13, 1983) (stating that "broker-dealers must not only adopt effective procedures for supervision, but must also `provide effective staffing, sufficient resources and a system of follow up and review to determine that any responsibility to supervise delegated to compliance officers, branch managers and other personnel is being diligently exercised.'") (*See* Mabon, Nugent & Co., Release No. 34-27301 (Sept. 27, 1989), vacating the prior Order issued in Release No. 34-19424 but reiterating the Commission's adherence to this statement); NASD Rule 3010(a)(5) (requiring the assignment of each registered person to a person

responsible for supervising their activities).

[38] See, e.g., Jeffrey L. Harfst, et al., Release No. 34-42080 (Nov. 1, 1999).

[39] NASDR 1997 Regulatory & Compliance Alerts, Volume 11, Number 2 (June 1997), discusses the supervision of off-site Series 8 or 24 qualified salespersons, and points out, among other things, that:

Conduct Rule 3010 requires that each registered person (including registered principals) must be assigned to another appropriately registered person responsible for supervising that person's activities. From a practical standpoint, this means that one or more persons identified by the firm must take direct responsibility for the supervision of all producing salespersons, whether they are Series 8 or 24 qualified or not. This supervision would include, but not be limited to, evidencing the review of transactions on both a daily as well as a periodic basis.

See also, Stuart K. Patrick, 51 S.E.C. 419, 422 (May 17, 1993) ("Supervision, by its very nature, cannot be performed by the employee himself") (Commission order sustaining application of the New York Stock Exchange's supervisory rule).

[40] See Josephthal & Co., Inc., Release No. 34-46039 (June 6, 2002) (broker-dealer found to have failed to reasonably supervise by failing to monitor whether its branch managers were adequately discharging their supervisory duties).

[41] See NASD Rule 3010(e) (requiring members to review a copy of the Uniform Termination Notice of Securities Industry Registration (Form U-5) filed by a person's most recent previous NASD member employer).

[42] See Prospera Financial Services, Inc., et al., Release No. 34-43352 (Sept. 26, 2000) (stating extraordinary supervision of representatives with disciplinary histories is especially appropriate if the representative works out of a one-person office). See also, Dale E. Frey, Release No. 34-44982 (Oct. 25, 2001) (chief executive of a broker-dealer, employing "independent contractor" representatives, found to have failed to reasonably supervise by failing (i) to develop procedures for imposing heightened supervision where appropriate, (ii) to implement firm procedures, and (iii) to commit adequate resources to implement supervisory procedures); Kirkpatrick, et al., Release No. 34-48748 (Nov. 5, 2003) (finding that branch manager of a remote office failed to impose heightened supervision on representative with a disciplinary history); James Harvey Thornton, Release No. 34-41007 (Feb. 1, 1999) (stating that knowledge of past misconduct triggers additional obligation to insure supervisory procedures are in place); Signal Securities, Inc., et al., Release No. 34-43350 (Sept. 26, 2000) (finding that a broker-dealer firm's policies and procedures failed adequately to provide for heightened supervision of representatives with a history of compliance-related concerns); NASD Notice to Members 03-49, NASD Requests Comment on Proposed Amendments to Rule 3010 to Require Heightened Supervision Plans for Associated Persons with a Specified Threshold of Industry/Regulatory-Related Events (Sept. 2003); NASD Notice to Members 97-19, The Joint Regulatory Sales Practice Sweep; Heightened Supervisory Procedures (April 1997).                    PAGE 105 OF 144

[43] Kirkpatrick, et al., Release No. 34-48748 (Nov. 5, 2003).

[44] Signal Securities, Inc., et al., Release No. 34-43350 (Sept. 26, 2000).

[45] See Id. (finding that broker-dealer firm's procedures failed to provide adequate review and follow-up of the information it gathered concerning the outside activities of its representatives). See also, NASD Rules 3030 and 3040, addressing the issue of outside business activities and selling away; NASD Notice to Members 01-79, Selling Away and Outside Business Activities (Dec. 2001).

[46] See Signal Securities, Inc., et al., Release No. 34-43350 (Sept. 26, 2000).

[47] See Prospera Financial Services, Inc., et al., Release No. 34-43352 (Sept. 26, 2000). See also, Signal Securities, Inc., et al., Release No. 34-43350 (Sept. 26, 2000).

[48] See Id. (representative accepted checks from clients made out to his company (an outside business) that he used to misappropriate funds from his clients while he was associated with the firm). See also, Royal Alliance Associates, Inc., Release No. 34-38174 (Jan. 15, 1997).

[49] See Josephthal & Co., Inc., Release No. 34-46039 (June 6, 2002) (The Commission stated that the firm's procedures and systems "were deficient because they did not adequately implement effective wire transfer procedures." The representative transferred customer funds to his personal bank account).

[50] Signal Securities, Inc., et al., Release No. 34-43350 (Sept. 26, 2000).

[51] See generally 15 U.S.C. §§ 78f(c)(3)(A), 78f(c)(3)(B) (authorizing national securities exchanges to deny membership based on failure to meet exchange's standards of training, experience, or competence). See also, NASD Rule 1120 (continuing education requirements).

[52] See, e.g., David D. Grayson, et al., Release No. 34-33298 (Dec. 8, 1993) (broker-dealer firm failed to adopt and maintain uniform standards of sales training, the firm did not train its representatives in a central facility or according to a standard curriculum, and the firm's sales training procedures were not reviewed by the sales, legal, or compliance departments). See also, Sandra Logay, Admin. Proc. File No. 3-8969 (Jan. 28, 2000) (stating that "the NASD requires that members...maintain a continuing education program and evaluate their training needs annually and develop a written training plan.") (The initial administrative law judge decision in Sandra Logay became final by order of the Commission on March 6, 2000 (Release No. 34-42496)); NASD Rule 1120 and NYSE Rule 345A; NASD Notice to Members 01-79, supra note 45.

**PAGE 106 OF 144**

[53] 17 CFR § 240.17a-3(a)(17)(i)(B)(2).

[54] See SG Cowen Securities Corp., Release No. 34-48335 (Aug. 14, 2003). See also, NASD Member Alert, Customer Address Changes and Use of P.O. Boxes (Jan. 28, 2002).

[55] SG Cowen Securities Corp., Release No. 34-48335 (Aug. 14, 2003).

[56] *See* Royal Alliance Associates, Inc., Release No. 34-38174 (Jan. 15, 1997).

[57] *Id.*

[58] *See generally* Exchange Act Section 17(a) and Rules 17a-3 and 17a-4 promulgated thereunder (15 U.S.C. § 78*q*(a) and 17 CFR §§ 240.17a-3, 240.17a-4).

[59] *See, e.g.,* NYSE Rules 342 and 472, and NASD Rules 3010(d) and 3110. *See also,* Notice to Members 99-03, *SEC Approves Rule Amendments Concerning Review of Incoming, Written Correspondence* (Jan. 1999); NASD Notice to Members 98-11, *supra* note 36.

[60] *See* NASD Notice to Members 03-33, *Instant Messaging* (June 2003) (stating "NASD rules do not specifically require member firms to review or approve internal communications. However, members must be certain that they have procedures adequate to supervise the activities of each registered representative and associated person, including their use of electronic communications technology.").

[61] *See, e.g.,* Lehman Brothers, Inc., Release No. 34-48336 (Aug. 14, 2003); SG Cowen Securities Corp., Release No. 34-48335 (Aug. 14, 2003) (branch office manager used a firm facsimile machine to send and receive falsified correspondence). *See also,* Kirkpatrick, et al., Release No. 34-48748 (Nov. 5, 2003) (representative formulated a written plan to inflate a stock's price and used a branch office facsimile machine to disseminate a copy of the plan).

[62] *See generally* 17 CFR § 240.17a-3(a)(17)(i)(B) (requiring firms to periodically furnish account record information to certain customers).

[63] 17 CFR § 240.17a-3(a)(18)(ii).

[64] The respective websites are: www.sec.gov; www.nasd.com; and www.nyse.com.

*http://www.sec.gov/interps/legal/mrslb17.htm*

PAGE 107 OF 44

FILED
A.M. _____ P.M. _____

JAN 1 4 2009

J. DAVID NAVARRO, Clerk
By PATRICIA A DWONCH
DEPUTY

LAWRENCE G. WASDEN
Attorney General

ALAN CONILOGUE
Deputy Attorney General
State of Idaho
P. O. Box 83720
Boise, ID 83720-0031
Telephone: 208.332.8093
Fax: 208.332.8016
ISBN 3196

IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR ADA COUNTY

| | |
|---|---|
| STATE OF IDAHO, DEPARTMENT OF FINANCE, SECURITIES BUREAU,<br><br>    Plaintiff,<br><br>vs.<br><br>DOUGLAS L. SWENSON, DBSI, INC., FOR 1031 LLC, FOR 1031 QUORUM LLC, and FOR 1031 QUORUM OFFICES LLC,<br><br>    Defendants. | Case No. CV OC 0900859<br><br>COMPLAINT<br><br>Fee category: Exempt |

COMES NOW the State of Idaho, Department of Finance, Gavin M. Gee, Director, by

and through its counsel, Alan Conilogue, Deputy Attorney General, and upon information and

belief, complains and alleges as follows:

1.    This action is brought pursuant to the Idaho Securities Act, Idaho Code § 30-1401

*et seq.* (the Act), and in particular Idaho Code § 30-1442(3), wherein the Department is

PAGE 108 OF 144



EXHIBIT
F

authorized to bring actions seeking injunctive and other relief against persons who have either violated or are about to violate provisions of the Act or any rule promulgated thereunder.

    2.    Defendants are individuals or businesses residing or domiciled in Ada County, Idaho.  The acts and practices herein comprising violations of law by the above-named Defendants occurred in Ada County, elsewhere in the state of Idaho, and in other states.

CASE SUMMARY

    3.    In order to understand how Defendants violated Idaho securities law in regards to the Quorum property transactions described below, it is necessary to understand how these transactions relate to a larger enterprise.  Defendants, and related entities not named in this Complaint, raised hundreds of millions of dollars by issuing securities in the form of investment contracts to thousands of investors in every state and numerous foreign countries involving hundreds of real estate properties. Defendants conducted an enterprise that identified properties and investors, purchased the properties, and then sold the properties at an inflated price to the investors.  Defendants kept a small interest in the properties and managed the properties on behalf of the investors.  Defendants typically set up a limited liability company for each property, eventually organizing hundreds of companies.

    4.    Integral to the enterprise was Defendants' ability to use the profits from new sales, as well as revenue generated by managing the properties, to purchase new properties.

    5.    The Quorum property transactions described below are similar to those related to hundreds of other properties involved in the enterprise.

    6.    The Quorum property involved seventeen (17) investors and an aggregate investment of nineteen million five hundred thousand dollars ($19,500,000).

    7.    Early in this decade, Defendants identified a market opportunity based on a 2002

IRS rule that allowed investors in commercial real estate to sell the property and avoid income tax on the appreciation by purchasing another commercial property. This transaction is known as a 1031 exchange, named after the code section that created it.

8.     Defendants noted that some owners of commercial real estate grew weary over time of managing the property, yet did not want to sell and have to pay income tax on an appreciated value. Defendants identified this as a market and an opportunity, and developed a program whereby commercial property owners could sell their property, reinvest in other commercial property, and avoid management of the property. The new program involved Defendants creating a tenancy in common (TIC) agreement, coupled with a property management plan called a "master lease."

9.     Property sellers took the proceeds from the sale of their commercial property and bought a fractional ownership interest in a new property owned by Defendants, which the sellers then owned along with other tenants in common. As part of this transaction, Defendants also set themselves up as the manager of the property and agreed to lease the property to sub-tenants, to collect rents, to maintain the property, to pay the debt service on the property, and to pay the investors a return on their investment. All the investors had to do regarding the property was cash a monthly check.

10.     Defendants were aware that such programs were typically considered to be securities, but preferred to market them as real estate products for reasons set forth in detail below. Under Idaho law, transactions in Defendants' TIC program constituted securities.

11.     Defendants defrauded investors by misrepresenting the investment as a real estate investment, and by omitting material information from the investor solicitations. Defendants failed to register these securities, and Defendants failed to register as securities broker-dealers as

PAGE 110 OF 144

required by law.

## DEFENDANTS

12.   Defendant DBSI, Inc., (DBSI) is a company organized in Idaho. DBSI is affiliated with hundreds of other companies, including companies related to FOR 1031 LLC, all of which are essentially owned or controlled by Defendant Douglas L. Swenson. DBSI is headquartered and does business in Ada County, Idaho.

13.   Defendant FOR 1031 LLC (For1031) is a limited liability company organized in Idaho on August 22, 2003 to facilitate the TIC transactions described in this Complaint. For1031 is affiliated with hundreds of other companies, including companies related to DBSI, Inc., all of which are essentially owned or controlled by Defendant Swenson. For1031 is headquartered and does business in Ada County, Idaho.

14.   Defendants FOR 1031 QUORUM LLC and FOR 1031 QUORUM OFFICES LLC are limited liability companies organized in Idaho on May 5, 2004 to facilitate the TIC transactions described in this Complaint.

15.   Defendant Douglas L. Swenson (Swenson) is an individual residing in Eagle, Ada County, Idaho. He owns, manages or controls the Defendant companies and the many For1031 related companies and affiliated DBSI companies.

## FACTS

16.   Defendant Swenson formed or caused to be formed DBSI Motels, Inc. on February 20, 1980. He changed the name of DBSI Motels, Inc. to DBSI Housing, Inc. on January 30, 1986. DBSI Housing, Inc. became DBSI, Inc. on March 26, 2008. Swenson does business through many corporations with slightly differing names, virtually all of which contain DBSI in the name, such as DBSI Realty, Inc., and DBSI Amarillo Apartments LeaseCo LLC. A

PAGE 111 OF 144

COMPLAINT – Page 4

recent bankruptcy filing listed 144 such like-named entities. These DBSI companies are mere alter egos for Defendant Swenson. These DBSI companies were used to make the fraudulent and unlawful offer or sale of securities as described in this Complaint, and were formed for the purpose of shielding Swenson from accountability and for perpetrating fraud on the investors. The companies have such a unity of interest with Swenson that the separate personalities of the companies and Swenson no longer exist. Further, if Swenson is allowed to hide behind these corporate facades it will sanction the fraud and promote injustice. Their corporate existence should be ignored.

17.     On August 22, 2003, Swenson caused to be formed FOR 1031 LLC. As with DBSI, over time Swenson caused to be formed an unknown number, but probably in the hundreds, of LLCs which contain the FOR 1031 name, and others. This Complaint focuses on FOR 1031 LLC (For1031), FOR 1031 QUORUM LLC (Quorum) and FOR 1031 QUORUM OFFICES LLC (Quorum Offices). As with DBSI, these and all similarly named FOR 1031 companies are mere alter egos for Defendant Douglas L. Swenson. They were used to make the fraudulent and unlawful offer or sale of securities as described in this Complaint, and were formed for the purpose of shielding Swenson from accountability and for perpetrating fraud on the investors. The companies have such a unity of interest with Swenson that the separate personalities of the companies and Swenson no longer exist. Further, if Swenson is allowed to hide behind these corporate facades it will sanction the fraud and promote injustice. Their corporate existence should be ignored.

18.     On May 5, 2004 Swenson caused to be formed FOR 1031 QUORUM (Quorum) and FOR 1031 QUORUM OFFICES (Quorum Offices). Quorum is managed by Quorum Offices, which is in turn managed by For1031. Quorum and Quorum Offices both relate to a

PAGE 112 OF 144

commercial property, an office building, located at 14801 Quorum Drive, in Addison, Texas.

19.     The Quorum property was handled according to the tenant in common (TIC) template developed by Swenson. The TIC template was developed by Swenson in order to tap into a burgeoning national real estate market, as follows:

### The Tenant in Common (TIC) Program

20.     Owners of commercial properties, which properties are defined herein as property held for productive use in a trade or business or for investment, usually desire to sell the property at some point, perhaps out of a need for money, or to realize appreciation on the property, or just to quit the business of managing commercial properties. When the property sells, the seller can defer payment of income tax on the appreciation in the property by doing a 1031 like-kind exchange, named after the tax law provision allowing the untaxed transaction. Essentially, the proceeds must be used to buy another commercial property, subject to various constraints imposed by the IRS.

21.     Participants in Defendants' TIC program varied in wealth and sophistication. Some of the investors had experience with the business of owning commercial properties, others did not. Some were elderly. A homeowner who has been renting a second home or a duplex can qualify for a 1031 exchange upon sale of the home or duplex, and many such unsophisticated investors participated in Defendants' program. The property owners had differing amounts to invest, and would receive an interest in the TIC property identified by Defendants commensurate with the size of their investment in proportion to the whole.

22.     Swenson, through his agents, would locate large commercial properties for sale. He would then aggregate several persons seeking to participate in a 1031 exchange and arrange for them to purchase the property for sale. A typical transaction would occur as follows:

**PAGE 113 OF 44**

a. Swenson's agents would locate a property for sale and begin negotiations for purchase. Simultaneously, other agents would be locating investors, including people looking to participate in a 1031 exchange. Swenson also allowed people to invest in the TIC program without engaging in a 1031 exchange.

b. Once investors were located, Defendants would buy the property from the selling owner. Defendants would then form a limited liability company and have the investors buy the property, as tenants in common, from Defendants at an inflated value. Purchase of the property occurred by the investor assuming a loan on the property from Defendants, by obtaining a new loan, by paying cash, or by some combination of the foregoing. It was also typical that the TIC investors would invest some cash in the purchase and would assume debt for the remainder. Defendants usually kept a small interest in the TIC, around 1%. The purchase and resale happened over a short period, often within a matter of days.

23.    The TIC template also included a property management agreement, called a NNN Plus Lease Agreement, which set up Defendant DBSI as the Master Lessee. This agreement authorized DBSI, Inc. to manage the property in all aspects, including to collect rents, make repairs and improvements, find sub-lessees, make debt payments, and to hire another property manager. The master lease granted all power to the Master Lessee, and placed limits on the TIC investors' ability to exercise control, such that the TIC investors had no practical ability to exercise any control over the property. The TIC investors were expected to do nothing more than cash their monthly return-on-investment check.

24.    An unusual provision of the NNN Plus Lease is that DBSI, Inc., DBSI Masterleasco, Inc, a DBSI insider or a combination of the three guaranteed the monthly payment amount to each investor. Even if the property had no sub-tenants, the guarantor(s) was(were)

PAGE 114 OF 44

obligated to make the debt payments and the TIC investor returns. Defendants were able to do this because they kept any extra profits earned when the property performed well, because of the capital obtained by re-pricing the properties upon sale to TIC investors, and because cash flows from the multiple properties and the inflows of cash from new investors in other properties were co-mingled and used to prop up underperforming properties. The TIC program also required the TIC investor to sign an irrevocable power of attorney in favor of Defendants or an agent or affiliate, allowing Defendants almost full authority over the lease, the property, and the tenancy in common, including the authority to commit the investors to new loan agreements. By using the profits from one property to make payments on another, Defendants participated in a common enterprise with investors and the other unnamed affiliated companies. Their fortunes were tied together such as to have both vertical and horizontal commonality of interest.

### The Quorum Property

25.    The Quorum Property transactions are similar to and representative of typical TIC transactions conducted by Defendants, and the violations of law that occurred regarding the Quorum property also occurred in relation to other properties bought and sold pursuant to the TIC program.

26.    Around April and May of 2004, Defendants arranged a TIC transaction relating to an office building located at 14801 Quorum Drive, in Addison, Texas. In aid of this transaction, Defendants organized For 1031 Quorum LLC and For 1031 Quorum Offices LLC on May 5, 2004.

27.    On May 12, 2004, Defendants, through Quorum, offered the TIC investment to investors. On May 19, 2004, Quorum bought the Quorum building for $13,300,000. Defendants, through Quorum, were simultaneously signing up 17 TIC investors to purchase the

**PAGE 115 OF 144**

---

COMPLAINT – Page 8

building from them.  One investor, N.W., executed a purchase agreement with Quorum on May 25, 2004 to purchase a 7% interest for $1,400,000.  N.W. paid $700,000 in cash, and assumed $700,000 of Defendants' debt in the building.  N.W. also executed a TIC Agreement, a Special Durable Power of Attorney, and various other purchase related documents.

28.    The Purchase Agreement and loan assumption placed the TIC investors in a non-recourse position with the lender, meaning that upon default the investor was liable only for amounts invested in the property, and the lender did not have recourse to other assets of the investor.  On December 13, 2004, Defendants, unbeknownst to the TIC investors and pursuant to the authority of the Special Durable Power of Attorney, executed a new loan agreement that did not contain the non-recourse clause, thereby subjecting the investors to expanded liability.  The loan agreement was signed by Quorum as attorney-in-fact for N.W. and other TIC investors. Defendant Swenson signed the agreement as Board Member of For1031, which signed as Manager of Quorum Offices, which signed as Manager of Quorum.

29.    Defendants sold the building, after owning it for 14 days, to the TIC investors for $19,500,000, a markup of $6,200,000, or around 46%.  Quorum retained a 1% interest in the TIC, and other investor interests ranged from .387% to 20.513%.  This $6,200,000 was co-mingled with profits and income streams from other properties and was used by Defendants to buy more properties and expand the TIC program, and likely other purposes.

30.    At the time of the sale to the TIC Investors, the Quorum building was occupied by only one tenant, which occupied the entire building save for the property manager's office.  This tenant has since moved out.  The building is empty except for a property manager's office, and is generating no cash flow.

31.    The TIC investors and Defendants were advised by the lender on December 3,

PAGE 116 OF 144

---

2008 that the scheduled monthly payment of $76,497.83 had not been paid and that the $9,750,000 promissory note is in default.

## Securities Violations

32.    The agreements between Defendants and the TIC investors, including the TIC Agreement, the NNN Plus Lease Agreement, and the Irrevocable Power of Attorney, created a common enterprise whereby the TIC investor would earn a profit based on Defendants' efforts. The TIC investor was not expected to expend any effort to obtain the return, other than providing the initial investment funds and cashing the monthly check.   The agreements thus constituted investment contracts.

33.   ` Defendant Swenson knew or should have known at the inception of the program that the TIC Agreements were securities.   With few exceptions, other promoters offering investments through TIC Agreements offered them as securities.   The NASD (of which DBSI Securities, Inc. is a member) issued a Notice to Members advising broker-dealers and their agents that most TIC transactions were securities.   Defendants sought changes to the securities laws of the states of Utah, Idaho, Montana and Oregon to exclude TIC transactions from the definition of a security, although these efforts were successful only in Utah.   Swenson also offered a similar TIC program as described above, but did so as a security.   A chief difference is that the securities laws require the issuer of the securities to provide full disclosure of material information to investors, but the real estate offerings were not subject to the same level of disclosure.   Additionally, securities laws require the seller of an investment to ensure the investment is suitable for a particular investor, but no such requirement exists for a real estate transaction.

34.    In order to beguile investors into signing the agreements, Defendants made the

**PAGE 117 OF 144**

misrepresentations set forth below.  Defendants also omitted from their sales materials and presentation important information necessary to make an informed investment decision.

35.      Defendants DBSI, For1031, Quorum and Quorum Offices, at all times material herein, were not registered as broker/dealers with the State of Idaho or the Securities and Exchange Commission (SEC).

36.   The securities issued by Defendants were not registered with the State of Idaho or the SEC.

Misrepresentations

37.   To induce investors to invest, Defendants made certain material representations. These representations were false.  Some of the material misrepresentations are as follows:

a.   Defendants or their agents represented that the property would not be leased in its entirety to a single tenant.  However, the property was leased to a single tenant.

b.   Defendants or their agents represented that the TIC owners' investment would not be affected by "other people's finances."  However, written disclosure materials state that a bankruptcy or similar insolvency proceeding of one TIC owner may adversely affect other TIC owners.   A loan agreement executed by Defendants and the TIC investors provides that bankruptcy of any TIC member can cause the lender to declare the agreement in default.

c.   Defendants or their agents in effect guaranteed the investment by stating that the TIC owners would always get their return and that the payment would not be affected by tenant issues.  However, written disclosure materials state that potential TIC investors should not rely on the financial strength of Defendants, but should instead look to the cash flow generated by the property.

d.   Defendants or their agents represented that the loan they would assume would

PAGE __118__ OF __144__

always be non-recourse.   However, after the initial transaction was complete, Defendants substituted the non-recourse loan with a recourse loan without informing investors of the change.

Material Omissions

38.     Defendants did not tell potential investors certain information that would be necessary to make other statements not misleading, and that an investor would likely consider as material to a decision to invest with Defendants.  Defendants failed to disclose the following material information, as well as other material information not itemized below:

a.   That TIC programs were widely considered to be a security, not a real estate product, and Defendants' investment carried the risk that it violated the Idaho Securities Act;

b.   That Defendants sold the Quorum property to the TIC investors for $6,200,000 more than they paid for it after holding it for just a few days;

c.   That the financial information given to investors was not audited, and did not comply with generally accepted accounting principles;

d.   That if Defendants were terminated as Master Lessee, the TIC owners might not be able to find a replacement;

e.   That the TIC owners bore the risk of Defendants not paying the rent;

f.   That the TIC owners bore the risk that Defendants might not be able to find sub-tenants for the property;

g.   The amount and type of compensation paid to Defendants;

h.   That the Quorum investment was suitable only for investors willing to expose their entire net worth to potential liabilities associated with ownership of the Quorum property;

i.   That the Quorum investment was speculative;

j.   That Defendants DBSI, For1031, Quorum and Quorum Offices were not

**PAGE 119 OF 144**

registered as broker-dealers to sell the securities, as required by the Idaho Securities Act; and

k. That the TIC programs were securities issued by Defendants, but were not registered as required by the Idaho Securities Act.

## COUNT ONE
### (Fraud - False and Misleading Statements)

39.   The allegations of paragraphs 1 through 38 above are realleged and incorporated herein as if set forth verbatim.

40.   Idaho Code § 30-1403(2) provides that it is unlawful for any person, in connection with the offer, sale or purchase of a security, directly or indirectly, to make any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

41.   Defendants' misrepresentations to prospective TIC investors as set forth above were made in connection with the offer, sale or purchase of securities.   Defendants' misrepresentations were false and misleading, constituting violations of Idaho Code § 30-1403 as to each misrepresentation to each investor.

42.   Defendants' omissions of material facts and failures to disclose to prospective investors as set forth above were made in connection with the offer, sale or purchase of securities.   Defendants' omissions of material facts and failures to disclose, as specifically set forth above, constitute violations of Idaho Code § 30-1403(2) as to each omission and failure to disclose to each investor.

## COUNT TWO
### (Fraudulent Conduct)

43.   The allegations of paragraphs 1 through 38 above are realleged and incorporated herein as if set forth verbatim.

PAGE 120 OF 144

44. Idaho Code § 30-1403(3) provides that it is unlawful for any person, in connection with the offer, sale or purchase of a security, directly or indirectly, to engage in an act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

45. Defendants' acts as set forth in paragraphs 1 through 38 were made in connection with the offer, sale or purchase of securities. Their conduct as described in paragraphs 1 through 38 constitutes engaging in transactions, acts, practices, or courses of business which operate or would operate as a fraud or deceit upon investors or prospective investors, in violation of Idaho Code § 30-1403(3) as to each investor.

<u>COUNT THREE</u>
(Unregistered Securities)

46. The allegations of paragraphs 1 through 38 above are realleged and incorporated herein as if set forth verbatim.

47. Defendants issued, sold or offered for sale in Idaho securities in the form of joint venture agreements and investment contracts. Such securities were not registered with the Idaho Department of Finance as required by Idaho Code § 30-1416.

48. The Defendants' failure to register such securities with the Department constitutes a violation of Idaho Code § 30-1416.

<u>COUNT FOUR</u>
(Failure to Register)

49. The allegations of paragraphs 1 through 38 above are realleged and incorporated herein as if set forth verbatim.

50. Defendants DBSI, For1031, Quorum and Quorum Offices transacted business in Idaho as broker-dealers. No Defendant was registered as a broker-dealer with the Department as

PAGE 121 OF 144

required by Idaho Code § 30-1406(1).

51.     Defendants' failure to register as broker-dealers with the Department constitutes a violation of Idaho Code § 30-1406(1).

### PRAYER FOR RELIEF

WHEREFORE, the Department prays for judgment in favor of the Department and against Defendants as follows:

1.     That Defendants be adjudged to have violated the Idaho Securities Act, Idaho Code § 30-1401 *et seq.*, and rules promulgated thereunder, and other applicable federal laws and regulations as proven at trial, as to Counts One through Four alleged above, as well as any additional counts proven at trial.

2.     That Defendants be permanently enjoined from engaging in any act or practice violating any provision of Idaho's Uniform Securities Act (2004), Idaho Code § 30-14-101 *et seq.*, or any rule promulgated thereunder,  and in particular that they be permanently enjoined from:

    a.  Offering or selling any tenant in common interest in any real property;

    b.  Selling or offering for sale nonexempt securities in any form in the state of Idaho without first registering them with the Department in accordance with Title 30, Chapter 14, Idaho Code;

    c.  Selling or offering for sale nonexempt securities in any form in the state of Idaho without first becoming registered as a broker-dealer and/or broker-dealer agent with the Department in accordance with Title 30, Chapter 14, Idaho Code;

    d.  Relying on any exemption to any securities law without the prior written consent of the Director; and

e.   In connection with the offer, sale or purchase of any security, directly or indirectly:

i.   Employing any device, scheme, or artifice to defraud;

ii.   Making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading;

iii.   Engaging in any act, practice or course of business that operates or would operate as a fraud or deceit upon another person.

3.   That Defendants be ordered to pay a civil penalty of up to $10,000 for each violation of the Act as the Court deems appropriate, pursuant to Idaho Code § 30-1442(3)(b), for total penalties of at least $40,000, and that the Court award a money judgment in favor of the Department in such amount.

4.   That Defendants be ordered to make restitution to Quorum investors, pursuant to Idaho Code § 30-1442(3)(a), in the amount of nine million seven hundred fifty thousand dollars ($9,750,000), or such other amount as may be proven at trial, that Defendants pay the restitution amount to the Department, to be delivered to the investors, and that the Court award a money judgment in favor of the Department in such amount.

5.   That the Department be awarded attorney fees and costs incurred in the preparation and prosecution of this action, pursuant to Idaho Code §§ 12-121 and 30-1442(3)(c), and that the Court award a money judgment in favor of Plaintiff in such amount. Should judgment be taken by default herein, Plaintiff asserts that $5,000 is a reasonable sum for the same.

PAGE 123 OF 144

6.     For such further relief as this Court may deem just and equitable under the circumstances.

DATED this ___14___ day of ___January___, 2009.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

ALAN CONILOGUE
Deputy Attorney General

PAGE 124 OF 144

COMPLAINT – Page 17

# Notice to Members

**MARCH 2005**

**SUGGESTED ROUTING**

Corporate Finance

Internal Audit

Legal & Compliance

Registered Representatives

Retail

Senior Management

**KEY TOPICS**

Broker-Dealer Registration

Due Diligence

Non-Conventional Investments

Private Placements

Real Estate

Rule 2420

Suitability

---

**GUIDANCE**

## Private Placements of Tenants-in-Common Interests

NASD Issues Guidance on Section 1031 Tax-Deferred Exchanges of Real Property for Certain Tenants-in-Common Interests in Real Property Offerings

### Executive Summary

This *Notice* addresses Section 1031 tax-deferred exchanges of real property for certain tenants-in-common (TIC) interests in real property offerings.[1] In a TIC exchange, interests in real property are exchanged for instruments that generally are securities for purposes of the federal securities laws and NASD rules.[2] This *Notice* reminds members that when offering TIC interests that are securities to customers, members and their associated persons must comply with all applicable NASD rules, including those addressing:

- suitability;
- due diligence;
- splitting commissions with unregistered individuals or firms;
- supervision; and
- recordkeeping.

In addition, members relying on private offering exemptions from the registration requirements of the Securities Act of 1933 must ensure that their manner of offering TIC interests complies with all applicable requirements, including the prohibition on general solicitation.

# 05-18

NASD NTM   MARCH 2005


EXHIBIT
G

## Questions/Further Information

Questions concerning this *Notice* should be directed to Joseph E. Price, Vice President, Corporate Financing Department, at (240) 386-4623 or Gary L. Goldsholle, Associate Vice President and Associate General Counsel, Office of General Counsel, Regulatory Policy and Oversight, at (202) 728-8104.

## Characteristics of TIC Exchanges

**Tax Status**

Typically, the sale of an investment, including an investment in real estate, is a taxable event, with the seller being responsible for capital gains taxes on the appreciation of the investment. Under Section 1031 of the Internal Revenue Code, however, an investor in income-producing or rental real estate may exchange the investment for another investment in income-producing or rental real estate of equal or greater value and defer payment of capital gains. In order to qualify for a deferral under Section 1031, an investor must acquire an interest in real estate in the exchange, not an interest in a partnership.

For example, if an investor purchased rental real property in 1972 for $50,000, the property today may be worth $2 million dollars. The sale of the property would cause the seller to incur taxes on the profit. If the owner of the rental property exchanged the rental property for different real property, he could defer paying these taxes. Because of the difficulty of finding equal and offsetting properties for each investor, sponsors have offered interests in larger real estate offerings to pools of investors, in the form of TIC interests. In the example provided, rather than exchanging a rental property valued at $2 million for a similarly valued property, the owner could pool his interest with other similarly situated property owners to acquire property or properties with a large enough value to provide tax deferral for all the investors. If, however, the pool of investors is treated as a partnership under the principles of federal tax law, the exchange will not qualify under Section 1031, and the taxes on the investors' profits will not be deferred under that section.

TIC exchanges have grown dramatically, from approximately $150 million in sales in 2001 to approximately $2 billion in 2004.[3] The driving force behind the growth in TIC exchanges is their favorable tax treatment.

In March 2002, the IRS issued Revenue Procedure 2002-22, 1 C.B. 733 ("Rev. Proc. 2002-22"), which addresses the conditions under which the IRS will consider a request for a ruling that a TIC interest in rental real estate is not an interest in a partnership. Rev. Proc. 2002-22 describes the central characteristic of a tenancy in common (each owner is deemed to own individually a physically undivided part of the entire parcel of property) and sets forth 15 specific conditions that must be met before the IRS will consider issuing a ruling.[4] If the arrangement among the investors is respected as a TIC interest in rental real estate, rather than an interest in a partnership, an exchange may qualify under Section 1031 if the other conditions of that section are satisfied.

PAGE 126 OF 144

## Securities Law Status

When TICs are offered and sold together with other arrangements, they generally would constitute investment contracts and thus securities under the federal securities laws.[5] An investment contract includes any contract, transaction or scheme in which persons invest their money in a common enterprise, with the expectation of profits to be derived predominantly from the efforts of others.[6] TIC interests are generally investment contracts because the tenants in common invest in an undivided fractional interest in the rental real property by pooling their assets and sharing in the risks and benefits of the enterprise, while obtaining profits derived predominantly from the efforts of others, such as through contracts concerning leasing, management and operation of the acquired property. In addition to managing the property, TIC sponsors typically structure the TIC and negotiate the sale price and the loan. The fact that investors in a particular TIC program might have authority to terminate a management contract, or even to maintain or repair the property, would not demonstrate that the TIC interest is not an investment contract.[7]

Although Section 1031 does not apply to an exchange of investment property for "interests in a partnership," "stocks, bonds, notes," or "other securities," the federal securities law definitions of those terms do not control interpretation of the tax laws. Accordingly, the fact that TIC interests typically are investment contracts under securities laws does not inherently disqualify them as property that may be exchanged under Section 1031.

We have become aware that certain states may exempt particular types of TIC transactions from the definition of "security" under state law. We remind members, however, that a determination that a particular transaction does not involve a security for purposes of state law is not determinative for purposes of federal securities law.

## Application of NASD Rules to TIC Exchanges

TIC interests are a type of non-conventional investment ("NCI"). In NTM 03-71, NASD explained that members engaged in the sale of NCIs must ensure that those products are offered and sold in a manner consistent with the member's general sales conduct obligations, as well as address any special circumstances presented by the sale of those products. Among the issues highlighted in NTM 03-71 are members' responsibilities to:

- conduct appropriate due diligence;
- perform a reasonable-basis suitability analysis;
- perform customer specific suitability analysis for recommended transactions;
- ensure that promotional materials used by the member are fair, accurate, and balanced;
- implement appropriate internal controls; and
- provide appropriate training to registered persons involved in the sale of these products.

PAGE 127 OF 144

## Suitability and Due Diligence

Before recommending a TIC exchange, members must have a clear understanding of the investment goals and current financial status of the investor. In many cases, a TIC interest will constitute a significant portion of an investor's total assets. Because of the favorable tax treatment, investors often elect to invest the entire proceeds from the sale of an investment property in a TIC exchange. Concentration of an investor's assets in a single asset class, however, is not suitable for many investors.[8] Members must, with respect to each customer for whom they make a recommendation, consider the risks from over-concentration against the benefits of tax deferral and the investment potential of the underlying real estate asset(s).

TIC interests are illiquid securities. NASD is not aware of any secondary market for TIC interests. Moreover, the tenant-in-common form of ownership may require unanimous consent to sell a TIC interest. The subsequent sale of TIC interests may only be possible at a significant discount to the net asset value of the undivided interest in the real estate. As fees charged in connection with a TIC exchange increase, the money saved as a consequence of tax deferral will be offset. Accordingly, members should consider the effect of fees on each TIC exchange.

TIC exchange sponsors routinely obtain legal opinions regarding whether a particular TIC's offering structure will qualify as a like-kind exchange of real property under Section 1031. Given the importance of that tax treatment, a member should obtain a "clean" legal opinion that a TIC "should" or "will" qualify for exchange under Section 1031. If a sponsor failed to obtain a legal opinion, or only obtained a "more likely than not" opinion, that would be a material fact. In such a case, a member, as part of its due diligence responsibilities would be required to ascertain the specific tax status risks of the TIC exchange and inform the investor of the risks involved.

In making a suitability determination in connection with a recommendation to a customer to purchase a TIC interest, a member must also consider whether the fees and expenses associated with TIC transactions outweigh the potential tax benefits to the customer. TICs structured with high up-front fees and expenses paid to the sponsor and/or salespersons of the selling broker-dealers raise particular concerns about the ability to make a suitable recommendation. In addition, TIC transactions in many cases may not provide complete tax-free exchanges for investors (e.g., in situations where the investor's debt ratio on the replacement property decreases, the difference may result in a taxable event for the investor). Members must take all of these factors into consideration when recommending a particular TIC transaction to a customer.

NTM 03-71 reminds members that the type of due diligence that is appropriate will vary from product to product. NASD staff believes that it is not appropriate for members that recommend a TIC transaction simply to rely on representations made by the sponsor in an offering document. While the nature and extent of verification will vary with the facts and circumstances related to particular sponsors and offerings, members should make a reasonable investigation to ensure that the offering document does not contain false or misleading information. Such an investigation could include background checks of the sponsor's principals, review of the agreements (e.g., property

**PAGE 128 OF 144**

management, purchase and sale, lease and loan agreements) and property inspection.[9] In addition, if the offering document contains projections, members should understand the basis for those projections, and the degree of likelihood that they will occur. For example, members should determine whether any projected yields can reasonably be supported by the property operations.

### Payment of Referral Fees

Real estate agents sometimes refer their customers to broker-dealers that offer TIC exchanges. Moreover, some states may require that a licensed real estate agent participate in the transfer of a TIC interest to an investor. A broker-dealer that pays a fee to the real estate agent or splits its brokerage commissions with the agent in connection with a TIC exchange may be deemed to have violated NASD Rule 2420. This rule generally prohibits the payment of commissions and fees to entities that operate (or based on the proposed activities, would operate) as unregistered broker-dealers. Under Section 3(a)(4)(A) of the Securities Exchange Act of 1934, a "broker" is defined as a person "engaged in the business of effecting transactions in securities for the account of others." Section 15(a) of the Exchange Act sets forth the general registration requirements for brokers and dealers.[10]

The determination of whether an entity should be registered as a broker-dealer rests with the Securities and Exchange Commission. Among the activities the SEC staff has found require registration are:

- receiving transaction-based compensation;
- participating in presentations or negotiations;
- making securities recommendations or discussing or presenting the attributes of a securities investment;
- structuring securities transactions; and
- recommending lawyers, underwriters, or broker-dealers for the distribution or marketing of securities in the secondary market.[11]

It is our understanding that the SEC staff would deem a real estate agent's receipt of a referral fee from a broker-dealer in connection with the sale of a TIC interest to be the type of activity that would render the real estate agent an unregistered broker-dealer. Therefore, under Rule 2420, a member may not pay a real estate agent who is not registered as a broker-dealer for participating in the transfer of a TIC interest that is structured as a security, nor may a member pay such real estate agent for referring TIC business that involves securities.[12] A member also may not evade Rule 2420 through indirect payments; for example, a member may not engage in an arrangement in which it reduces its normal commission for a TIC exchange so that the customer will pay the difference to the real estate agent for participating in the TIC exchange or for referring business to the broker-dealer.

Members that act as TIC sponsors and pay fees to real estate agents should carefully review SEC and NASD precedent and, if necessary, consult an attorney with experience in these matters.

PAGE 129 OF 144

### Licensing, Supervision and Recordkeeping

Associated persons selling TIC interests must have passed the appropriate qualification examinations. Because TICs are typically structured as direct participation programs ("DPPs"), associated persons who sell them generally must have passed either the Series 7 or the Series 22 (Limited Representative — Direct Participation Program securities). In addition, most states require the Series 63 State Agent's license. Also, as with any security, a TIC interest transaction must be reviewed and endorsed by a qualified principal in accordance with the member's supervisory procedures.[13] A qualified principal for supervising TIC interests would be either a General Securities Principal (Series 24) or a DPP principal (Series 39).

In accordance with NASD Rule 3010, members should establish an appropriate supervisory system for the offer and sale of TIC interests. The system should include comprehensive written supervisory procedures reasonably designed to ensure compliance with all applicable rules, including suitability and sales practice requirements related to TIC transactions. The supervisory system should address the sales practice issues discussed in this Notice, including ensuring that neither the member nor its registered representatives pay referral fees or otherwise share transaction-based compensation from TIC transactions with persons that would be deemed to be unregistered broker-dealers.

NASD and SEC record keeping and retention requirements also apply to TIC transactions, and firms should establish appropriate procedures to comply with the applicable requirements in SEC Rules 17a-3 and 17a-4, and NASD Rule 3110. Due to the complexity and varying documentation requirements of TIC exchanges, firms should examine the records they maintain and ensure that applicable record keeping requirements are satisfied.

### Private Offering Exemption

Many TIC transactions are conducted without registration under the Securities Act of 1933 as private placements, most in reliance on Regulation D under that statute.[14] One of the fundamental requirements of most Regulation D offerings is a prohibition on general solicitation.[15] As a result of this prohibition, neither the issuer nor any person acting on its behalf may offer or sell securities based on general solicitation or general advertising, including communications published in any newspaper or similar media or any seminar or meeting whose attendees have been invited by any general solicitation or advertising.

A critical factor in determining whether a communication is appropriately limited, and thus not a "general solicitation," is the existence of an adequate pre-existing relationship between a member and the TIC offeree. An adequate pre-existing relationship will enable the member to evaluate the potential TIC investor's sophistication and financial circumstances.[16]

PAGE 130 OF 144

If a communication is made by general solicitation, then an issuer or its agents will have made a prohibited general solicitation if the communication includes an offer of the privately placed securities. If the communication references a security that is currently offered or contemplated to be offered at the time of the communication, the communication will generally be considered an offer of that security. In addition, if the person solicited via the communication is subsequently offered a security that was currently offered or contemplated to be offered at the time of the communication, the communication would generally be considered an offer of that security.

Members have requested guidance with regard to two specific methods of solicitation or advertising. In the first scenario, a registered representative who also holds a real estate license solicits potential investors by advertising a "real estate" seminar. At the seminar, investors are given a presentation on TIC exchanges and are made aware that the member offers TIC investments to its customers. Since the advertisement for the seminar would be a general solicitation, and since the references to the TIC investments currently being offered by members would be deemed an offer of those securities, the members engaged in such offerings would not be able to rely on the exemption from registration for private placements under Regulation D.[17]

In the second scenario, members place advertisements in newspapers and magazines that indicate that the member sells TIC interests, but the advertisements do not identify any particular TIC investment for sale by the member. Since the advertisement itself is a general solicitation, the issue for members is whether the advertisement includes an offer of securities. In general, such an advertisement would not be deemed an offer of securities if:

- the advertisement is generic;
- the advertisement is not being made in contemplation of an offering; and
- the member has procedures to ensure that an investor solicited via the advertisement will not be offered TICs that the member is currently offering or contemplating offering at the time of the initial contact.

Advertisements that do not meet each of these conditions are likely to be deemed general solicitations and inconsistent with the conditions for private placements conducted in compliance with Regulation D. Moreover, in addition to meeting these conditions, the other requirements under Regulation D also must be met, including establishing an adequate, substantive and pre-existing relationship with the investor and completing a suitability analysis prior to offering TICs to an investor.[18]

## Endnotes

1   This NTM is focused on investors exchanging real estate for TIC interests. NASD is aware that some investors purchase TIC interests directly, without a corresponding exchange of real estate. Many of the concepts discussed herein are applicable to investors in TIC interests who are not exchanging real property.

2   *See, e.g., SEC v. Edwards*, 540 U.S. 389 (2004), 124 S. Ct. 892 (2004). *See also* Triple Net Leasing, LLC, SEC No-Action Letter, SEC No-Act. LEXIS 824 (Aug. 23, 2000). (The staff of the SEC's Division of Corporation Finance stated that it was unable to assure the requestor that it would not recommend enforcement action to the Commission unless the described TIC exchanges subject to a master lease agreement were registered under the Securities Act of 1933 or exempt from such registration.)

3   Terry Fiedler, *Buying a Little Piece of a Big Deal*, Minneapolis Star Tribune, August 16, 2004; Terry Pristin, *Money Flowing New Way to Pool Buyers*, New York Times, September 22, 2004.

4   The 15 factors are: Tenancy in Common Ownership; Number of Co-Owners; No Treatment of Co-Ownership as an Entity; Co-Ownership Agreement; Voting; Restrictions on Alienation; Sharing Proceeds and Liabilities upon Sale of Property; Proportionate Sharing of Profits and Losses; Proportionate Sharing of Debt; Options; No Business Activities; Management and Brokerage Agreements; Leasing Agreements; Loan Agreements; and Payments to Sponsor. Detailed information concerning these conditions is provided in Rev. Proc. 2002-22.

5   TIC interests in real property standing alone generally are not securities, but are a form of ownership in which each tenant (*i.e.*, owner) holds a fractional undivided interest in real property under state real property law.

6   *See, e.g., SEC v. Edwards*, 540 U.S. 389 (2004); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975); *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

7   Rev. Proc. 2002-22 limits the activities of TIC interest holders to those "customarily performed in connection with the maintenance and repair of rental property." Rev. Proc. 2002-22, at 18 (2002). IRB LEXIS 122 *8.

8   *See Stephen Thorlief Rangen*, 52 S.E.C. 1304, 1308 (1997) (finding that broker's recommendations were unsuitable where they resulted in 80 percent of the equity in customers' accounts being concentrated in one stock – "by concentrating so much of their equity in particular securities, [the broker] increased the risk of loss for these individuals beyond what is consistent with the objective of safe, non-speculative investing"). *See also Stephen Thorlief Rangen*, 53 S.E.C. 290, 292 (1997) (Order Denying Motion for Reconsideration) ("[O]ur findings of undue concentration served to support our conclusion that Rangen's recommendations were unsuitable."); *Department of Enforcement v. Daniel R. Howard*, No. C11970032, 2000 NASD Discip. LEXIS 16, at *19 (Nov. 16, 2000) (holding that the broker's recommendations "also led to an undue concentration of these speculative securities, making the recommendations particularly unsuitable"), *aff'd*, Exchange Act Rel. No. 46269, 2002 SEC LEXIS 1909 (July 26, 2002), *aff'd*, No. 02-1939, 2003 U.S. App. LEXIS 19454 (1st Cir. Sept. 19, 2003); *Dane S. Faber*, Exchange Act Rel. No. 49216, 2004 SEC LEXIS 277, at *26 (Feb. 10, 2004) ("We have repeatedly found that high concentration of investments in one or a limited number of speculative securities is not suitable for investors seeking limited risk.").

9   For example, members should make a reasonable investigation to ensure that any agreement associated with the TIC transaction, such as a master lease agreement with a real estate investment trust or its operating partnership, does not mandate a transaction subsequent to the acquisition of the TIC interest that would threaten the tax treatment of the acquisition under Section 1031.

PAGE \_132\_ OF \_144\_

05-18   NASD NTM   MARCH 2005                                                                    8

10 Section 15(a) of the Exchange Act excepts from registration "a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange." The intrastate exception in Section 15(a) traditionally has been narrowly and literally construed. *See* Buy Blue Chip Stocks Direct, SEC No-Action Letter, SEC No-Act. LEXIS 155 (Jan. 24, 1996); Legacy Motors, Inc., SEC No-Act. LEXIS 986 (Jul. 31, 1991); CMS Financial Group Inc., SEC No-Act. LEXIS 673 (Apr. 2, 1990); Don Chamberlain, SEC No-Act. LEXIS 3271 (Aug. 10, 1979); National Educator's Group, Inc., SEC No-Act. LEXIS 2884 (Oct. 17, 1977); American Liberty Financial Corp., SEC No-Act. LEXIS 2629 (Nov. 21, 1975).

11 *See, e.g.,* Dominion Resources, Inc., SEC No-Action Letter, 2000 SEC No-Act. LEXIS 304 (Mar. 7, 2000) (revoking prior no-action relief granted to a firm that assisted corporate and governmental issuers in structuring securities transactions and recommending broker-dealers); John Wirthlin, SEC No-Action Letter, 1999 SEC No-Act. LEXIS 83 (Jan. 19, 1999) (no-action relief denied to a person that would solicit investments in real estate limited partnership interests and would receive a fee if any referred investors purchased those interests); Davenport Management, Inc., SEC No-Action Letter, 1993 SEC No-Act. LEXIS 624 (Apr. 13, 1993) (registration required where business broker receives transaction fees and participates in negotiations); Woodmoor Corporation, SEC No-Action Letter, 1972 SEC No-Act. LEXIS 1052 (Feb. 3, 1972) (real estate agent could not discuss or present any of the attributes of the security, nor provide documents connected with the investment).

12 A member that pays fees to an unregistered person who acts as a finder would not be deemed to violate Rule 2420 if the member obtained a no-action letter from the SEC staff indicating that the finder is not required to register as a broker-dealer.

13 Rule 3010(d).

14 17 CFR 230.501-508.

15 Rule 504 under Regulation D has certain exceptions from the general solicitation limitations.

16 E.F. Hutton & Co. Inc., SEC No-Action Letter, 1985 SEC No-Act. LEXIS 2917 (Dec. 3, 1985) (In determining what constitutes general solicitation, the Division of Corporation Finance underscored the importance of substantive, pre-existing relationships with offerees prior to their being solicited); Bateman Eichler, Hill Richards, Inc., SEC No-Action Letter, 1985 SEC No-Act. LEXIS 2918 (Dec. 3, 1985) (Division concurs in the view that it would not constitute a general solicitation if proposed solicitation that would be generic in nature, would not make any reference to any specific investment currently offered or contemplated to be offered at the time of the solicitation, and persons solicited are not offered any securities that were offered or contemplated for offering at the time of the solicitation); *see also* H.B. Shaine & Co., Inc., SEC No-Action Letter, 1987 SEC No-Act. LEXIS 2004 (May 1, 1987); Woodtrails-Seattle, Ltd., SEC No-Action Letter, 1982 SEC No-Act. LEXIS 2662 (Aug. 9, 1982).

17 *Cf.* Aspen Grove, SEC No-Action Letter, 1982 SEC No-Act. LEXIS 3136 (Dec. 8, 1982) (no-action relief denied where promotional brochure for limited partnership offering would be distributed at a horse auction).

18 *See, e.g.,* Bateman Eichler, Hill Richards, Inc., supra note 16.

©2005. NASD. All rights reserved. *Notices to Members* attempt to present information to readers in a format that is easily understandable. However, please be aware that, in case of any misunderstanding, the rule language prevails.

PAGE 133 OF 144



National Association c
Securities Dealers, In¢
1735 K Street, N.W.
Washington, D.C. 2000¢
(202) 728-8000

**I M P O R T A N T**
SEC NOTICE CONCERNING
INDEPENDENT CONTRACTORS

TO:        All NASD Members

FROM:      Frank J. Wilson

DATE:      August 25, 1982


        Attached is a copy of a letter from the Securities and Exchange Commission
to the NASD on the question of the concept of independent contractors and the respoh-
sibility of member firms for their supervision notwithstanding their designation as such.
All members should closely review this letter.  It would be advisable if it were
distributed to all registered and compliance personnel in your firm, including branch
office personnel.


Attachment

EXHIBIT

H



**SECURITIES AND EXCHANGE COMMISSION**

WASHINGTON, D.C. 20549

DIVISION OF
MARKET REGULATION

June 18, 1982

Mr. Gordon S. Macklin
President
National Association of Securities Dealers, Inc.
1735 K Street, N.W.
Washington, D.C.  20006

Dear Mr. Macklin:

   The Division has become concerned over apparent misunder-
standings within the broker-dealer community about the status
under the Securities Exchange Act of 1934 ("Act") of securities
salespersons designated as independent contractors. Questions
have been raised as to whether these persons are subject to
the Act, whether they come within the definition of associated
persons in Section 3(a)(18) of the Act, and whether they are
employees subject to coverage by a broker-dealer firm's fidelity
bond.  These issues have surfaced recently because of the increas-
ing number of firms denoting their salespersons as independent
contractors.  The Division is concerned that some securities sales-
persons calling themselves independent contractors have failed
either to register with the Commission as broker-dealers or with
a self-regulatory organization ("SRO") as associated persons of
a registered broker-dealer.  In order to forestall any regulatory
problems relating to such developments, I would like to take this
opportunity to restate the Commission's long-standing policy
toward independent contractors.

   The Act requires that a person selling securities be registered
with the Commission as a broker-dealer under Section 15(a) unless
he is an associated person as defined in Section 3(a)(18) of the
Act.  These two categories encompass the universe of persons
engaged in the purchase or sale of securities.  The term indepen-
dent contractor does not appear either in the Act's definition of
associated person in Section 3(a)(18) or elsewhere; thus, merely
denoting a salesperson as an independent contractor does nothing
to resolve the status under the Act of a given individual.  The
critical question is whether a so-called independent contractor's
activities are subject to control by a broker-dealer within the
scope of Section 3(a)(18) of the Act.  Without that control relation-
ship, the salesperson must be registered individually as a broker-
dealer.

   Confusion concerning the issue of "control" seems to be at
the core of the independent contractor debate.  The presumption
that an independent contractor, by definition, cannot be subject
to the control of an employer broker-dealer is incorrect.  Pertinent

PAGE 135 OF 144

Mr. Gordon S. Macklin
June 18, 1982
Page 2

agency law makes it clear that an individual can be denoted properly
as an independent contractor and still be subject to the control
of an employer if their relationship is one of principal and agent
or master and servant.  Distinguishing between the independent
contractor who acts as a principal rather than as a servant or
agent is a question of fact.  Each situation must be scrutinized
to determine how much control can be exercised by a broker-dealer
over the acts of the independent contractor.

It has been a long-standing policy of the Commission that
independent contractors whose selling activities were controlled
by their broker-dealer employers could be characterized as
employees for the purposes of the Act.  As early as 1945, 1/
prior to the introduction of the term "associated person" in the
Act, the Commission identified "control" by a broker-dealer as
the sole standard for determining whether a person was an employee
for purposes of attaching liability to a broker-dealer employer
under Section 15(b) of the Act. 2/ At that same time, the Commission
stated that use of the term "employee" in Commission rules or releas
could include free-lance salesmen or other persons whether or not
such persons would be deemed employees in some statutory context oth
than the federal securities laws.

Neither of these Commission interpretive positions was changed
with the introduction of the concept of "associated person" to the
Act by the Securities Acts Amendments of 1964.  Indeed, the legisla-
tive history of Section 3(a)(18) of the Act makes it clear that
the phrase "associated person" was created "for convenience of
reference" to newly adopted statutory provisions of the Act which
authorized direct disciplinary action against individuals. 3/
There was no desire to alter the Act's applicability to persons
previously held to be employees, i.e., salespersons controlled by
a firm, including those who were independent contractors.  Rather,
the Commission's General Counsel, now Commissioner Loomis, stated
that the purpose of the new definition was to preserve the Act's
existing applicability to persons controlled by a broker-dealer

---

1/   Securities Exchange Act Release No. 3674 (April 9, 1945).

2/   Section 15(b) of the Act authorized the Commission to deny
     or revoke the registration of any broker-dealer if it found
     (1) that such action was in the public interest and (2) that
     such broker-dealer, or any partner, officer, director or
     branch manager, or any person controlling or controlled by
     such broker or dealer, had been convicted within ten years
     or was enjoined in connection with activity involving
     securities, or had willfully violated any provision of the
     Securities Act of 1933 or the Act or any rule thereunder.

3/   S. Rep. No. 379, 88th Cong., 1st Sess. 1642 (1963).

Mr. Gordon S. Macklin
June 18, 1982
Page 3

or controlling a broker-dealer, such as partners, officers and
directors. 4/  Section 3(a)(18) was drafted to incorporate almost
identical language to that already appearing in Section 15(b) of
the Act.  Thus, it is clear that the independent contractor
salesperson may be deemed to be an employee and associated person
under the Act if the requisite control relationship exists.

Accordingly, independent contractor salespersons who act
as independent principals, in selling or inducing the purchase
or sale of securities must be registered with the Commission as
broker-dealers.  Likewise, an independent contractor salesperson,
whose activities are subject to control by a broker-dealer, whether
by contract or otherwise, must be registered with a SRO as an
associated person and should be covered by the employer broker-
dealer's fidelity bond.  Broker-dealers may not shift their
obligation to control or supervise the activities of their inde-
pendent contractor salespersons who are associated persons, and
contractual terms that attempt to limit broker-dealer liability
for the acts of such persons under the federal securities laws
are of no effect.

While we believe the SROs have consistently required their
members to assume appropriate supervisory responsibilities for
independent contractors who are not separately registered as
broker-dealers, we recognize that, in certain instances, SRO
rules may not have been applied to all such independent con-
tractors.  In this connection, we also believe that it is important
to emphasize that a simple denial of "control" of an independent
contractor by a broker-dealer would not remove its responsibility
for supervising that person.  To the extent that a firm forms a
relationship with an independent contractor, that firm would be
responsible for either (1) ensuring that the independent contractor
was registered as a broker-dealer or (2) assuming the supervisory
responsibilities attendant to a relationship with an associated
person.  Therefore, the Commission believes that if a salesperson
was not registered and a broker-dealer permitted him to hold out
to the public that he was acting on behalf of that firm, such
salesperson would be deemed to be an associated person of the
broker-dealer.

We are advising all the SROs of our views on this matter so
that any necessary modifications in their rules and enforcement
procedures which presently conflict with the Commission's position
on the status of independent contractors under the Act can be

---

4/   Part I, Investor Protection, Hearings on H.R. 6789, H.R. 6793,
     S. 1642 Before a Subcommittee of the Committee on Interstate
     and Foreign Commerce, House of Representatives, 88th Cong.,
     1st Sess. 255 (1963).

Mr. Gordon S. Macklin
June 18, 1982
Page 4

made.  It should be noted that the Commission's position does
not prevent a SRO from prescribing rules for its members which
are more restrictive than the Act on how the relationship between
a broker-dealer and its associated persons should be structured.
I hope through the clarification of this matter that we are able
to assure uniform application of the Act to every broker-dealer.
In this regard, if you have any questions concerning independent
contractors, please contact Sarah Ackerson at (202) 272-2857.

Sincerely,

Douglas Scarff
Director.

10b-6 to permit each Seller or an affiliate that acts as trustee or investment advisor to Stock Index Funds that are based on non-discretionary mathematical formulas to make purchases of Lockheed Common Stock on behalf of such Stock Index Funds during the distribution of Lockheed Common Stock owned by or attributable to such Seller, as described herein.

---

[¶ 77,303] . Gordon S. Macklin, NASD; Charles J. Henry, CBOE; Robert J. Birnbaum, AMEX; and John J. Phelan, NYSE.

Securities and Exchange Commission, Division of Market Regulation. June 18, 1982. (Available July 19, 1982.) On SEC Significant List of November 30, 1982. Correspondence in full text.

Exchange Act—Broker-Dealers—Independent Contractors.—In the opinion of the Division of Market Regulation, broker-dealers registered under Section 15(a) of the Act and "associated persons" defined in Section 3(a)(18) comprise the "universe of persons engaged in the purchase or sale of securities". Thus, securities salespersons termed "independent contractors" must be, subject to the amount of control a broker-dealer exercises over them, in one or the other category. For example, if an "independent contractor" does not have a control relationship with a broker-dealer, the salesperson must register individually as a broker-dealer; and, if his activities are subject to control within the scope of § 3(a)(18), he is an associated person.

See ¶ 21,242, "Exchange Act—Definitions; Exchanges" division, Volume 2 and ¶ 25,001, "Exchange Act—Broker-Dealer Regulation", division, Volume 3.

[*SEC Staff Reply*]

The Division has become concerned over apparent misunderstandings within the broker-dealer community about the status under the Securities Exchange Act of 1934 ("Act") of securities salespersons designated as independent contractors. Questions have been raised as to whether these persons are subject to the Act, whether they come within the definition of associated persons in Section 3(a)(18) of the Act, and whether they are employees subject to coverage by a broker-dealer firm's fidelity bond. These issues have surfaced recently because of the increasing number of firms denoting their salespersons as independent contractors. The Division is concerned that some securities salespersons calling themselves independent contractors have failed either to register with the Commission as broker-dealers or with a self-regulatory organization ("SRO") as associated persons of a registered broker-dealer. In order to forestall any regulatory problems relating to such developments, I would like to take this opportunity to restate the Commission's long-standing policy toward independent contractors.

The Act requires that a person selling securities be registered with the Commission as a broker-dealer under Section

15(a) unless he is an associated person as defined in Section 3(a)(18) of the Act. These two categories encompass the universe of persons engaged in the purchase or sale of securities. The term independent contractor does not appear either in the Act's definition of associated person in Section 3(a)(18) or elsewhere; thus, merely denoting a salesperson as an independent contractor does nothing to resolve the status under the Act of a given individual. The critical question is whether a so-called independent contractor's activities are subject to control by a broker-dealer within the scope of Section 3(a)(18) of the Act. Without that control relationship, the salesperson must be registered individually as a broker-dealer.

Confusion concerning the issue of "control" seems to be at the core of the independent contractor debate. The presumption that an independent contractor, by definition, cannot be subject to the control of an employer broker-dealer is incorrect. Pertinent agency law makes it clear that an individual can be denoted properly as an independent contractor and still be subject to the control of an employer if their relationship is one of principal and agent or master and servant. Distinguishing between the independent contractor who acts as a prin-

cipal rather than as a servant or agent is a question of fact. Each situation must be scrutinized to determine how much control can be exercised by a broker-dealer over the acts of the independent contractor.

It has been a long-standing policy of the Commission that independent contractors whose selling activities were controlled by their broker-dealer employers could be characterized as employees for the purposes of the Act. As early as 1945,[1] prior to the introduction of the term "associated person" in the Act, the Commission identified "control" by a broker-dealer as the sole standard for determining whether a person was an employee for purposes of attaching liability to a broker-dealer employer under Section 15(b) of the Act.[2] At that same time, the Commission stated that use of the term "employee" in Commission rules or releases could include free-lance salesmen or other persons whether or not such persons would be deemed employees in some statutory context other than the federal securities laws.

Neither of these Commission interpretive positions was changed with the introduction of the concept of "associated person" to the Act by the Securities Acts Amendments of 1964. Indeed, the legislative history of Section 3(a)(18) of the Act makes it clear that the phrase "associated person" was created "for convenience of reference" to newly adopted statutory provisions of the Act which authorized direct disciplinary action against individuals.[3] There was no desire to alter the Act's applicability to persons previously held to be employees, *i.e.*, salespersons controlled by a firm, including those who were independent contractors. Rather, the Commission's General Counsel, now Commissioner Loomis, stated that the purpose of the new definition was to preserve the Act's existing applicability to persons controlled by a broker-dealer or controlling a broker-dealer, such as partners, of-

ficers and directors.[4] Section 3(a)(18) was drafted to incorporate almost identical language to that already appearing in Section 15(b) of the Act. Thus, it is clear that the independent contractor salesperson may be deemed to be an employee and associated person under the Act if the requisite control relationship exists.

Accordingly, independent contractor salespersons who act as independent principals, in selling or inducing the purchase or sale of securities must be registered with the Commission as broker-dealers. Likewise, an independent contractor salesperson, whose activities are subject to control by a broker-dealer, whether by contract or otherwise, must be registered with a SRO as an associated person and should be covered by the employer broker-dealer's fidelity bond. Broker-dealers may not shift their obligation to control or supervise the activities of their independent contractor salespersons who are associated persons, and contractual terms that attempt to limit broker-dealer liability for the acts of such persons are of no effect.

While we believe the SROs have consistently required their members to assume appropriate supervisory responsibilities for independent contractors who are not separately registered as broker-dealers, we recognize that, in certain instances, SRO rules may not have been applied to all such independent contractors. In this connection, we also believe that it is important to emphasize that a simple denial of "control" of an independent contractor by a broker-dealer would not remove its responsibility for supervising that person. To the extent that a firm forms a relationship with an independent contractor, that firm would be responsible for either (1) ensuring that the independent contractor was registered as a broker-dealer or (2) assuming the supervisory responsibilities

---

1. Securities Exchange Act Release No. 3674 (April 9, 1945).
2. Section 15(b) of the Act authorized the Commission to deny or revoke the registration of any broker-dealer if it found (1) that such action was in the public interest and (2) that such broker-dealer, or any partner, officer, director or branch manager, or any person controlling or controlled by such broker or dealer, had been convicted within ten years or was enjoined in connection with activity

involving securities, or had willfully violated any provision of the Securities Act of 1933 or the Act or any rule thereunder.
3. S. Rep. No. 379, 88th Cong., 1st Sess. 1642 (1963)
4. Part I, Investor Protection, Hearings on H.R. 6789, H.R. 6793, S. 1642 Before a Subcommittee of the Committee on Interstate and Foreign Commerce, House of Representatives, 88th Cong., 1st Sess. 255 (1963).

PAGE 140 OF 144

attendant to a relationship with an associated person. Therefore, the Commission believes that if a salesperson was not registered and a broker-dealer permitted him to hold out to the public that he was acting on behalf of that firm, such salesperson would be deemed to be an associated person of the broker-dealer.

We are advising all the SROs of our views on this matter so that any necessary modifications in their rules and enforcement procedures which presently conflict with the Commission's position on the status of independent contractors under the Act can be made. It should be

noted that the Commission's position does not prevent a SRO from prescribing rules for its members which are more restrictive than the Act on how the relationship between a broker-dealer and its associated persons should be structured. I hope through the clarification of this matter that we are able to assure uniform application of the Act to every broker-dealer. In this regard, if you have any questions concerning independent contractors, please contact Sarah Ackerson at (202) 272-2857.

[*No letter of inquiry in SEC official files. CCH.*]

---

**[¶ 77,304]   Great American Management and Investment, Inc.**

Securities and Exchange Commission, Division of Investment Management. August 27, 1982. (Available September 27, 1982.) On SEC Significant List of November 30, 1982. Correspondence in full text.

Investment Company Act—Definition of Investment Company—Real Estate Development Concern—Mortgage Lending Activities.—A real estate company in business to own, operate and develop real property, and that engages in mortgage lending as a result of providing purchase money financing in connection with the sale of real estate, may conduct these activities without registration under the Investment Company Act. The position of the Division of Investment Management is anchored by a concern that the interest in the property securing the purchase money mortgage notes will in all cases be a mortgage interest under applicable state law.

See ¶ 47,355, "Investment Companies—Definitions" division, Volume 4.

[*Letter of Inquiry*]

On behalf of Great American Management and Investment, Inc. ("Great American" or the "Company") we are writing regarding the possible application of the Investment Company Act of 1940 (the "1940 Act") to Great American should the Company effect the proposed business transactions outlined herein. We have concluded that Great American would not be deemed to be an investment company under the 1940 Act as a result of the circumstances set forth below and we seek your concurrence in our view.

*The Company*

Great American is incorporated under the laws of the State of Delaware and is a real estate company engaged in the business of owning, operating, and developing real properties (which include hotels and motels, apartment communities, residential development properties, and unimproved land) and in the business of real estate mortgage lending,

including mortgage lending resulting from the Company's providing purchase money financing in connection with the sale of its real estate assets from time to time. Great American conducts the majority of its business through wholly-owned subsidiaries that have been incorporated in various Southeastern states.

In order to reduce its outstanding debt and redeploy its assets into other real estate related investments the Company may wish over a period of time to dispose of a substantial amount of the present real property assets of the Company. Upon disposition of these assets, Great American's asset portfolio may consist, for a period of time, primarily of purchase money notes received as partial consideration for the asset sales. To the extent that Great American does not reduce outstanding indebtedness with the proceeds of the disposition or real estate assets, Great American intends to use such proceeds to make

10b-6 to permit each Seller or an affiliate that acts as trustee or investment advisor to Stock Index Funds that are based on non-discretionary mathematical formulas to make purchases of Lockheed Common Stock on behalf of such Stock Index Funds during the distribution of Lockheed Common Stock owned by or attributable to such Seller, as described herein.

---

[¶ 77,303]. Gordon S. Macklin, NASD; Charles J. Henry, CBOE; Robert J. Birnbaum, AMEX; and John J. Phelan, NYSE.

Securities and Exchange Commission, Division of Market Regulation. June 18, 1982. (Available July 19, 1982.) On SEC Significant List of November 30, 1982. Correspondence in full text.

Exchange Act—Broker-Dealers—Independent Contractors.—In the opinion of the Division of Market Regulation, broker-dealers registered under Section 15(a) of the Act and "associated persons" defined in Section 3(a)(18) comprise the "universe of persons engaged in the purchase or sale of securities". Thus, securities salespersons termed "independent contractors" must be, subject to the amount of control a broker-dealer exercises over them, in one or the other category. For example, if an "independent contractor" does not have a control relationship with a broker-dealer, the salesperson must register individually as a broker-dealer; and, if his activities are subject to control within the scope of § 3(a)(18), he is an associated person.

See ¶ 21,242, "Exchange Act—Definitions; Exchanges" division, Volume 2 and ¶ 25,001, "Exchange Act—Broker-Dealer Regulation", division, Volume 3.

*[SEC Staff Reply]*

The Division has become concerned over apparent misunderstandings within the broker-dealer community about the status under the Securities Exchange Act of 1934 ("Act") of securities salespersons designated as independent contractors. Questions have been raised as to whether these persons are subject to the Act, whether they come within the definition of associated persons in Section 3(a)(18) of the Act, and whether they are employees subject to coverage by a broker-dealer firm's fidelity bond. These issues have surfaced recently because of the increasing number of firms denoting their salespersons as independent contractors. The Division is concerned that some securities salespersons calling themselves independent contractors have failed either to register with the Commission as broker-dealers or with a self-regulatory organization ("SRO") as associated persons of a registered broker-dealer. In order to forestall any regulatory problems relating to such developments, I would like to take this opportunity to restate the Commission's long-standing policy toward independent contractors.

The Act requires that a person selling securities be registered with the Commission as a broker-dealer under Section 15(a) unless he is an associated person as defined in Section 3(a)(18) of the Act. These two categories encompass the universe of persons engaged in the purchase or sale of securities. The term independent contractor does not appear either in the Act's definition of associated person in Section 3(a)(18) or elsewhere; thus, merely denoting a salesperson as an independent contractor does nothing to resolve the status under the Act of a given individual. The critical question is whether a so-called independent contractor's activities are subject to control by a broker-dealer within the scope of Section 3(a)(18) of the Act. Without that control relationship, the salesperson must be registered individually as a broker-dealer.

Confusion concerning the issue of "control" seems to be at the core of the independent contractor debate. The presumption that an independent contractor, by definition, cannot be subject to the control of an employer broker-dealer is incorrect. Pertinent agency law makes it clear that an individual can be denoted properly as an independent contractor and still be subject to the control of an employer if their relationship is one of principal and agent or master and servant. Distinguishing between the independent contractor who acts as a prin-

cipal rather than as a servant or agent is a question of fact. Each situation must be scrutinized to determine how much control can be exercised by a broker-dealer over the acts of the independent contractor.

It has been a long-standing policy of the Commission that independent contractors whose selling activities were controlled by their broker-dealer employers could be characterized as employees for the purposes of the Act. As early as 1945,[1] prior to the introduction of the term "associated person" in the Act, the Commission identified "control" by a broker-dealer as the sole standard for determining whether a person was an employee for purposes of attaching liability to a broker-dealer employer under Section 15(b) of the Act.[2] At that same time, the Commission stated that use of the term "employee" in Commission rules or releases could include free-lance salesmen or other persons whether or not such persons would be deemed employees in some statutory context other than the federal securities laws.

Neither of these Commission interpretive positions was changed with the introduction of the concept of "associated person" to the Act by the Securities Acts Amendments of 1964. Indeed, the legislative history of Section 3(a)(18) of the Act makes it clear that the phrase "associated person" was created "for convenience of reference" to newly adopted statutory provisions of the Act which authorized direct disciplinary action against individuals.[3] There was no desire to alter the Act's applicability to persons previously held to be employees, *i.e.*, salespersons controlled by a firm, including those who were independent contractors. Rather, the Commission's General Counsel, now Commissioner Loomis, stated that the purpose of the new definition was to preserve the Act's existing applicability to persons controlled by a broker-dealer or controlling a broker-dealer, such as partners, of-

ficers and directors.[4] Section 3(a)(18) was drafted to incorporate almost identical language to that already appearing in Section 15(b) of the Act. Thus, it is clear that the independent contractor salesperson may be deemed to be an employee and associated person under the Act if the requisite control relationship exists.

Accordingly, independent contractor salespersons who act as independent principals, in selling or inducing the purchase or sale of securities must be registered with the Commission as broker-dealers. Likewise, an independent contractor salesperson, whose activities are subject to control by a broker-dealer, whether by contract or otherwise, must be registered with a SRO as an associated person and should be covered by the employer broker-dealer's fidelity bond. Broker-dealers may not shift their obligation to control or supervise the activities of their independent contractor salespersons who are associated persons, and contractual terms that attempt to limit broker-dealer liability for the acts of such persons under the federal securities laws are of no effect.

While we believe the SROs have consistently required their members to assume appropriate supervisory responsibilities for independent contractors who are not separately registered as broker-dealers, we recognize that, in certain instances, SRO rules may not have been applied to all such independent contractors. In this connection, we also believe that it is important to emphasize that a simple denial of "control" of an independent contractor by a broker-dealer would not remove its responsibility for supervising that person. To the extent that a firm forms a relationship with an independent contractor, that firm would be responsible for either (1) ensuring that the independent contractor was registered as a broker-dealer or (2) assuming the supervisory responsibilities

---

1. Securities Exchange Act Release No. 3674 (April 9, 1945).

2. Section 15(b) of the Act authorized the Commission to deny or revoke the registration of any broker-dealer if it found (1) that such action was in the public interest and (2) that such broker-dealer, or any partner, officer, director or branch manager, or any person controlling or controlled by such broker or dealer, had been convicted within ten years or was enjoined in connection with activity

involving securities, or had willfully violated any provision of the Securities Act of 1933 or the Act or any rule thereunder.

3. S. Rep. No. 379, 88th Cong., 1st Sess. 1642 (1963).

4. Part I, Investor Protection, Hearings on H.R. 6789, H.R. 6793, S. 1642 Before a Subcommittee of the Committee on Interstate and Foreign Commerce, House of Representatives, 88th Cong., 1st Sess. 255 (1963).

attendant to a relationship with an associated person. Therefore, the Commission believes that if a salesperson was not registered and a broker-dealer permitted him to hold out to the public that he was acting on behalf of that firm, such salesperson would be deemed to be an associated person of the broker-dealer.

We are advising all the SROs of our views on this matter so that any necessary modifications in their rules and enforcement procedures which presently conflict with the Commission's position on the status of independent contractors under the Act can be made. It should be noted that the Commission's position does not prevent a SRO from prescribing rules for its members which are more restrictive than the Act on how the relationship between a broker-dealer and its associated persons should be structured. I hope through the clarification of this matter that we are able to assure uniform application of the Act to every broker-dealer. In this regard, if you have any questions concerning independent contractors, please contact Sarah Ackerson at (202) 272-2857.

[*No letter of inquiry in SEC official files. CCH.*]

---

**[¶ 77,304]   Great American Management and Investment, Inc.**

Securities and Exchange Commission, Division of Investment Management. August 27, 1982. (Available September 27, 1982.) On SEC Significant List of November 30, 1982. Correspondence in full text.

Investment Company Act—Definition of Investment Company—Real Estate Development Concern—Mortgage Lending Activities.—A real estate company in business to own, operate and develop real property, and that engages in mortgage lending as a result of providing purchase money financing in connection with the sale of real estate, may conduct these activities without registration under the Investment Company Act. The position of the Division of Investment Management is anchored by a concern that the interest in the property securing the purchase money mortgage notes will in all cases be a mortgage interest under applicable state law.

See ¶ 47,355, "Investment Companies—Definitions" division, Volume 4.

**[*Letter of Inquiry*]**

On behalf of Great American Management and Investment, Inc. ("Great American" or the "Company") we are writing regarding the possible application of the Investment Company Act of 1940 (the "1940 Act") to Great American should the Company effect the proposed business transactions outlined herein. We have concluded that Great American would not be deemed to be an investment company under the 1940 Act as a result of the circumstances set forth below and we seek your concurrence in our view.

*The Company*

Great American is incorporated under the laws of the State of Delaware and is a real estate company engaged in the business of owning, operating, and developing real properties (which include hotels and motels, apartment communities, residential development properties, and unimproved land) and in the business of real estate mortgage lending, including mortgage lending resulting from the Company's providing purchase money financing in connection with the sale of its real estate assets from time to time. Great American conducts the majority of its business through wholly-owned subsidiaries that have been incorporated in various Southeastern states.

In order to reduce its outstanding debt and redeploy its assets into other real estate related investments the Company may wish over a period of time to dispose of a substantial amount of the present real property assets of the Company. Upon disposition of these assets, Great American's asset portfolio may consist, for a period of time, primarily of purchase money notes received as partial consideration for the asset sales. To the extent that Great American does not reduce outstanding indebtedness with the proceeds of the disposition or real estate assets, Great American intends to use such proceeds to make